# In the United States Court of Federal Claims

Nos. 23-210, 23-311
(Filed:  27 December 2023[*])

```
*****************************************
GLOBAL K9 PROTECTION GROUP, LLC,     *
                                     *
              Plaintiff,             *
                                     *
v.                                   *
                                     *
THE UNITED STATES,                   *        No. 23-210
                                     *
              Defendant,             *
                                     *
and                                  *
                                     *
AMERICAN K-9 DETECTION SERVICES,     *
LLC,                                 *
                                     *
              Defendant-Intervenor.  *
                                     *
*****************************************
*****************************************
MICHAEL STAPLETON ASSOCIATES,        *
LTD.,                                *
                                     *
              Plaintiff,             *
                                     *
v.                                   *        No. 23-311
                                     *
THE UNITED STATES,                   *
                                     *
              Defendant.             *
                                     *
*****************************************
```

    *Walter Brad English*, Maynard Nexsen PC, with whom were *Jon D. Levin*, *Emily J. Chancey*, and *Nicholas P. Greer*, all of Huntsville, AL, for plaintiff Global K9 Protection Group LLC.

---

[*] This opinion was originally filed under seal on 22 December 2023 pursuant to the protective order in this case. The Court provided the parties an opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 27 December 2023 at 5:00 p.m. (ET).  The parties proposed redactions on 27 December 2023 by the deadline.  The Court accepts the parties' proposed redactions and reissues the order, with redacted language replaced as follows:  "[XXXXX]."

*Ryan Christopher Bradel*, Ward & Berry PLLC, of Tysons, VA for plaintiff Michael Stapleton Associates, LTD.

*Steven Gillingham*, Assistant Director, with whom were *Reginald T. Blades*, Assistant Director, *Patricia M. McCarthy*, Director*, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, all of Washington, DC, for defendant.

*Daniel Jonathan Strouse*, Cordatis LLP, with whom were *Joshua D. Schnell*, all of Arlington, VA, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiffs Global K9 Protection Group, LLC ("GK9") and Michael Stapleton Associates, Ltd. ("MSA") bring post-award bid protests against the United States Postal Service (USPS) and defendant-intervenor American K-9 Detection Services, LLC ("AMK9") in response to USPS's award of a contract for United States airport mail package explosive detection services. Pending before the Court are plaintiffs' motions to supplement the administrative record, plaintiffs' motions for judgment on the administrative record (MJAR), and the government's and AMK9's cross-MJARs.

The solicitation at issue in this case is nearly four years old. Throughout more than three years of litigation, there have been multiple re-solicitations, re-awards, and remands. Despite years of scrutiny and several chances to correct course, USPS continues to falter in its award decisions. Most recently, in September 2022, USPS issued an award to latecomer K2 Solutions, Inc. ("K2"). GK9 raised issues with K2's past performance in March 2023 and maintains K2 materially misrepresented the quality of its past work in its proposal: "Everybody . . . knows K2 lied. [K2] said they met contract requirements. Everybody knows that's not true." 30 Nov. 2023 Oral Arg. Tr. ("Tr.") at 61:20–25. Although aware of these allegations—and the 200 pages of supporting evidence—for at least nine months, USPS has not investigated GK9's claims. Instead, despite having significant evidence of K2's misrepresentation plus newly evolved ongoing K2 performance issues, USPS's contracting officer recently reaffirmed award of the contract to K2. When asked by the Court days before the November 2023 oral argument how long a remand to review K2's allegations would take, USPS stated a "remand process would likely be resolved by March 2024"—*four more months*. 20 Nov. 2023 JSR at 3. Placing this into perspective, if the Court granted USPS's request for four additional months, by the time the agency completes review, it will have known about credible allegations of material misrepresentations for *12 months*. The government requests this extensive timeline, despite admitting the case concerns "plane[s] falling out of the sky." Tr. at 100:19–20 (the government). In contrast, USPS has acted with less delay in responding to K2's severe underperformance of the instant contract. Indeed, USPS initiated proceedings to potentially terminate K2 *sua sponte*. In line with its performance history, K2's performance here is so poor USPS continues to rely on MSA for services related to the original 2020 award, which MSA was previously enjoined from in a 2022-filed protest.

For the following reasons, the Court now (1) grants plaintiff GK9's Motion to Supplement the Administrative Record and grants the government's supplementation of the administrative record; (2) grants in part and denies in part plaintiff GK9's Motion for Judgment on the Administrative Record and grants award of a permanent injunction disqualifying K2 from performance; (3) grants in part and denies in part the government's Cross-motion for Judgment on the Administrative Record; (4) grants in part and denies in part AMK9's Cross-motion for Judgment on the Administrative Record; (5) finds as moot plaintiff MSA's Motion for Judgment on the Administrative Record; and (6) finds as moot plaintiff MSA's Motion to Supplement the Administrative Record.

## I.    Factual Background

This case relates to prior bid protests filed before this Court:  *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248 (2021) and *Michael Stapleton Assocs., Ltd v. United States*, 163 Fed. Cl. 297 (2022).

### A.    Prior Related Bid Protests

The Court provided extensive background related to this case in November 2022 in *Michael Stapleton Assocs., Ltd*:

**Aircraft Operator Standard Security Program**

Following the September 11th attacks, the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission") issued a federal mandate to the Transportation Security Administration ("TSA") requiring "100% screening of all air cargo on passenger airlines by 2020."  Admin. R. at 3 (USPS Supply Management Competitive Purchase Plan), ECF No. 23-2 ("2020 AR"), *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020); *see also* 49 U.S.C. § 44901 ("The Administrator of the [TSA] shall provide for the screening of all passengers and property, including United States mail, . . . that will be carried aboard a passenger aircraft . . . .").  . . .

To grant the USPS control over the package screening process and facilitate development of a program expanding the number of sites with screening capabilities, TSA is currently developing a policy to relieve TSA from package screening and "require the shift of the explosives detection screening to [the USPS]." *Id.*  . . . .

On 14 August 2020, the USPS issued a request for information ("RFI") inviting "vendors in the marketplace to register their interest in providing services to the USPS should the USPS decide to develop the [Third-Party Canine-Cargo ('3PK9' or 3PK9-C')] program." *Id.* at 24 (RFI).  The RFI was sent to seven potential offerors "from TSA's list of SAFETY Act certified and in-process SAFETY Act certified organizations[.]" *Id.* at 6–7 (USPS Supply Management Competitive Purchase Plan) . . . .

The USPS's Competitive Purchase Plan ("CPP") explained its need for mail screening and resolution services. *Id.* at 3–4 (USPS Supply Management CPP) . . . .The government acknowledged requiring SAFETY Act certification would limit the number of offerors who could submit responsive proposals but determined "this will not preclude diversity in the types and sizes of offerors." *Id.* The CPP reiterated such a contract "will allow [the USPS] to control the [mail] screening process[.]" *Id.* at 4 . . . .

The USPS issued a solicitation in September of 2020 ("2020 solicitation"). *Id.* at 53–151 (2020 SOW, 2020 Solicitation Instructions and Evaluation Criteria, and 2020 Solicitation).

## [] The Solicitation

On 22 September 2020, the USPS issued Solicitation No. 2B-20-A-0087 for "the procurement of Third-Party Canine-Mail Screening with Real-Time X-ray Analysis [and] Interpretation." *Id.* at 118 (2020 Solicitation). The solicitation contemplated "a four-year base period award with two two-year renewal options." *Id.* at 97 (2020 SOW). The pricing method for the contract contemplated: (1) a contract for 3PK9-C services; (2) a contract for alarm resolution services; or (3) a combined contract for both 3PK9-C services and alarm resolution. *Id.* . . .

Offerors would be evaluated under three factors: (1) capability (explosive detection canines ("EDC") service); (2) capability (alarm resolution); and (3) past performance. 2020 AR at 112–13. . . .

## [] Contract Award

Each of the seven offerors submitted a proposal for combined 3PK9-C services and alarm resolution services, but MSA was recommended for the award as the CO determined MSA "provide[d] the best tradeoff between technical, risk, and price." *Id.* at 805 (Award Recommendation). On 9 November 2020, the USPS informed AMK9 and GK9 it awarded the contract to MSA. *See* AMK9 2020 Am. Compl., Ex. 1 at 2 (Unsuccessful Offeror Notice), ECF No. 20-1, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020); GK9 2020 Am. and Restated Compl. at 5, ECF No. 82, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020).

## [] AMK9's Post-Award Administrative Dispute and Appeal

AMK9 filed a post-award business disagreement with the USPS on 27 November 2020, challenging the award of the contract to MSA. 2020 AR at 1976–90 (AMK9's Post-Award Protest Before the CO). AMK9 alleged an "unreasonable and inconsistent" evaluation of its proposal and "clear [OCIs] that should have warranted MSA's removal from consideration for award." *Id.* at 1976. AMK9

further alleged the USPS used an "unstated evaluation factor" to evaluate AMK9's proposal, assigned unreasonable weakness to AMK9's proposal, "ignored portions of AMK9's proposal[,]" conducted an unreasonable tradeoff analysis, and "failed to consider the [OCI]." *Id.* at 1981–90.

## [] GK9's Administrative Dispute and Appeal

On 30 November 2020, GK9 filed a post-award business disagreement with the USPS. *Id.* at 1937–45 (GK9's Post-Award Protest Before the CO). GK9 disputed USPS's effective identification, and resolution, of an "obvious" OCI involving MSA. *Id.* at 1942–44. GK9 further alleged the USPS improperly evaluated technical aspects of its proposal, including aspects related to x-ray technology, the number of command center locations, past rollouts, and projected staffing to meet the rollout schedule. *Id.* at 1944.

## [] The USPS's Second Pre-Award Investigation of MSA's Potential OCI

The CO denied AMK9's post-award business disagreement on 7 December 2020. 2020 AR at 1991–98 (CO's Response to AMK9's Post-Award Protest). On 17 December 2020, AMK9 appealed to the Supplier Disagreement Resolution Official ("SDRO"), who denied the appeal on 21 April 2021. *Id.* at 1999–2016 (AMK9's Appeal to the SDRO), 2017–26 (SDRO's Response to AMK9's Appeal). The USPS CO denied GK9's post-award business disagreement on 10 December 2020. *Id.* at 1946–51 (CO's Response to GK9's Post-Award Protest). On 17 December 2020, GK9 appealed the CO's denial to the USPS SDRO. *Id.* at 1952–63 (GK9's Appeal to the SDRO). On 13 April 2021, the SDRO denied GK9's appeal. *Id.* at 1964–72 (SDRO's Response to GK9's Appeal).

## [] *American K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020)

The protesters disputed the USPS's decision to combine several requirements into one procurement in a way that benefitted MSA, and the protestors further argued MSA had distinct advantages due to purported conflicts of interest. 2020 Compl. at 1. After briefing and oral argument, this Court twice remanded the case to the USPS to conduct a full OCI investigation. *See Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614, 2021 WL 1086225 (Fed. Cl. Mar. 19, 2021); *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248 (2021). After the second remand, the CO found MSA had OCIs involving unequal access to information and biased ground rules. *See* 2020 AR at 3665–84 ("CO Franklin's Report"). The USPS took corrective action on 18 February 2022 to mitigate the OCI by shortening MSA's contract by one year and cancelling all renewal options for the contract. *Id.* at 3682–83. The USPS also issued two new solicitations—one for Third-Party Canine Mail Screening ("Canine Screening") services and one for Mail Screening Alarm Resolution ("Alarm Resolution") services (collectively, "2022 re[-]solicitation"). Admin. R. at 6806–6962 (Canine Screening Solicitation), ECF

No. 48-4 ("2022 AR"); 2022 AR at 5877–5966 (Alarm Resolution Solicitation), ECF No. 44-5.

**[] MSA's Post-Award Business Disagreement Protest**

MSA filed a business disagreement with the CO on 7 April 2022 arguing the services should remain bundled and alleging the 2022 solicitations contained patent ambiguities. *See* 2022 AR at 6525–34 (MSA's Initial Disagreement), ECF No. 44-13. The CO denied MSA's disagreement, stating the USPS learned "that a single award to one supplier was unnecessary[,]" and "separating the services would allow for more companies to compete . . . [and] this increased competition would better serve [the USPS]'s objective of obtaining best value." *Id.* at 6535 (CO Baker's Decision Letter to MSA). The CO also found MSA's allegations of patent ambiguities in the solicitations were unfounded. *Id.* at 6537–38. MSA appealed the denial to the SDRO, who upheld the CO's decision. *See id.* at 6597–6605 (SDRO's Decision Letter to MSA), ECF No. 44-12.

**[] AMK9 and GK9's Post-Award Business Disagreement Protests**

Around the same time as MSA's agency-level challenges, offerors GK9 and AMK9 submitted business disagreements; they argued the USPS's 18 February 2022 corrective actions were insufficient because MSA was still allowed to compete despite allegedly having an unfair advantage. *See* 2022 AR at 6326–43 (AMK9's Initial Business Disagreement), ECF No. 44-10, 6344–50 (GK9's Initial Business Disagreement). The CO initially denied AMK9's and GK9's business disagreements. *See id.* at 6395–6402 (CO's Decision Regarding AMK9's Business Disagreement), 6403–11 (CO's Decision Regarding GK9's Business Disagreement). GK9 and AMK9 appealed, and the SDRO denied AMK9's and GK9's business disagreements in part and sustained them in part. *See* 2022 AR at 6412–28 (AMK9's 2022 Appeal to the SDRO), 6455–63 (GK9's 2022 Appeal to the SDRO), ECF No. 44-11, 6606–20 ("SDRO's AMK9 Decision"), 6630–48 ("SDRO's GK9 Decision"). The agency amended the 2022 re[-]solicitation to mitigate MSA's advantage as an incumbent but declined to exclude MSA from competing for awards under the 2022 re[-]solicitation. *Id.* at 6619, 6646–47.

*Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. at 308–313 (2022).

**B.**   ***Michael Stapleton Assocs., Ltd v. United States*, 163 Fed. Cl. 297 (2022)**

In May 2022, AMK9, GK9, and MSA filed pre-award bid protests challenging USPS's re-solicitation, which the Court consolidated on 13 June 2022. *See Michael Stapleton Assocs., Ltd. v. United States*, Fed. Cl. No. 22-573, ECF No. 19. On 29 September 2022, USPS issued awards to MSA, AMK9, and K2 pursuant to 2022 re-solicitation. *See* AR at 11163–93 ("Supply Management Competitive Award Recommendation). Further:

[O]n 23 November 2022, the Court made a "determination on the motions and generally agree[d] with the USPS's proposed plans to phase-out MSA and disqualify MSA from future performance as a result of [organizational conflict of interest ('OCI')]-tainted solicitations" but required "operational detail from the USPS" in the form of "additional briefing" before entering a final judgment.

The 23 November 2022 order necessitated a supplemental response from the government, and instructed: "If desired, any plaintiff may respond" to "the USPS's proposed plans to phase-out MSA and disqualify MSA from future performance as a result of OCI-tainted solicitations." All parties—except MSA—responded to the government's additional briefing on the remaining reevaluation issues identified in the 23 November 2022 order. AMK9 did not object to the USPS's proposed roll-out, but GK9 objected to certain [of] the USPS['s] rollout changes. Specifically, GK9 furnished arguments regarding: (1) the USPS's rationale for reevaluating only the clusters awarded to MSA and not the clusters awarded to [K2], a third-party screening service, and AMK9; and (2) the USPS characterizing GK9 . . . MSA later filed a motion for a stay or injunction pending an appeal of the Court's 23 November 2022 order and motion to expedite consideration of its motion to preserve the status quo of the USPS's 2022 re[-]solicitation until the Federal Circuit can hear MSA's appeal.

*Michael Stapleton Assocs., Ltd. v. United States*, 164 Fed. Cl. 455, 458–59 (2023).

### C.   *Michael Stapleton Assocs., Ltd. v. United States*, 164 Fed. Cl. 455 (2023)

On 31 January 2023, the Court ordered USPS to disqualify MSA from the re-solicitation due to its failure to mitigate MSA's OCI. 31 Jan. 2023 Order*, Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. Jan. 31, 2023), ECF No. 106; *see also Michael Stapleton Assocs., Ltd. v. United States*, 164 Fed. Cl. 455 (2023). On 6 February 2023, USPS conducted a new best value decision for each cluster after the Court disqualified MSA in its 31 January 2023 Order. AR at 12442–12469. The February 2023 decision superseded the September 2022 award. *See id.*

In the final best value determination from February 2023, USPS chose to use a two-supplier solution rather than a three-supplier solution, awarding seven clusters to K2 and four to AMK9. *See* AR at 12461–62. USPS selected K2 for the International, Central East, Southwest, Northwest, and Central North Clusters. AR at 12458–59. USPS selected AMK9 for the Mid-Atlantic, Central South, Southeast and Northeast Clusters. *Id.* GK9 bid on the International, Southwest, Northwest, and Northeast Clusters, but USPS did not select GK9 as an awardee. AR at 12456–57, 12461–62. USPS selected K2 for the International Cluster because "K2 has the highest technical ranking with the lowest price." AR at 12458. USPS chose K2 for the Southwest Cluster because "K2 has a higher technical ranking" and GK9 "has the lowest technical ranking," even though "[GK9] has the lowest price." AR at 12459 ("While the CO acknowledges that Global has a lower price, K2's price is only [XXXXX]% percent higher (total base plus both options), a \$[XXXXX] difference and K2 has a higher technical ranking. Due to the numerous weaknesses in Global's technical proposal, which resulted in a technical rating of

only Fair (two adjectival ratings below K2), Global is not considered as the best value for this cluster."). USPS chose K2 for the Northwest Cluster because "K2 has the highest technical ranking with the lowest price." *Id.* USPS selected AMK9 for the Northeast Cluster because "AMK9 had the second highest technical ranking with the lowest price." AR at 12460.

## II.     Procedural History Before the Court

The procedural history in case Nos. 23-210, 23-311 is as follows:

On 13 February 2023, plaintiff [GK9] filed its complaint in this bid protest. *See* Compl., *Global K9 Protection Group, LLC v. United States*, No. 23-210, (Fed. Cl. Feb. 13, 2023), ECF No. 1. On 17 February 2023, [AMK9] filed an unopposed motion to intervene, *see* AMK9's Mot. to Intervene, *Global K9 Protection Group, LLC v. United States, No. 23-210*, (Fed. Cl. Feb. 17, 2023), ECF No. 13, which the Court granted the same day. *See* 17 Feb. 2023 Order, *Global K9 Protection Group, LLC v. United States*, No. 23-210 (Fed. Cl. Feb. 17, 2023), ECF No. 15. Also, on 17 February 2023, [MSA] filed a motion to intervene . . . . *See* MSA's Mot. to Intervene, *Global K9 Protection Group, LLC v. United States*, No. 23-210 (Fed. Cl. Feb. 17, 2023), ECF No. 14 . . . .

On 1 March 2023, MSA filed its complaint in *Michael Stapleton Associates, LTD v. United States*, No. 23-311 (Fed. Cl. March 1, 2023), along with a notice the protest is directly related to case number 23-210, captioned *Global K9 Protection Group, LLC v. United States*. *See* Compl., *Michael Stapleton Associates, LTD v. United States*, No. 22-311 (Fed. Cl. March 1, 2023), ECF No. 1; Notice of Directly Related Cases, *Michael Stapleton Associates, LTD v. United States*, No. 2[3]-311 (Fed. Cl. March 1, 2023), ECF No. 4. During a status conference with the parties in the above-mentioned cases, on 2 March 2023, the parties agreed case numbers 23-210 and 23-311 should be consolidated under Rule 42 of the Rules of the Court of Federal Claims ("RCFC"). *See* 2 Mar. 2023 Order at 3.

6 Mar. 2023 Order at 1–2, ECF No. 25. On 6 March 2023, the Court consolidated case numbers 23-210 and 23-311. *Id.* at 2. On 19 May 2023, the Court issued an Order recounting additional procedural history in this case:

On 6 March 2023, the Court stayed "the proceedings in the consolidated cases pending the resolution of agency-level disagreements . . . ." 6 Mar. 2023 Order at 3, ECF No. 25. On 18 May 2023, the parties filed a joint status report [(JSR)], describing the [SDRO] "had previously dismissed MSA's SDRO appeal on 15 December 2022," and "the SDRO denied GK9's SDRO appeal" on 11 May 2023. 18 May 2023 JSR at 1–2, ECF No. 28.

19 May 2023 Order at 1–2, ECF No. 29. On 19 May 2023, the Court lifted the 6 March 2023 stay. *Id.* Further:

On 7 July 2023, plaintiffs in these consolidated bid protests . . . each filed a motion for judgment on the Administrative Record ("MJAR"), ECF Nos. 39, 41. [On the same day, MSA filed a motion to supplement the administrative record, ECF No.

38 ("MSA Mot. to Suppl. Admin. R.").  On 18 July 2023, GK9 filed its Motion to
Supplement the Administrative Record, ECF No. 41 ("GK9 Mot. to Suppl.").
AMK9 responded to plaintiffs' motions to supplement on 4 August.  AMK9
Response to Motions to Supplement, ECF No. 45 ("AMK9 Resp. to Mots. to
Suppl.")]  [Also o]n 4 August 2023, intervenor . . . AMK9[] and the government
each filed a cross-MJAR and response[.  *See* Gov't's Cross-Mot. and MJAR, ECF
No. 46; AMK9 Resp., ECF No. 44.]  The government's cross-MJAR contained its
response to plaintiffs' supplementation motions.  *See generally* Gov't's Cross-Mot.
and MJAR.]   On 18 August 2023, MSA and GK9 each responded to the
government's and AMK9's [c]ross-MJARs and replied in support of their
respective MJARs, ECF Nos. 49, 51.  On 28 August 2023, the government and
AMK9 each replied in support of their respective Cross-MJARs, ECF Nos. 53, 54.
On 31 August 2023, the government filed under seal a status report ("SR")
including updates on the contract and an updated roll-out schedule.  SR, ECF No.
56.

12 Sept. 2023 Order at 1–2, ECF No. 58.

    On 18 September 2023, after MJAR briefing concluded, the government notified the
Court of "K2 performance issues" necessitating "changes to the rollout schedule."  18 Sept. 2023
JSR at 1, 3, ECF No. 59.  In light of this update, in which the government indicated some or all
of GK9's protest could be mooted as "there may be a transition or change in service[s]" if "K2
fails to cure its performance deficiencies," *id.* at 3, the Court held a status conference on 21
September 2023.  Given the government's indication it might transition away from K2, *id.*, on 22
September 2023 the Court ordered the parties update it regarding K2, including information
gleaned from the government's upcoming meeting with K2, by 3 October 2023.  *See* Order, ECF
No. 60.  After the 3 October 2023 update, in which the government stated it failed to meet with
K2 but would "allow 60 days [until 1 December 2023] . . . for K2 to remedy its deficient
performance[,]" 3 Oct. 2023 JSR at 2, ECF No. 61, the Court granted the parties' request for
supplemental MJAR briefing regarding these contract administration issues, further delaying
resolution of this case.  *See* Order, ECF No. 62.  The 3 October 2023 JSR provided the Court
insight into K2's underperformance.  3 Oct. 2023 JSR at 3 ("On March 3 [2023] in Columbus, a
dog was unable to do "inverted V" searches, so a new handler-canine team from K2 had to take
over. . . .  On March 9 [2023] in the Cincinnati rollout, there were several improper handling
issues, such as handlers not using gloves, not doing safety checks prior to screening, and
stickering without putting their dog away first. . . .  On March 22 [2023] in Chicago, K2 failed to
satisfy contract requirements because the K2 storage cabinet with necessary materials was locked
without any key available on site.  On March 24 [2023] in Detroit, a handler was late with
conflicting explanations.  And, when the canine alerted, that handler was not familiar with the
refined screening process.").  On 17 October 2023, GK9 filed its Supplement to its MJAR
regarding its claim of K2's material misrepresentation and K2's ongoing performance issues.
GK9's Suppl. Br., ECF No. 63.  On 31 October 2023, the government and MSA each responded
to GK9's Supplement, ECF Nos. 64, 65.  On 7 November 2023, GK9 submitted its Reply in
support of its MJAR.  GK9 Reply, ECF No. 67.  On 20 November 2023, the parties filed a JSR
addressing their positions regarding remand, should the Court ultimately do so.  20 Nov. 2023
JSR at 1–3, ECF No. 69.  In the 20 November JSR, the government stated:  (1) it planned to push

the conclusion of K2's probationary period from 1 December to "approximately Jan[uary 15, 2024]"; and (2) any remand would likely take until March 2024. *Id.* On 30 November 2023, the Court held oral argument on the pending motions.

### III.    GK9's Motion for Judgment on the Administrative Record Arguments[1]

####    A.    GK9's Argument K2 Should Be Disqualified for Material Misrepresentation and Motion to Supplement the Administrative Record

GK9 argues "K2 should be disqualified from this competition due to its material misrepresentation about its past performance," specifically because K2 misrepresented its performance capabilities in connection with prior work for GK9 during 2021. GK9 MJAR at 24–25. Relying upon the Beason Declaration attached to its Amended Complaint, GK9 cites numerous prior performance deficiencies by K2, most of which surround staffing issues and a potential misrepresentation of K2's certified team capability. *Id.* at 25–27; *see* GK9 Am. Compl. ¶ 18, Ex. A, ECF No. 40-1 [hereinafter Beason Decl.]. Specifically, GK9 argues "K2 misrepresent[ed] that it '[met] all contract requirements'" when it caused many performance failures and "misrepresented [the] number of teams" used to support GK9, which was approximately 66 *individuals* rather than 78 *teams*. GK9 MJAR at 28; AR at 10392 ("In order to meet this requirement, K2's Canine Training Academy (CTA) certified 78 3PK9-C teams in a 6-month period to meet all contract requirements in the latter part of 2021."). Using the Beason Declaration, GK9 assumes K2 represented in its proposal for this Solicitation "every . . . person who ever billed time to the [GK9] Subcontract constituted a 'team,'" which is how K2 calculated it had 78 teams. GK9 MJAR at 28; *see* Beason Declaration ¶ 18. Had K2 not materially misrepresented its work for GK9, USPS "would have realized that K2 misrepresented its past performance and (acting reasonably) would have disqualified it from the competition." GK9 MJAR at 30. In support of this argument, GK9 filed its Motion to Supplement the Administrative Record and "requests that the Court supplement the administrative record with" the Beason Declaration, which is 272 pages of documents contained in Appendix A to GK9's Amended and Restated Complaint outlining K2's past failures. GK9 Mot. to Suppl. at 2, ECF No. 42.

The government responds "GK9 does not argue that USPS possessed the information in the Beason Declaration and accompanying materials at the time the award was made, or that USPS should have had or requested these materials," so the Court need not rely upon the materials in its decision because "the purpose of a post-award dispute is to determine whether the Postal Service made a reasonable decision based on the information it had at the time." Gov't's Cross-Mot. and MJAR at 24, ECF No. 46. The government explains "[b]y disclosing that it worked as subcontractor to GK9 and the sites in question . . . K2 appears to have given USPS sufficient notice of the nature of the contract and an opportunity to investigate by checking

---

[1] GK9 withdrew "its challenges to USPS's evaluation of its proposal (doc. 40, Count I) and derivative best value challenge (doc. 40, Count III, ¶¶ 59-60), without prejudice to its remaining claims and arguments." GK9 Reply at 1, ECF No. 51. The Court will address the remainder of Count III in Section IX - Whether USPS's Reliance on K2's Material Misrepresentation Prejudiced GK9, as those arguments relate to USPS's award of the Southwest Cluster and final award decision. *See supra* Section IX.

references or taking other steps." *Id.* at 24–25. The government notes: "[e]ven if the Court were to accept [the Beason Declaration], . . . GK9's request for the Court to disqualify K2 as a result would be unfounded" because "K2 is not a party to this case." *Id.* at 25. The government also argues GK9 "fails to show that the Court should assume that K2's ranking would have been lowered absent, at minimum, reevaluation by USPS." *Id.* at 26. The government argues "[t]he Court should reject GK9's motion to supplement the record" because "GK9 does not argue that USPS possessed the information in the Beason Declaration and accompanying materials at the time the award was made, or that USPS should have had or requested these materials." Gov't Cross-Mot. and MJAR at 23–24 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). The government further reasons, "GK9 does not demonstrate that supplementation of the record is necessary to correct a material misrepresentation" because K2 "was [not] required to furnish the detail on its past performance to the degree that GK9 puts forth for K2[]" and K2, nonetheless, gave "USPS sufficient notice of the nature of the contract and an opportunity to investigate by checking references or taking other steps." *Id.* at 24–25. The government also argues "[e]ven if the Court were to allow GK9 to supplement the record, however, GK9 would still fail to demonstrate that K2 should be disqualified or that USPS's best value determination should be changed as a result." *Id.* at 23. AMK9 responds GK9's motion to supplement the record has no "impact on the awards to AMK9" so AMK9 "takes no position on GK9's motion." AMK9 Resp. to Mots. to Suppl. at 1 n.1, ECF No. 45.

GK9 replies "USPS represented to the Court that GK9 should raise its misrepresentation argument for the first time with the Court, not in the administrative process, so it is estopped from saying otherwise now." GK9 Reply at 12. GK9 argues "with or without K2, this is a bid protest that the Court has jurisdiction to decide." *Id.* at 14. GK9 reasons "not only did USPS's technical evaluation team [('TET')] rely on K2's misrepresented work for GK9 . . . , but [it] found that K2's performance [was] 'successful.'" *Id.* at 17 (citing AR at 11446, 12448). GK9 asserts USPS's argument about the contract outcome being the same without K2's misrepresented past performance is flawed because accounting for the misrepresentation: (1) "USPS will have to award to GK9, even as improperly rated, or abandon the multi-supplier approach it has twice adopted as the best value to the government"; (2) "USPS's hypothetical tradeoff fails to consider an important aspect of the problem—that K2 will be disqualified"; (3) "hypothetical award decisions like this, made in the heat of litigation, should get little to no credit"; and (4) GK9 establishes prejudice and "GK9's chances of award increased." *Id.* at 17–19. In support of its Motion to Supplement, GK9 replies it is "true" and "irrelevant" "none of the records were before USPS when it made the award decision" because "[t]he Court of Federal Claims has uniformly recognized that the documents needed to adjudicate a material misrepresentation argument are almost never part of the government's original administrative record." GK9 Reply in Support of Mot. to Suppl., ECF No. 52, at 1–2. GK9 argues it: (1) "is not trying to correct a misrepresentation, but to prove that K2 made one"; and (2) "provided [the Beason Declaration], rosters, subcontracts, time records, correspondence and other documents to establish the facts K2 omitted." *Id.* at 2–3.

In response to GK9's argument about the government allegedly being estopped from opposing GK9's material misrepresentation claim, the government argues it "stated [at the March 2023 status conference it] would not argue th[at] GK9 failed to exhaust its administrative remedies by failing to supplement its post-award business disagreement for the February 2023

award recommendation with the materials it proffers now to supplement the record." Gov't's Reply at 14, ECF No. 53.  By stating this, the government argues it "did not concede that supplementation of the record in this Court with the documents that GK9 proffers would be proper because GK9 still must demonstrate that the documents demonstrate a material misrepresentation by K2." *Id.* at 14.

### 1.    Supplemental Briefing Related to K2's Performance Deficiencies

On 6 October 2023, the Court ordered supplemental briefing related to K2's performance concerns to wrap up all final briefing on the Cross-MJARs.  6 October 2023 Order at 1.  This is not related to K2's alleged misrepresentation in its proposal.

In its supplemental briefing, GK9 discusses K2's performance failures and argues the Court should sustain the protest.  GK9's Suppl. Br. at 4.  Citing to Federal Circuit precedent, GK9 argues "disqualification [of K2] is the only possible result" when there is a material misrepresentation.  *Id.* (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007)).  GK9 also argues the Court should sustain this protest because K2 misrepresented its past performance and therefore "the close at hand doctrine applies[,]" which states, "if a government agency possesses personal knowledge or internal information pertaining to an offeror's contract or prior work, the agency may be obligated to consider that information even if the offeror did not cite the information in a proposal." *Id.* at 4–5.  GK9 points to CO Moore's declarations and hypothetical tradeoff decision as the foundation for its argument stating:  "Mr. Moore submitted his first declaration on August 3, but chose not to tell the Court about K2's performance failures that had been ongoing since March." *Id.* at 5.  GK9 argues "K2's ongoing performance failures undermine USPS's argument against an injunction." *Id.* at 3.

The government responds the information submitted by GK9 concerning K2's performance as a subcontractor to GK9 does not "demonstrate a material misrepresentation . . . [and,] if the Court were to order any relief as a result of these materials, the proper remedy would be remand for the Postal Service to consider these materials in the first instance." Gov't Resp. to Suppl. at 6, ECF No. 64.  The government notes GK9 wrongly attributes an argument about material misrepresentation triggering disqualification to the Federal Circuit when the quote came from the underlying Court of Federal Claims decision.  *Id.* at 7 (citing *Blue & Gold Fleet, L.P.*, 492 F.3d 1308).  Responding to GK9's argument about the close at hand doctrine, the government argues "GK9's argument is speculative because the Government has given no indication that the Postal Service would ignore information in its possession regarding K2's past performance in the event of a remand" and "has shown no reason why the Court should direct results on a remand rather than allowing the Postal Service to conduct its own analysis." *Id.* at 8.  In response to GK9's argument about the Moore Declaration, the government reasons "GK9's argument misinterprets the declaration because the declaration discusses a hypothetical re-weighing of K2's past performance as of the February 6, 2023 contract award" and "K2's performance after the February 6, 2023 contract award would not have been relevant to its past performance rating as of February 6, 2023." *Id.* at 8–9.  The government also notes "GK9 does not show any reason why K2's current performance issues are relevant to GK9's past performance misrepresentation argument." *Id.* at 9.  Regarding permanent injunction, the government asserts "[g]iven th[e] continued need for services, even if the Court were to award

- 12 -

relief, the Court should permit performance of the contract to continue even if the Court were to rule in favor of GK9's motion for judgment on the administrative record." *Id.* at 10. MSA responds: "The facts presented in the GK9 MJAR Supplement concerning the work performance of K2 . . . are consistent with MSA's experience working in proximity to K2 in transition at various 3PK9 sites as well as information that MSA has received from its contacts throughout the industry." MSA Resp. to Suppl. at 1–2, ECF No. 65.

GK9 concedes its MJAR incorrectly attributed the argument about "preserv[ing] the integrity of the solicitation process when . . . a material misrepresentation influences the award of the proposal" by disqualifying the proposal from consideration to *Blue & Gold Fleet* when it came from the Court of Federal Claims. GK9 Reply to Suppl. at 2, ECF No. 67 (citing *Blue & Gold Fleet, LP*, 70 Fed. Cl. at 495, *aff'd sub nom. Blue & Gold Fleet, L.P.*, 492 F.3d 1308). GK9 cites to several cases in support of its argument about disqualification, including *Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992); *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 701 (2022); and *LightBox Parent, L.P. v. United States*, 162 Fed. Cl. 143, 152 (2022). *Id.* at 2–4. GK9 argues "[a]ny new analysis [by USPS] would have to consider the material misrepresentation in K2's proposal and its performance failures on the very contract at issue." *Id.* at 6. GK9 concedes it "cannot rely on [K2's] failures to show that K2 made a misrepresentation in the first place" but "K2's failures are relevant to the prejudice issue." *Id.* at 6.

## B.    GK9's Argument USPS's Errors Prejudiced GK9

GK9 argues had USPS and GK9 had meaningful discussions, GK9 could have addressed weaknesses, and "GK9 would have been at least [rated] Good overall and would have won at least the Southwest cluster, and likely more." GK9 MJAR at 31–32. GK9 argues "K2's material misrepresentation prejudiced GK9" because "[w]ith K2 disqualified, USPS will have to award to GK9, even as improperly rated." GK9 MJAR at 32. GK9 makes other arguments regarding USPS's errors prejudicing GK9 by assigning unwarranted weaknesses and performing a flawed technical evaluation. *Id.* at 31–32.

## C.    GK9's Argument the Court Should Issue a Permanent Injunction

GK9 argues it "succeeds on the merits" and (1) "GK9 will be irreparably harmed without a permanent injunction"; (2) "[t]he balance of harms favors GK9"; and (3) "[a]n injunction serves the public interest in honest, open, and fair competition." *Id.* at 33–34. The government responds injunctive relief is not warranted because plaintiff fails to show "(1) actual success on the merits; (2) that the plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to the plaintiff will outweigh[] the harm to the Government and third parties; and (4) that granting the injunction serves the public interest." Gov't's Cross-Mot. and MJAR at 29–30 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1226–29 (Fed. Cir. 2004)). AMK9 responds "[t]he Court should not grant a permanent injunction to GK9" because "GK9's arguments on the merits fall short, which should result in the Court denying GK9's injunction request." AMK9 Cross-MJAR and Resp. at 38, ECF No. 44. GK9 replies "this Court can fashion an injunction that takes the USPS's concerns into account and does not delay the delivery of mail." GK9 Reply at 22, ECF No. 51. GK9 argues it

"has not asked for, and does not expect this Court to award it[,] a contract." *Id.* GK9's only request is K2 be disqualified. 30 Nov. 2023 Oral Arg. Tr. ("Tr.") at 189:21–22 ("[GK9]: I'm not asking the Court to direct award."), ECF No. 75. The government replies, even if GK9 prevails on the merits, "GK9 has not shown that an injunction is appropriate" because GK9 has "not demonstrated irreparable harm[,] and the balance of harms and public interest in public safety weigh against injunctive relief." Gov't Reply at 18.

### D.    GK9's Argument USPS Failed to Have Meaningful Discussions

GK9 argues "USPS failed to conduct meaningful discussions" because "USPS did not mention any of the significant weaknesses in GK9's proposal during discussions with GK9" and "deprived GK9 of an opportunity to address those significant weaknesses and improve its proposal." GK9 MJAR at 18–19. GK9 cites *Banknote Corp. of America v. United States* in its MJAR to argue: "The Court of Federal Claims applies traditional Part 15 discussions principles to USPS." *Id.* at 18 (citing *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)). The government responds the applicable "[USPS *Supplying Principles and Practices* (SP&Ps)] do not require USPS to allow suppliers to correct all weaknesses in their proposals" because SP&P 2-37.1 "provides that discussions allow USPS to 'generate further information and facts' and 'clarify any possible misunderstandings with a supplier.'" Gov't Cross-Mot. and MJAR at 19 (quoting U.S. POSTAL SERV., SUPPLYING PRINCIPLES AND PRACTICES § 2-37.1, at 209 (2023) [hereinafter SP&P]). The government explains: "[n]either the SP&P[s] nor the cases GK9 relies upon interpreting the [Federal Acquisition Regulations (FAR)] compel such a result." *Id.* at 20 (citing *Banknote Corp. of Am.*, 56 Fed. Cl. at, 384). AMK9 responds USPS need only follow the standard set out by the SP&Ps and "the SP[&]Ps do not mandate that the government [has] to notify each offeror of significant weaknesses or deficiencies," unlike what is required in FAR Part 15. AMK9 Cross-MJAR and Response at 32. Further, "even if USPS were held to a standard of having to notify offerors of each significant weakness and deficiency, the contemporaneous record shows that GK9 did not receive any significant weaknesses or deficiencies." *Id.* at 32. "Even if the weaknesses were deemed significant (they were not), and even if USPS was required to identify the significant weaknesses (it was not), the summary of the discussions shows that the agency did actually provide GK9 with the opportunity to address the concerns." *Id.* at 34.

GK9 replies, FAR Part 15 applies to discussions and, therefore, USPS should have addressed GK9's significant weaknesses. GK9 Reply at 1. Looking to *Banknote*, GK9 argues "once USPS decided to enter into discussions, it had to identify any deficiencies or significant weaknesses in GK9's proposal." *Id.* at 5 (citing *Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. at 342, 355 (2017)). GK9 reasons "USPS admitted that GK9's weaknesses were 'significant,' and they certainly fit the definition applied under Part 15 and Court of Federal Claims precedent" and "because USPS chose not to discuss those significant weaknesses with GK9, its discussions were not meaningful." *Id.* at 9. The government responds GK9 relies on cases interpreting the FAR in its Reply, which is "mistaken" because the FAR does not apply to USPS. Gov't Cross-Mot. and MJAR at 6. The government notes "[t]he FAR and the SP&Ps treat discussions in fundamentally different ways" because "the guidance from the SP&Ps requires no discussion at all, much less a discussion of weaknesses—significant or otherwise." *Id.* at 6–7. AMK9 responds USPS need not conduct discussions in compliance with FAR Part 15

and GK9 wrongly relies on *Banknote* because the holding does not compel USPS to "identify significant weaknesses and deficiencies."  AMK9 Cross-MJAR and Resp. at 8.

## IV.    MSA's Argument It Has Standing to Protest the Solicitation

MSA argues it "is an interested party under 28 U.S.C. § 1491(b)(1) as an actual offeror whose direct economic interest in the procurements will be adversely affected by an award to other offerors."  MSA Am. Compl. at 3, ECF No. 37.  MSA reasons it "protests USPS's awards determinations now to preserve its post award rights should it prevail in its appeal" at the Federal Circuit.  *Id.*  MSA argues "[i]f MSA's appeal is successful, MSA will no longer be disqualified from the 3PK9 procurement and will again be eligible to protest awards made to AMK9 and K2 that, had the USPS conducted a rational procurement in accordance with the Solicitation, would have resulted in the majority of awarded work going to MSA."  *Id.*  The government responds, "all of MSA's [substantive] arguments fail for an overarching reason:  in the prior MSA bid protest, the Court disqualified MSA from award in the solicitation under review."  Gov't's Cross-Mot. and MJAR at 27.  AMK9 responds MSA "lacks standing and cannot show prejudice" and, therefore, the "Court should dismiss MSA's protest" because "MSA is not an actual or prospective offeror" and "it was not considered for award in USPS's final decision."  AMK9 Cross-MJAR and Resp., at 7–9.  MSA replies "MSA has the economic interest of an intervenor to protect its economic interests before this Court in GK9's appeal."  MSA Reply at 7, ECF No. 49.  The government, in its Reply, reiterates its position the Court should reject MSA's MJAR because "the Court disqualified MSA from award in the solicitation under review, and that matter is currently on appeal."  Gov't's Reply at 19.  AMK9 reasons "[i]f MSA's appeal is successful, the Federal Circuit will fashion a remedy associated with that appeal and its decision" and "[i]t is not for this Court to 'preserve' rights of a party for a case in which it does not have standing."  AMK9 Reply, ECF No. 54, at 4.

## V.    MSA's Motion for Judgment on the Administrative Record Arguments

MSA argues "USPS committed prejudicial procedural error because the TET did not review each offeror's pricing proposal as required by the Solicitation."  MSA MJAR at 17, ECF No. 39.  Specifically, "[t]he administrative record does not indicate that the TET ever evaluated or ranked the offerors' pricing proposals," as the proposals were "only evaluated by the Pricing/Purchase Team 'to see if price would become a determinative factor in assigning each cluster.'"  *Id.* at 17–18.  The government does not address MSA's argument on the merits and responds, "all of MSA's arguments fail for an overarching reason:  in the prior MSA bid protest, the Court disqualified MSA from award in the solicitation under review."  Gov't's Cross-Mot. and MJAR at 27.  AMK9 responds MSA's argument about TET not evaluating price is flawed because "USPS conducted a new evaluation in February of 2023—after the Court's November 2022 decision" and, thus, MSA's argument "must fail because [it is] based on outdated and no longer relevant documents."  AMK9 Cross-MJAR and Resp. at 10.  MSA replies "[the government] does not defend the substance of USPS's award process and instead focuses on whether MSA's MJAR is moot in light of the Court's disqualification of MSA from the 2022 3PK9 procurement."  MSA Reply at 2–3.  MSA replies "AMK9 cannot rebut the fact that . . . the TET did not evaluate price as part of its 3PK9 evaluation."  *Id.* at 2.  The government responds USPS's failure to conduct a price realism analysis "could prejudice MSA only if MSA were an

eligible offeror, and therefore its request for a new analysis is purely hypothetical."  Gov't's Cross-Mot. and MJAR at 19–20.  AMK9 responds "MSA disregards the fact that, regardless of who evaluated price, the price evaluation was limited" because "the price evaluation would involve reviewing the price offering spreadsheet provided by offerors for each cluster of sites, and a ranking of offerors' pricing based on the numbers."  AMK9 Resp. at 4–5 (citing AR 6884).

MSA makes several additional arguments, including:

(1)  USPS "did not consider the additional costs of running a 3PK9 program within the TSA/USPS framework" as "the TET only evaluated each offerors' 3PK9 screening capabilities against the requirements of the SOW and not against each offerors' pricing."  MSA MJAR at 21.

(2)  "[T]he TET also did not factor offerors' pricing proposals into its risk assessment, which also constituted a violation of the terms of the Solicitation."  *Id.* at 22.

(3)  "[T]he TET's assessment was incomplete because it did not include any discussion of several key factors that USPS's own SP&Ps suggested should be part of a risk assessment—most important being whether an offeror's proposal included all relevant costs."  *Id.* at 24.

(4)  "USPS irrationally determined that K2 and AMK9 would provide it with the best value in the International, Central South, Central East, and Northeast 3PK9 clusters, despite MSA's proposal exhibiting a substantial comparative advantage over K2 and AMK9."  *Id.* at 26.

To each, the government responds, "all of MSA's arguments fail for an overarching reason:  in the prior MSA bid protest, the Court disqualified MSA from award in the solicitation under review."  Gov't's Cross-Mot. and MJAR at 27.  AMK9 responds substantively to MSA's arguments, noting USPS "acted reasonably when considering prices proposed in its best value determination,"  the "Solicitation did not require USPS to evaluate pricing to assess whether each costs was included within each [proposed] hourly rate," USPS "did not 'have the option to "look under the hood" to assess the costs included in each offeror's price,'" and perhaps most importantly, MSA fails to mention USPS was prohibited from considering MSA's proposal.  AMK9 Reply at 5; AMK9 Cross-MJAR and Resp. at 15, 16, 18.

Throughout its MJAR, MSA argues USPS's decision prejudiced MSA because "USPS's failure to apply the terms of the Solicitation to its evaluation of 3PK9 proposals prejudiced MSA, whose pricing proposal included all costs associated with operating a TSA-compliant 3PK9 screening program."  MSA MJAR at 17 (citing Exhibit A, Decl. of C. Shelton. ¶ 8).  MSA also argues:  "Because there was a substantial chance that MSA would have received a higher percentage of the 3PK9 awards absent USPS's failure to have the TET evaluate price [and conduct a proper risk assessment], USPS's actions prejudiced MSA."  *Id.* at 22, 25 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999)).  MSA "requests an evidentiary hearing to determine whether MSA was prejudiced by USPS failing to conduct a risk assessment according to the terms of the Solicitation."  *Id.* at 24 (citing *Bannum, Inc. v.*

*United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005)).  The government argues **"MSA cannot show prejudice from any alleged error because it was not a potential recipient of the February 2023 award."**  Gov't's Cross-Mot. and MJAR at 27 (citing *Alfa Laval Separation, Inc.*, 175 F.3d at 1368 (bidder must show that "there was a substantial chance it would have received the contract award"); *Sys. Stud. & Simulation, Inc. v. United States*, 122 F.4th 994, 997 (Fed. Cir. 2021) (finding of prejudice required before setting aside a bid award)).

MSA seeks injunctive relief ordering USPS "to set-aside awards made to parties other than MSA . . . on the grounds that USPS's determination to make contract awards to . . . AMK9 . . . and K2 was both arbitrary and capricious and made in violation of the terms of the Solicitation."  MSA Am. Compl. at 1–2.  At oral argument MSA effectively requested a reconsideration of the September 2022 award:  "it's . . . not insubstantial that we might win the appeal, and when we win the appeal, as this Court has said, you know, we basically revert back to September 2022."  Tr. at 204:16-19.  The government responds injunctive relief is not warranted because plaintiffs fail to show "(1) actual success on the merits; (2) that the plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to the plaintiff will outweigh the harm to the Government and third parties; and (4) that granting the injunction serves the public interest."  Gov't's Cross-Mot. and MJAR at 29–30 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1226–29 (Fed. Cir. 2004)).  AMK9 responds MSA fails to discuss the required injunctive relief factors beyond the merits.  AMK9 Cross-MJAR and Resp. at 19.

Finally, MSA seeks to supplement the administrative record with "with a declaration from MSA employee Chris Shelton . . . to aid it in its review of the administrative record and to help determine, if needed, whether the . . . USPS['s] actions prejudiced MSA."  MSA Mot. to Suppl. Admin. R. at 1–2.  MSA explains "there is no documentation in the administrative record that clarifies the substance of TSA's directives or how TSA's directives might affect each offeror's pricing proposal as well as USPS's best value determination."  *Id.* at 3.  The government responds:  "[T]he Court should deny MSA's motion to supplement the record because MSA cannot receive award at present" and "cannot demonstrate prejudice due to its currently being ineligible to receive award."  Gov't's Cross-Mot. and MJAR at 11, 28.  AMK9 responds:  "While MSA would like the court to believe that the costs discussed in Mr. Shelton's declaration were not included in AMK9's proposal (or K2's proposal), the record is sufficient on its face for the Court to make a determination."  AMK9 Resp. to MSA Mots. to Suppl. at 2.

## VI.    Legal Standards

### A.    Bid Protest Jurisdiction and APA Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), provides this court jurisdiction over "action[s] by an *interested party* objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with* a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (emphasis added); Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874–76.  The term "interested party" means "actual or prospective bidders or offerors whose

direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)). "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "[T]he Federal Circuit has held that '[t]he operative phrase "in connection with" is very sweeping in scope.'" *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 439–40 (2019) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)). Though this court's bid protest jurisdiction is broad, it nevertheless "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).

The Court evaluates bid protests under the framework laid out in § 706 of the APA.[2] 28 U.S.C. § 1491 (b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "[T]he proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Since the arbitrary and capricious standard is "highly deferential," a reviewing court must "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). A court, therefore, will not "substitute its judgment" for the agency's so long as the agency's decision was reasonable. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998–99 (Fed. Cir. 2018) (citing *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

### B.       Judgment on the Administrative Record in a Bid Protest

---

[2] "The Tucker Act, as amended by ADRA, requires the COFC in a bid protest case to apply the APA's standard of review, pursuant to which government agency action is reviewed to determine whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'without observance of a procedure required by law.'" MATTHEW H. SOLOMSON, COURT OF FEDERAL CLAIMS JURISDICTION, PRACTICE, AND PROCEDURE 8–37 (2016) (footnote omitted) (citing 28 U.S.C. §1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1243 (Fed. Cir. 2010) (citing 28 U.S.C. §1491(b)(4) and noting "[t]he ADRA also directed the court to use the standards of review provided by the APA in reviewing the bid protest suits"); *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001) ("[W]hile pre-ADRA protests brought in the Court of Federal Claims were governed by a narrow standard of review, *see Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566, 492 F.2d 1200, 1203–04 (1974), the ADRA expressly made the APA standard of review applicable to all bid protest actions . . . .")).

"[Rule] 52.1(c) [of the Rules of the Court of Federal Claims ('RCFC')] provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). RCFC 52.1(c), previously RCFC 56.1, was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356. The court may set aside an agency action if plaintiff has proven "either:  (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Garufi*, 238 F.3d at 1332. The rational basis test requires the court to ask "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P.*, 906 F.3d at 992 (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1351) (internal quotations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Garufi*, 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). "[D]e minimis errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (emphasis omitted). "De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are." *Id.* (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)) (internal quotations omitted). A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Apps. Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

### C.    Supplementation of the Administrative Record[3]

"It is well settled that the 'primary focus' of the court's review of agency decision making 'should be the materials that were before the agency when it made its final decision.'" *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 166 (2011) (quoting *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 349–50 (1997)). "[T]o perform an effective review pursuant to the APA, the court must have a record containing the information upon which the agency relied when it made its decision as well as any documentation revealing the agency's decision-making process." *Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 92 (2011) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). The Federal Circuit established the standard for supplementation of the administrative record in *Axiom*. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009). In *Axiom*, the Federal Circuit explained, "[t]he purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into

---

[3] The parties agreed at oral argument to supplement the administrative record with the Declaration of Contracting Officer (CO) Edward Moore attached to the government's cross-MJAR because the Moore Declaration assesses the Beason Declaration. Moore Decl., ECF No. 46-1; Tr. at 78:9–18 ("THE COURT: . . . [S]hould the record be supplemented to admit the Moore declaration?  [GOVERNMENT]: . . . Yes . . . .  THE COURT:  Does GK9 agree with that?  [GK9]:  No objection to that at all, Your Honor."). After the parties agreed to supplement the record with the Moore Declaration, oral argument continued as if the Moore Declaration was in the record. Tr. at 87:3–5 ("[GOVERNMENT]: . . . 46-1, [the Moore Declaration,] now in the record . . .").

effectively *de novo* review.'" *Id.* (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000)). "Thus, supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735). When performing this analysis, the Court is "required to explain why the evidence omitted from the record frustrate[s] judicial review as to the ultimate question of whether the award . . . was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom*, 564 F.3d at 1379–80). In *Golden IT*, the court determined plaintiff's misrepresentation allegations related to key personnel were sufficient to warrant discovery because the court could not "possibly evaluate a plausible misrepresentation claim based upon only the evidence in the government's possession." *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 688 (2022). The court reasoned, "[g]iven the nature of . . . [the] misrepresentation argument, this [c]ourt would be remiss if it did not permit the evidence in question to be added to the record." *Id.* at 688 (citing *Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 182 (2021)). Further, "no one could reasonably expect [such information] to be contained in the administrative record." *Id.* at 680. The court is inclined to grant a motion to supplement when the agency did not itself consider, or have the opportunity to consider, evidence of the plaintiff's misrepresentation allegations and is inclined to deny these motions when "[(1)] the AR [contains] the documents that [the agency] developed and considered in making [its] decisions . . . and [(2) the] plaintiff has not made a sufficient showing for this court to permit supplementation or limited discovery." *Oracle Am., Inc. v. United States*, 2019 WL 354705 at *6 (Fed. Cl. 2019).

### D.    Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

## VII.   Whether GK9's Motion to Supplement the Administrative Record with Documents Related to K2's Material Misrepresentation Should Be Granted

GK9 filed its Motion to Supplement the Administrative Record with "Mr. Beason's declaration" about K2's performance history, "evidence demonstrating that K2's statements materially misrepresented its performance as GK9's subcontractor," "the subcontract agreement between GK9 and K2," "K2 personnel and attendance information," "documents showing client locations and required shifts," and "email communications relevant to K2's misrepresentation." GK9 Mot. to Suppl. at 3. The government responds "[t]he Court should reject GK9's motion to supplement the record" because "GK9 does not argue that USPS possessed the information in the Beason Declaration and accompanying materials at the time the award was made, or that USPS should have had or requested these materials," meaning plaintiff's proffered information is

outside the scope of a motion to supplement. *Id.* at 23–24 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). The government further reasons, "GK9 does not demonstrate that supplementation of the record is necessary to correct a material misrepresentation" because K2 "was [not] required to furnish the detail on its past performance to the degree that GK9 puts forth for K2" and K2, nonetheless, gave "USPS sufficient notice of the nature of the contract and an opportunity to investigate by checking references or taking other steps." *Id.* at 24–25. The government also argues, "[e]ven if the Court were to allow GK9 to supplement the record, . . . GK9 would still fail to demonstrate that K2 should be disqualified or that USPS's best value determination should be changed as a result." *Id.* GK9 replies it is "true" and "irrelevant" "none of the records were before USPS when it made the award decision" because "[t]he Court of Federal Claims has uniformly recognized that the documents needed to adjudicate a material misrepresentation argument are almost never part of the government's original administrative record." GK9 Reply in Support of Mot. to Suppl. at 1–2. GK9 argues it "is not trying to correct a misrepresentation, but to prove that K2 made one." *Id.* at 2.

K2's proposal stated:

Today, K2 provides dozens of 3PK9-C teams from Anchorage to Miami, and from NY to LA. When a larger provider accepted more work than they were able to perform, K2 was selected as the subcontractor to stand up work for them at 69 customer sites in 11 cities. In order to meet this requirement, K2's Canine Training Academy (CTA) certified *78 3PK9-C teams* in a 6-month period *to meet all contract requirements* in the latter part of 2021. . . . We have performed more than 450 contracts, with more than 150 of them focused on [explosive detection canine or] EDC services. . . . From July to December of 2021, K2 *certified 78 teams* to stand up screening in 11 cities and 69 customer locations as a subcontractor of Global K9, who needed K2 to help fulfill their contractual obligations.

*See* AR at 10392, 10411 (emphasis added). GK9 argues K2's proposal materially misrepresented the quality of K2's past work and the number of teams or individuals it stood up as part of its past performance. *See* GK9 Mot. to Suppl. *passim*.

The Beason Declaration is from the perspective of GK9 chief operating officer Ronald Beason, who is "familiar with GK9's business relationship with K2[]." Beason Decl. at 1. The Declaration states "GK9 chose K2 as [its] subcontractor largely because K2 represented that it had enough teams standing by and ready to fill the needed shifts" and "[o]n June 1, 2021, GK9 and K2 entered into a Subcontracting Agreement." *Id.* at 2. The Declaration notes K2 began work months late in many airport locations, including Dallas Forth Worth (DFW), San Francisco (SFO), Los Angeles (LAX), New York (JFK), Newark (EWR), Atlanta (ATL), Houston (IAH), and Miami (MIA). *Id.* at 2–3. The Declaration also states, "once K2's personnel arrived at scheduled locations, K2 had trouble covering shifts." *Id.* at 3. The Declaration notes many K2 employees arrived late, worked minimally, or did not come to work at all, causing disruptions at MIA, ATL, LAX, SFO, and ORD. *Id.* at 4–5. The Declaration also provides the following on the number of "teams" or "individuals" employed by K2 during its subcontractor work for GK9:

Attachment 2 shows that K2 employed 66 individuals who billed time to GK9 from July 2021 to June 2022, but many of these individuals did not work the entire period.  In fact, many of the 66 total K2 employees were replacements for other K2 employees who quit, just stopped showing up, or that K2 had to fire.  So the 66 individuals do not represent 66 distinct shifts or positions. . . . Very few of K2's employees worked for the entire period of performance.  At its highest point, K2 had 40 employees working on contract in December of 2021.  Even then, not all 40 worked continuously.  In fact, less than half worked the whole month.

*Id.* at 5 (footnote omitted).  The Declaration also states "[o]n various occasions, when K2's employees were unable to work, K2 would reach out to the personnel who worked at local baseball stadiums and other locations for personnel to work for a day or a few days."  *Id.* at 6.  The Declaration provided GK9 "lost work with . . . customers at sites that K2 was supposed to support."  *Id.*

In *Axiom*, the Federal Circuit explained, "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  When performing this analysis, the Court is "required to explain why the evidence omitted from the record frustrate[s] judicial review as to the ultimate question of whether the award . . . was arbitrary and capricious."  *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom*, 564 F.3d at 1379–80).

The parties do not dispute:  (1) the information from the Beason Declaration was not in front of the USPS when it made its award decision; and (2) the information is not part of the administrative record.  GK9 Mot. to Suppl. at 3; Gov't's Cross-Mot and MJAR at 24; Tr. at 31:5–9 ("[GOVERNMENT]: . . . [W]e have new information the contracting officer never knew, and that is the classic case [for supplementation].").  The government at oral argument recognized the record should be supplemented because USPS did not consider the contents of the Beason Declaration in making its initial award and there are allegations of material misrepresentation.  Tr. at 31:5–21; *see also* Tr. at 63:23–64:5 ("THE COURT:  [D]oes the Government agree . . . there should be supplementation under the standards? [GOVERNMENT]: . . . [I]t seems like the best outcome.").  The Beason Declaration and related documents are necessary for the Court to engage in "effective judicial review" of whether K2 materially misrepresented its past performance because plaintiff GK9 alleges the alleged misrepresentations undermine K2's past performance representation.  *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 166 (2011) (citing *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 349–50 (1997); *Camp*, 411 U.S. at 142–43); *Axiom*, 564 F.3d at 1379–81.  The omission of these documents particularly "precludes effective judicial review" of USPS's contract award because USPS relied on K2's representation in awarding K2 a "Good" past performance rating and, ultimately, contracts.  *See Axiom*, 564 F.3d at 1380; *infra* Section VIII.B.3.  This is a "classic case" for supplementation and, thus, the Court grants GK9's motion to supplement.  Tr. at 31:5–9; *Axiom*, 564 F.3d at 1380 (quoting *Murakami*, 46 Fed. Cl. at 735).  The Court next turns to whether the declaration of USPS CO Moore should be added to the administrative record.

In the Moore Declaration, USPS CO Moore reviews GK9's allegations of material misrepresentation and the Beason Declaration concerning K2's past performance.  *See* Moore Decl., ECF No. 46-1.  Even though the government did not formally request to supplement the record with the Moore Declaration, the parties agreed to do so at oral argument because it assesses the Beason Declaration.  Tr. at 78:9–18 ("THE COURT:  . . . [S]hould the record be supplemented to admit the Moore declaration?  [GOVERNMENT]:  . . .Yes. . . .  THE COURT: . . . Does GK9 agree with that?  [GK9]:  No objection to that at all, Your Honor.").  After the parties agreed to supplement the record with the Moore Declaration, oral argument continued as if the Moore Declaration was in the record.  Tr. at 87:3–5 ("[GOVERNMENT]:  . . . 46-1, [the Moore Declaration, is] now in the record").  The government relies on the Moore Declaration in its briefing and clarified the Moore Declaration is not a *post hoc* rationalization:

> [T]his declaration was not meant to serve as a substitute for a record on remand; instead, it was meant to supplement the record in this Court for purposes of this motion in the event the Court decided to consider GK9's material misrepresentation allegation on the basis of the record in the Court.  The Court may consider an agency's interpretation of its regulations made during litigation contesting its position, as long as there is no reason to suspect that the interpretation merely represents a "convenient litigating position" or "post hoc rationalization."  *See Price v. Panetta*, 674 F.3d 1335, 1342 (Fed. Cir. 2012) (quotations omitted). As such, although the Court should remand rather than deciding the matter in the first instance, if the Court were to decide to supplement the record with the materials that GK9 has proffered, the cont[r]acting officer's declaration should serve as evidence that GK9's proposed remedy would not be a foregone conclusion based on the current record.

Gov't's Reply at 17.  The Moore Declaration is necessary for effective "judicial review as to the ultimate question of whether the award . . . was arbitrary and capricious" because it is a "new determination[]" of K2's proposal.  *AgustaWestland*, 880 F.3d at 1332 (citing *Axiom*, 564 F.3d at 1379–80); *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1316 (Fed. Cir. 2021) ("It's true that an agency cannot rely on a new rationale for an old decision . . . [but agencies may] ma[k]e new determinations.").  Plaintiff supports the supplementation of the record with the Moore Declaration, and the government notes the Moore Declaration is not a "post hoc rationalization" because it provides insight into USPS's February 2023 decision.  Tr. at 78:9–18; Gov't's Reply at 17.  The Court understands the Moore Declaration to be a new review and determination of K2's proposal, rather than an impermissible post hoc rationalization by the agency.  *See DynCorp Int'l, LLC*, 10 F.4th at 1316.  Accordingly, the Court supplements the administrative record with the Moore Declaration for effective "judicial review as to the ultimate question of whether the award . . . was arbitrary and capricious."  *AgustaWestland*, 880 F.3d at 1332 (citing *Axiom*, 564 F.3d at 1379–80).

## VIII.   Whether K2 Should Be Disqualified for Material Misrepresentation

On 1 March 2023, GK9 indicated it "plan[ned] to file an amended complaint . . . to raise an additional ground for material misrepresentation by K2" based on K2's statements regarding

past performance in its proposal.  1 Mar. 2023 JSR at 3, ECF No. 23.  GK9 first attempted to raise these allegations in front of the CO and SDRO, 2 Mar. 2023 Tr. at 20:5–9, ECF No. 27, but USPS objected, arguing GK9 is "free to [bring these claims] in the court, but . . . [not] . . . [as] part of the Post Office administrative dispute process."  2 Mar. 2023 Tr. at 21:15–19.  GK9 now argues before the Court "K2 should be disqualified from this competition due to its material misrepresentation about its past performance," specifically because K2 misrepresented its performance capabilities in connection with prior work for GK9 during 2021.  GK9 MJAR at 24.  GK9 states:  "When a bidder makes a material misrepresentation, the law requires disqualification."  *Id.* at 24 (citing *Plan. Rsch. Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992)).[4]  Despite being aware of these allegations and anticipating GK9's additional misrepresentation claims since at least March 2023, USPS has not performed an independent investigation of K2's performance history.  *See* Tr. at 71:24–25:6 ("THE COURT:  . . . I don't understand why USPS would not immediately investigate K2's statements.  [GOVERNMENT]: I have nothing else I can offer to the Court at this point . . . ."); Tr. at 43:22–44:25; Tr. at 47:4– 49:2.  Instead, USPS merely refutes the significance of GK9's allegations and requests a remand to "look into" these claims, despite already having had nine months to do so.  Gov't's Cross-Mot. and MJAR at 26; *see, e.g.*, Tr. at 37:8–15.

   "To establish a material misrepresentation, plaintiff[s] must demonstrate that (1) [the awardee] made a false statement; and (2) the [agency] relied on that false statement in selecting [the awardee's] proposal for the contract award."  *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007).  The Federal Circuit in *Planning Research Corp.* provided misrepresentations trigger disqualification of proposals when the misstatement materially influences the agency's consideration of a proposal:  "[W]e believe that the submission of a misstatement . . . materially influences consideration of a proposal should disqualify the proposal . . . .  Any further consideration of the proposal in these circumstances would provoke suspicion and mistrust and reduce confidence in the competitive procurement system."  *Plan. Rsch. Corp.*, 971 F.2d at 741 (quoting *Informatics, Inc.*, 57 Comp. Gen. 217, 225 (1978)).  "When a bidder is found to have misrepresented its ability to perform a contract, that bidder *will lose its right to execute the solicited work* or bid on the re[-]procurement of the contract."  *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 468 (2001).  Such "[material] misrepresentations . . . taint[] the bidding and evaluation process."  *Plan. Rsch. Corp*, 971 F.2d at 740–41.

   In determining whether K2 should be disqualified for material misrepresentation, the court will assess:  (A) whether the Beason Declaration alleges falsity; (B) whether the Beason Declaration is material, including through a review of the CO's conclusions in the Moore Declaration and the USPS's reliance on the alleged misrepresentations; and (C) whether the CO's conclusion in the Moore Declaration is arbitrary and capricious.  *See Blue & Gold Fleet*, 70 Fed. Cl. at 495 (2006), *aff'd*, *Blue & Gold Fleet*, 492 F.3d 1308; *Plan. Rsch. Corp.*, 971 F.2d at 740–41.

### A.   Whether the Beason Declaration Alleges Falsity

---

[4] At the 2 March 2023 status conference, all parties agreed GK9 may raise its material misrepresentation arguments before the Court.  2 Mar. 2023 Tr. at 21:15–19.

The Court begins its material misrepresentation analysis by determining whether the Beason Declaration establishes falsity. *Blue & Gold Fleet*, 70 Fed. Cl. at 495 ("To establish a material misrepresentation, plaintiff must demonstrate that (1) [awardee] *made a false statement*; and (2) the [agency] relied on that false statement in selecting [awardee's] proposal for the contract award." (emphasis added)). The Court must first find the Beason Declaration is credible, however. In doing so, the Court is permitted "to make factual findings from the record evidence as if it were conducting a trial." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). At oral argument, GK9 emphasized the falsity of K2's past performance proposal: "Everybody in here knows K2 lied. We've proven it. There is a record. And under [Rule] 52.1, the Court has the right to make findings of fact. We've proven there are . . . lies of omission and express falsities. They said they met contract requirements. Everybody knows that's not true." Tr. at 61:20–25. The government then admitted nothing in the record conflicts with the evidence put forth in the Beason Declaration: "For the purpose of falsity. . . there is nothing in the record contradicting [the over 200 pages of evidence in the Beason Declaration.]" Tr. at 112:2–16. The Court accordingly finds the Beason Declaration credible and therefore compares the allegedly false representations in K2's proposal with plaintiff's evidence. *See Bannum*, 404 F.3d at 1353–54.

The Beason Declaration undermines the validity of K2's past performance because there are significant differences between what K2 stated in its proposal and the evidence-supported allegations in the Beason Declaration. *Compare* AR at 10392, 10411 (K2 Proposal), *with* Beason Decl. Specifically:

| *Compare* K2's Past Performance Proposal | *With* Beason Declaration |
|---|---|
| "K2's Canine Training Academy (CTA) certified 78 3PK9-C teams." AR at 10392, 10411 (K2 Proposal). | K2 had "66 individuals . . . [who] do not represent 66 distinct shifts or positions"; "At its highest point, K2 had 40 employees working on contract"; and "Even then, not all 40 worked continuously." Beason Decl. at 5. |
| K2 "m[et] all contract requirements." AR at 10392, 10411 (K2 Proposal). | "K2 had trouble covering shifts"; "K2 did not arrive at the . . . locations until" months after promised; "no K2 employee reported to work for a two week period"; "K2 missed three consecutive shifts"; and "when K2's employees were unable to work, K2 would reach out to the personnel who worked at local baseball stadiums and other locations for personnel to work for a day or a few days." Beason Decl. at 1–6. |
| K2 "m[et] all contract requirements" to assist "a larger provider [who] accepted more work than they were able to perform." AR at 10392, 10411 (K2 Proposal). | GK9, the contractor, "lost work with other customers at sites that K2 was supposed to support, including [XXXXX] and [XXXXX]." Beason Decl. at 6. |

*See* AR at 10392, 10411 (K2 Proposal); Beason Decl.

The Beason Declaration contains over 200 pages of supportive evidence explaining the falsity of K2's proposal, and, as conceded by the government at oral argument, there is nothing in the record to refute it. *See* Beason Decl.; Tr. at 112:2–16. The Beason evidence includes the subcontract agreement between GK9 and K2, K2 personnel shift attendance logs, and email communications addressing the alleged misrepresentations. *See* Beason Decl. The Court, therefore, has ample reason to rely on the Beason Declaration and finds it clearly establishes falsity in K2's proposal relating to past performance. *Id.*; *Blue & Gold Fleet, LP*, 70 Fed. Cl. at 495, *aff'd*, 492 F.3d 1308; *Bannum, Inc.*, 404 F.3d at 1353–54. Notably, USPS's Moore Declaration, discussed in depth *infra*, presupposes the veracity of the Beason Declaration. Moore Decl. ¶¶ 3–5; Tr. at 36:6–8 ("[GOVERNMENT]: Th[e] [Moore] declaration basically assumed [the Beason Declaration] was true, because the second part of the material misrepresentation is materiality, basically.").

**B.     Whether the Beason Declaration is Material**

**1.     Whether the Information within the Beason Declaration is Material**

The Court next analyzes whether the information within the Beason Declaration is material. At oral argument, GK9 clarified what it considers material from the Beason Declaration:

> It's the fact that [K2] represented they stood up 78 teams in six months, when we know the most is 66 in a whole year, that 40 is the most they had working at any one time . . . . What was represented was basically [K2 had] these 78 teams working full-time when we know it was about 20 percent of that if we factor in all the refilling, and they said they met contract requirements.

Tr. at 84:6–16; Beason Decl. at 5. The government responds "GK9 does not dispute that K2 worked as a subcontractor to GK9, nor does it dispute that K2 worked on the sites in question." Gov't's Cross-Mot. and MJAR at 24. The government argues GK9 "fails to show that the Court should assume that K2's ranking would have been lowered absent, at minimum, reevaluation by USPS." *Id.* at 26. The government further asserts "although any formal reevaluation would require remand, GK9 has failed to demonstrate that [the Beason Declaration] would be likely to result in a change to USPS's best value determination." *Id.*

A misrepresentation is material when it was made intentionally and relates to a requirement of the solicitation. *Plan. Rsch. Corp.*, 971 F.2d 736; *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32 (citing *Allied Tech. Grp., Inc.*, 649 F.3d at, 1329 ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.")). The Court may use "circumstantial evidence" to prove intent. *Plan. Rsch. Corp.*, 971 F.2d at 742.

The parties at oral argument discussed *Planning Research*, among other cases, as establishing the standard for material misrepresentation, including the "intent" requirement. *See*

Tr. at 153:6–174:25; *Plan. Rsch. Corp.*, 971 F.2d 736.  In *Planning Research*, the Federal Circuit assessed the General Services Board of Contract Appeals' ("the Board") decision to terminate awardee PRC for a material misrepresentation regarding its personnel.  971 F.2d at 737.  PRC falsely promised it would not use incumbent personnel.  *Id.* at 738–740 ("In its reconsideration decision, the [B]oard reaffirmed its holding that PRC misrepresented the personnel to be used on the contract . . . .").  The Federal Circuit affirmed: "[W]e affirm the decision of the board as being fully supported by the misrepresentations of PRC in the bidding process and by the modification of the contract permitted and encouraged . . . after award."  *Id.* at 743.  The Federal Circuit noted, it "has held that intent frequently must be proved by circumstantial evidence."  *Id.* at 742 (citing *Klein v. Peterson*, 866 F.2d 412, 415 (Fed.Cir.1989)).  Likewise, in *Klein*, the Court found the petitioner "acted deliberately to mislead" the relevant agency after comparing his claims to the surrounding circumstances, thereby concluding there was "inten[t] to deceive." *Klein*, 866 F.2d at 415.

In *Golden IT*, this court stated:  "where an agency's contract award is based on a proposal's material misrepresentation, the award is *per se* inconsistent with a solicitation's requirements and, thus, is contrary to law."  *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32 (citing *Allied Tech. Grp., Inc.*, 649 F.3d at 1329 ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.")).  As noted by the Federal Circuit in *E.W. Bliss*, a contract is "improperly awarded" when the winning "proposal did not conform to a material term of the solicitation."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996).  In assessing the merits, the Court may therefore consider whether the misrepresentation impacts a Solicitation requirement.  *Golden IT, LLC*, 157 Fed. Cl. at 701 n.34 (noting an at-issue solicitation requirement was "unquestionably a material one," meaning a knowing misrepresentation thereof "would [lead to] . . . judgment on the merits").

The Court first looks objectively at K2's representation it "certified 78 3PK9-C teams":

| *Compare* K2's Past Performance Proposal | *With* Beason Declaration |
|---|---|
| "K2's Canine Training Academy (CTA) certified 78 3PK9-C teams."  AR at 10392, 10411 (K2 Proposal). | K2 had "66 individuals . . .  [who] do not represent 66 distinct shifts or positions"; "At its highest point, K2 had 40 employees working on contract"; and "Even then, not all 40 worked continuously."  Beason Decl. at 2–6. |

AR at 10392, 10411 (K2 Proposal).  The Beason Declaration states K2's "78 3PK9-C teams" was actually "66 individuals," or more accurately, no more than 40 employees at any one time. Beason Decl. at 5; AR at 10392, 10411 (K2 Proposal).  The Solicitation stated USPS, in assessing past performance, would "evaluate the depth of the offeror's experience and [the] degree to which successful performance has occurred in the past for a national level program for cargo or mail screening."  AR at 6883 (Solicitation).  USPS's evaluation was required to include a determination of whether each offeror "[d]emonstrated support for the execution of cargo or mail screening across the U.S., including the planning and administration of such a national level program."  *Id.*  K2's representation of having 78 teams therefore impacts these Solicitation

requirements related to past performance—the "degree to which successful performance has occurred in the past" and an offeror's "[d]emonstrated support for the execution of cargo or mail screening." *Id.*; *Golden IT*, 157 Fed. Cl. at 700 n.32, 701 n.34. K2 misrepresented its ability to meet these requirements by inflating—by nearly double—the number of teams it had ready to provide "support for the execution of cargo or mail screening." AR at 6883 (Solicitation); Beason Decl. at 5. K2's proposal thus "fails to conform to the material terms and conditions of the solicitation." *Golden IT, LLC*, 157 Fed. Cl at 700 n.32 (citing *Allied Tech. Grp., Inc.*, 649 F.3d at 1329); *E.W. Bliss Co.*, 77 F.3d at 448. As acknowledged by the government at oral argument "[a]s to its past," K2's "narrative . . . is [it put on a] romantic comedy" when, in fact, its performance was a "horror film." Tr. at 139:16–19. The government argues "only 10 percent [of the contract] was based on past performance." Tr. at 91:8–10. K2's false statements, however, directly related to these Solicitation requirements and are sufficient "to sustain [a] . . . finding" K2 "intended to mislead." *Klein*, 866 F.2d at 415. Without these misrepresentations regarding its past "support for . . . cargo or mail screening," K2 would have had no relevant, successful experience on which to rely and would have been unable to meet this past performance Solicitation requirement. AR at 6883 (Solicitation); Tr. at 90:3–20. K2's express need to demonstrate successful past performance and its lack of examples indicates K2 had an "inten[t] to deceive" and include falsities in its proposal. *Klein*, 866 F.2d at 415. "Upon consideration of all the facts and circumstances," the Court therefore finds K2's overtly false representations related to these important Solicitation requirements provide "circumstantial evidence" of "intent." *Plan. Rsch. Corp.*, 971 F.2d at 742. K2's misrepresentations regarding its number of certified and available teams thus was intentional and impacted an important Solicitation requirement, meaning they are material. *See id.*; *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32.

The Court next looks objectively at K2's representation it "m[et] all contract requirements":

| *Compare* K2's Past Performance Proposal | *With* Beason Declaration |
| --- | --- |
| K2 "m[et] all contract requirements." AR at 10392, 10411 (K2 Proposal) | "K2 had trouble covering shifts"; "K2 did not arrive at the . . . locations until" months after promised; "no K2 employee reported to work for a two week period"; "K2 missed three consecutive shifts"; and "when K2's employees were unable to work, K2 would reach out to the personnel who worked at local baseball stadiums and other locations for personnel to work for a day or a few days." Beason Decl. at 1–6. |

AR at 10392, 10411 (K2 Proposal). The Beason Declaration calls this representation into question because it states K2 began work weeks late at several GK9 sites and "had trouble covering shifts" due to employees "arriv[ing] late or . . . not com[ing] to work at all." Beason Decl. at 2–6. The Declaration notes, for example, K2 employees did "[not] report to work for a two week period"; "missed three consecutive shifts"; and "K2 [had to] reach out to the personnel who worked at local baseball stadiums and other locations . . . to work for a day or a few days"

to cover K2's shifts.  Beason Decl. at 1–6.  The Solicitation required offerors demonstrate "successful performance . . . in the past for a national level program for cargo or mail screening."  AR at 6883 (Solicitation).  K2's representations regarding its 2021 work for GK9 falsely claimed K2 successfully performed such a project in the past.  Beason Decl. at 1–6.  In reality, K2 fell short by "not arriv[ing] at the . . . locations until" months after promised, failing to "cover[] shifts," and reaching out to other entities to perform work it could not.  Beason Decl. at 1–6.  Indeed, the government at oral argument acknowledged "[a]s to its past [performance]," K2 advertised a "romantic comedy" but in truth put on "a horror film."  Tr. at 139:15–19.  K2's proposal thus "fails to conform to the material terms and conditions of the solicitation" because it misrepresented the success of its past performance.  *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32 (citing *Allied Tech. Grp., Inc.*, 649 F.3d at 1329); *Informatics, Inc.*, 57 Comp. Gen. at 225 (1978) ("Submission of a misstatement . . . which materially influences consideration of a proposal should disqualify the proposal.").  Further, as above, K2's expressly false statements directly related to the Solicitation requirement of successful past performance are sufficient "to sustain [a] . . . finding" K2 "intended to mislead" in an attempt to secure the contract award.  *Klein*, 866 F.2d at 415.  Indeed, without the misrepresentations regarding its past "successful performance," K2 would have had no relevant past performances on which to rely.  AR at 6883 (Solicitation); Tr. at 90:3–20.  The Court therefore finds K2's misrepresentations regarding the nature and quality of its past performance are material.  *Klein*, 866 F.2d at 415; *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32.

Finally, the Court looks at K2's representation it "m[et] all contract requirements" in assisting "a larger provider [who] accepted more work than they were able to perform."  AR at 10392, 10411 (K2 Proposal).

| *Compare* K2's Past Performance Proposal | *With* Beason Declaration |
|---|---|
| K2 "m[et] all contract requirements" to assist "a larger provider [who] accepted more work than they were able to perform."   AR at 10392, 10411 (K2 Proposal). | GK9 "lost work with . . . customers at sites that K2 was supposed to support."  Beason Decl. at 6. |

AR at 10392, 10411 (K2 Proposal).  Contrary to K2's claim of assisting GK9, the Beason Declaration states GK9 "lost work with other customers at sites that K2 was supposed to support."  Beason Decl. at 6.  The Solicitation required offerors demonstrate "successful performance . . . in the past for a national level program for cargo or mail screening."  AR at 6883 (Solicitation).  K2's representation it adequately assisted GK9, a "larger provider [who] accepted more work than they were able to perform," is therefore material because it impacts the Solicitation requirement to demonstrate "successful [past] performance."  *Id.*; AR at 10392, 10411 (K2 Proposal); *Golden IT*, 157 Fed. Cl. at n.32.  GK9's subcontracting to K2 ultimately had the opposite effect of meeting contract requirements:  GK9 "lost work with other customers at sites that K2 was supposed to support."  Beason Decl. at 6.  K2's proposal thus "fails to conform to the material terms and conditions of the solicitation" because it misrepresented its ability to perform and keep work for contractors in the past.  *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32 (citing *Allied Tech. Grp., Inc.*, 649 F.3d at 1329).  Further, as above, K2's expressly false statements directly related to this Solicitation requirement of successful past performance are sufficient "to sustain [a] . . . finding" K2 "intended to mislead" in an attempt to secure the

contract award. *Klein*, 866 F.2d at 415.  Indeed, without the misrepresentations regarding its past "successful performance," K2 would have had no relevant past performances on which to rely. AR at 6883 (Solicitation); Tr. at 90:3–20.  The Court therefore finds K2's misrepresentations regarding the nature and quality of its past performance are material.  *Klein*, 866 F.2d at 415; *Golden IT, LLC*, 157 Fed. Cl. at 701 n.34.

Overall, K2 painted "its past" as "a beautiful romantic comedy" when "instead it was a horror film."  Tr. at 139:15–19; Tr. at 85:22–24.  Per the Solicitation, K2 had to "[d]emonstrate[] [successful] support for the execution of cargo or mail screening across the U.S., including the planning and administration of such a national level program."  AR at 6883 (Solicitation).  K2, in response, asserted it "me[t] all contract requirements" during past performances in its proposal. AR at 10392, 10411 (K2 Proposal).  In reality, during its work for GK9, K2 failed to cover shifts, arrived months late to multiple locations, and had inadequate staffing.  Beason Decl. at 1– 6.  K2 likewise stated in its proposal it adequately assisted "a larger provider [who] accepted more work than they were able to perform."  AR at 10392, 10411 (K2 Proposal).  In reality, GK9 "lost work with . . . customers at sites that K2 was supposed to support."  Beason Decl. at 6. Finally, K2 stated it had "78 3PK9-C teams" on standby.  AR at 10392, 10411 (K2 Proposal).  In reality, K2 had no more than 40 individual employees at any one time.  Beason Decl. at 5.  These misstatements go to the heart of the Solicitation's past performance requirements.  *See* AR at 6883 (Solicitation).  Without its misrepresentations, K2 completely lacked relevant successful past performance.  Tr. at 90:3–20.  The "facts and circumstances" surrounding these express misstatements require a finding they were intentional—K2 intended to represent its past performance was sufficient to warrant contract award when this was not the case.  *Klein*, 866 F.2d at 415.  These misrepresentations are therefore material.  *Allied Tech Grp.*, 649 F.3d at 1329; *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32.

### 2.      CO's Analysis in the Moore Declaration

In the preceding Section, the Court found K2 intentionally and materially misrepresented its past performance.  The Court will next review the CO's analysis in the Moore Declaration— signed by CO Moore on 3 August 2023 (six months after the award)—to assess USPS's continued reliance on these material misrepresentations.  CO Moore assessed GK9's alleged material misrepresentations and the Beason Declaration in the Moore Declaration.  Moore Decl. ¶¶ 3–5.  The CO, after assessing the alleged misrepresentations, provides the following assessment and conclusion:

5. As the Contracting Officer, I reviewed the analysis underlying the February 2023 award.  I determined that [] even if the statements highlighted by GK9 were completely removed from the analysis, K2's score would not have changed so significantly with respect to the other offerors' scores that any specific cluster would have been awarded to any different offeror.

6. In reaching that conclusion, I reviewed the final scoring analysis.  K2 listed multiple accomplishments in its Past Performance section. The TET analysis indicated a strength for K2 based on its work for GK9.  It is possible, though not

at all certain, that removing that strength would have lowered K2's grade in Past Performance from "Good" to "Fair."

*Id.* ¶¶ 5,6.

CO Moore assessed whether K2 engaged in material misrepresentation by virtue of analyzing "the February 2023 award" in conjunction with "the statements highlighted by GK9"— the Beason Declaration. Moore Decl. ¶ 5. The CO concluded K2 had not engaged in material misrepresentation: "K2's score would not have changed [such] . . . that any specific cluster would have been awarded to any different offeror." *Id.* ¶ 5. The government reiterated this point at oral argument: "[T]he contracting officer's statement [is] basically saying, ultimately, I don't think . . . this is a material misrepresentation." Tr. at 49:4–13. Further, the Moore Declaration makes a responsibility determination regarding K2 and holds, notwithstanding the misrepresentation allegation, K2 is a responsible contractor such that K2 may remain an awardee. *See* Moore Decl. ¶ 5 ("[E]ven if the statements highlighted by GK9 were completely removed from the analysis, K2's score would not have changed so significantly with respect to the other offerors' scores that any specific cluster would have been awarded to any different offeror."). Although the Solicitation required USPS to "evaluate the depth of the offeror's experience and degree to which successful performance has occurred in the past for a national level program for cargo or mail screening," AR at 6883 (Solicitation), the CO overlooked K2's dearth of successful past performance in light of these misrepresentations. *See* Tr. at 90:3–20. Indeed, the Moore Declaration makes a responsibility determination, but in doing so the CO failed to adequately consider K2's capability as a contractor. Moore Decl. ¶ 5; Tr. at 141:2–7 ("[GOVERNMENT]: . . . [CO Moore] determined . . . that the award still stood."); *see also* Tr. at 97:12–19 ("[GOVERNMENT]: . . . The award score would not have been lowered sufficiently to disqualify them for award, and he mentions no other factor."). The government further stated at oral argument, "there's nothing in [the Moore] [D]eclaration that suggests [the CO] would have pulled the award according to the terms of the solicitation." Tr. at 98:2–4. Thus, even after accepting the allegations and evidence in the Beason Declaration as true, the CO concluded K2 is a viable contractor. Moore Decl. ¶ 5. The CO, however, overlooked K2's inability to demonstrate "successful [past] performance," AR at 6883 (Solicitation), after K2 misrepresented the quality of all past performance related to "national level program[s] for cargo or mail screening." *Id.*; Beason Decl. at 1–6.

### 3.    USPS's Reliance on the Material Misrepresentation

The Court next addresses whether USPS relied on K2's misrepresentations when originally awarding the contract. GK9 asserted at oral argument USPS relied on K2's material misrepresentation: "[K2's proposal discussion of past performance] was a misrepresentation. It was past performance used to misrepresent present capabilities, and the Government took it exactly the way that K2 wanted it taken, as a representation of present capability." Tr. at 192:3–10. The government responded: "In making the award, effectively the contracting officer's statement [in the Moore Declaration] says we still would have awarded to them, so there's no effective reliance . . . ." Tr. at 113:4–8.

USPS awarded K2 strengths and a "Good" rating for having 78 teams from July to December of 2021 in supporting GK9.  *See* AR at 12448 (USPS Award Recommendation for Evaluation Factor 3 – Past Performance).  Specifically, USPS stated:

> Evaluation Factor 3 – Past Performance:  *Good* . . .
> *Strengths* . . .
> From July to December of 2021, K2 was able to stand up seventy-eight (78) teams in eleven (11) cities and sixty-nine (69) customer locations as a subcontractor of Global K9, who needed K2 to help fulfill its contractual obligations.  *This shows that K2 has the resources and capabilities* to put teams in place in relatively short order.

See AR at 12448 (USPS Award Recommendation for Evaluation Factor 3—Past Performance) (emphasis added); *see also* AR at 11446.

The Solicitation, as noted *supra* Section VIII.B.1, required USPS "evaluate the depth of the offeror's experience and [the] degree to which successful performance has occurred in the past for a national level program for cargo or mail screening."  AR at 6883 (Solicitation).  USPS's evaluation was required to include a determination of whether each offeror "[d]emonstrated support for the execution of cargo or mail screening across the U.S., including the planning and administration of such a national level program."  *Id.*  Under the SP&Ps, USPS must select contractors capable of performing the contract.  SP&P § 2-26.4, at 166 ("Past performance and supplier capability must be evaluated during the purchasing process.").  USPS has discretion to act according to what is the best business decision for the agency.  SP&P at 1 ("These guidelines are intended . . . to assist the Postal Service in obtaining best value and to efficiently conduct its SCM functions.  They . . . are intended to provide for flexibility and discretion in their application to specific business situations.").

Here, the Solicitation required an evaluation of past performance.  *See* AR at 6883 (Solicitation).  USPS did so when it labeled K2's Past Performance "Good" and awarded K2 strengths for its "resources and capabilities to put teams in place in relatively short order."  *See* AR at 11446, 12448 12448 (USPS Award Recommendation for Evaluation Factor 3 – Past Performance).  USPS therefore took account of K2's past performance in making its February 2023 award; USPS would not have cited K2's 'successful' past performance as a strength and basis for its recommendation if past performance was "not material".  *Id.*; Tr. at 113:4–8.  As a result, K2's misstatement of its past performance materially influenced USPS's award decision: "From July to December of 2021, K2 was able to stand up seventy-eight (78) teams in eleven (11) cities and sixty-nine (69) customer locations as a subcontractor of Global K9, who needed K2 to help fulfill its contractual obligations.  This shows that K2 has the resources and capabilities to put teams in place in relatively short order . . . . The TET views these as all successful contract fulfillments."  AR at 12448 (USPS Award Recommendation for Evaluation Factor 3 – Past Performance); *Plan. Rsch. Corp.*, 971 F.2d at 741 (quoting *Informatics, Inc.*, 57 Comp. Gen. 217, 225 (1978) ("[W]e believe that the submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal . . . .  Any further consideration of the proposal in these circumstances

would provoke suspicion and mistrust and reduce confidence in the competitive procurement system.").

The Moore Declaration emphasizes USPS considered past performance, including K2's misrepresentations, in its February 2023 award decision.  The Moore Declaration acknowledges, "even if the statements . . . by GK9 were completely removed [from the February 2023 award] analysis, K2's score would not have changed . . . significantly."  Moore Decl. ¶ 5.  Even so, the Moore Declaration indicates removing the "strength for K2 based on its work for GK9" may lower "K2's grade in Past Performance from 'Good' to 'Fair.'"  *Id.*  CO Moore therefore admits USPS relied on K2's misstatements regarding its past performance in February 2023 such that the Beason Declaration may warrant a reduction in K2's adjectival rating.  *Id.*  USPS thus evaluated past performance as required by the Solicitation in February 2023, *see* AR at 6883, including by relying on K2's misstatements.  These misstatements led USPS to give K2 a strength based on K2's work for GK9, as well as a positive past performance grade, *supra*.  USPS thus used K2's misstatements in its consideration of "[p]ast performance and supplier capability" as set forth in the SP&Ps, *see* SP&P § 2-26.4, at 166 ("Past performance and supplier capability must be evaluated during the purchasing process."), and as required by the Solicitation.  *See* AR 6883 (Solicitation).  In sum, USPS relied on K2's material misrepresentations in its February 2023 award decision.  *Plan. Rsch. Corp.*, 971 F.2d at 741

### C.    Whether the Moore Declaration is Arbitrary and Capricious

The Court will next assess whether CO Moore's conclusion in the Moore Declaration is arbitrary and capricious.  At oral argument, the government agreed this is appropriate:  "whether the contracting officer's judgments are correct . . . [is] decided on the basis of an arbitrary and capricious standard of review."  Tr. at 109:18–110:11; *see also* Tr. at 112:14–16 ("[GOVERNMENT:]  But, ultimately, a decision to award on this record is judged on the basis of arbitrary and capricious for sure.").

An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  The Solicitation here required USPS "evaluate the depth of the offeror's experience and [the] degree to which successful performance has occurred in the past for a national level program for cargo or mail screening."  AR at 6883 (Solicitation).  USPS has discretion to determine what is the best business decision for the agency.  *See* SP&P at 1 ("These guidelines are intended . . . to assist the Postal Service in obtaining best value and to efficiently conduct its SCM functions.  They . . . are intended to provide for flexibility and discretion in their application to specific business situations."); *see also* Tr. at 97:5–7 ("[GOVERNMENT]:  . . . now it's up to the contracting officer to exercise his discretion and business judgment to determine what's best for the Postal Service").

CO Moore did not adequately assess GK9's allegations of material misrepresentation or the core substance of the Beason Declaration despite having all relevant information before him. *See, e.g.*, Moore Decl. ¶ 3 ("I have reviewed the portion of the [MJAR] filed by [GK9] that alleged that the offer of competing bidder K2 . . . materially misrepresented K2's past performance . . . ."). Specifically, the CO could have: (1) looked to the Beason Declaration and its 200 pages of supporting documentation; (2) analyzed whether K2 made material misrepresentations; and (3) drawn a conclusion regarding materiality and, ultimately, whether K2 was providing USPS with the best business value. Instead, with little to no analysis of GK9's allegations and supporting evidence, *see* Tr. at 140:12–141:7, CO Moore concluded K2 did not engage in *material* misrepresentation: "I determined that even if the statements highlighted by GK9 were completely removed from the analysis, K2's score would not have changed so significantly with respect to the other offerors' scores that any specific cluster would have been awarded to any different offeror." Moore Decl. ¶¶ 5, 6; Tr. at 101:12–18 ("THE COURT: So the [g]overnment's position is that under the CO's review . . . the only difference would be past performance would drop, but all things being considered, the [g]overnment should still pay K2 more because of perhaps a technical rating being higher[?] [GOVERNMENT]: . . . [Y]es."); Tr. at 49:4–13 ("[GOVERNMENT]: . . . [CO Moore's] statement basically say[s], ultimately, I don't think . . . this is a material misrepresentation [by K2], even if it's a misrepresentation."). Without engaging with the substance of the Beason Declaration or GK9's claims, CO Moore determined K2's complete misrepresentation of *all* of its relevant past performance might—at most—"lower[] K2's grade in Past Performance from 'Good' to 'Fair,'" with no impact on the contract awards. *Id.* Indeed, CO Moore failed to recognize K2, without its misrepresentations regarding "work performed as a subcontractor for GK9," has no successful past performance related to "the execution of cargo or mail screening across the U.S." on which to rely in its proposal. Moore Decl. ¶ 3; AR at 6883 (Solicitation).

Further, by failing to acknowledge the Beason Declaration's impact—i.e., K2 has no successful past performance on a similar contract as all provided examples were misrepresented—CO Moore did not "evaluate . . . [the] degree to which *successful* performance has occurred in the past" as required by the Solicitation. AR at 6883 (Solicitation) (emphasis added). Even the government noted at oral argument the CO's decision lacked thorough analysis: "THE COURT: . . . So you agree that there's no analysis of GK9's statements[?] [GOVERNMENT]: He is explaining the *results* of his analysis." Tr. at 143:22–25 (emphasis added). The government further noted materiality as it relates to material misrepresentation was "baked into [CO Moore's] conclusion," rather than being spelled out in any analysis. Tr. at 142:16–20. Thus, CO Moore failed to adequately evaluate K2's past performance record as required by the Solicitation. AR at 6883 (Solicitation).

CO Moore's decision is particularly arbitrary and capricious considering USPS's reliance on K2's past performance in its February 2023 decision. *Supra* Section VIII.B.3; AR at 12448 (USPS Award Recommendation for Evaluation Factor 3 – Past Performance) ("K2 was able to stand up seventy-eight (78) teams . . . as a subcontractor of Global K9, who needed K2 to help fulfill its contractual obligations. This shows that K2 has the resources and capabilities to put teams in place in relatively short order . . . . The TET views these as all successful contract fulfillments."). Instead of comparing K2's proposal and USPS's reliance in February 2023 to the Beason Declaration, CO Moore merely states, even were USPS to "remove[] . . . [the

misstatements highlighted by GK9 and the Beason Declaration from] the analysis[,]" "K2's score would not . . . change[] so significantly with respect to the other offerors' scores that any specific cluster would . . . be[] awarded to any different offeror." Moore Decl. ¶¶ 5, 6. CO Moore's unsupported statements fail to adequately consider how K2's misrepresentations and poor past performance impact its capability as a contractor, which is the sort of analysis required by the Solicitation and the SP&Ps. AR at 6883 (Solicitation); SP&P § 2-26.4, at 166 ("Past performance and supplier capability must be evaluated during the purchasing process."). Indeed, the SP&Ps specifically call for an analysis of an offeror's "past performance and . . . capability." SP&P § 2-26.4, at 166. The CO's decision therefore lacked any substantive analysis surrounding K2's material misrepresentations and therefore was arbitrary, capricious, and failed to consider best business value for USPS. *Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *State Farm*, 463 U.S. at 43). CO Moore failed to select a contractor "capable of performing the contract." SP&P § 2-26.4, at 166.

## IX. Whether USPS's Reliance on K2's Material Misrepresentation Prejudiced GK9

GK9 argues "K2's material misrepresentation prejudiced GK9" because "[w]ith K2 disqualified, USPS will have to award to GK9, even as improperly rated." GK9 MJAR at 32. At oral argument, GK9 specified USPS's reliance on K2's misrepresentation prejudiced GK9 for all clusters GK9 bid on except the Northeast Cluster[5]: "[GK9]: I would say [GK9 was prejudiced as it relates to] all four [clusters] they bid on . . . . The tradeoff came down to the three of us, and it ultimately ended up between [GK9 and K2] . . . ." Tr. at 185:2–186:15. GK9 argues it has a substantial chance of securing award should K2 be disqualified. Tr. at 105:21–25 ("[T]he standard . . . is [whether plaintiff] still [has] a substantial chance [at award], and . . . I think [K2] should be disqualified[.] [T]hen it's just [GK9] and AMK9, unless [USPS is] going to go back to a single award solution, which we would protest."); Tr. at 106:20–21 ("Our chances have been improved."). If K2 is disqualified, GK9's chances of being awarded the Southwest Cluster are the strongest: "[GK9]: [A]ll I have to show is my chances would increase, and I have showed my chances would . . . go through the roof as second on price if [K2 is] out." Tr. at 190:5–9. GK9's remaining arguments from Count III—that USPS failed to give price appropriate consideration in making the award decision for the Southwest cluster and USPS's second level, final award decision was irrational—are relevant to the Court's consideration of whether USPS's reliance on K2's material misrepresentation prejudiced GK9. *See supra* note 2; GK9 Reply at 1. GK9 argues "[f]or the Southwest cluster, USPS totally disregarded the material savings GK9 offered over K2." GK9 Compl. at 23. GK9 also argues "USPS also failed to meaningfully consider whether a two supplier solution posed all of the same benefits as its previous three supplier solution." *Id.* at 24.

At oral argument, the government appeared to concede GK9 was prejudiced by USPS's reliance on K2's misrepresentation. Tr. at 186:21–187:20 ("THE COURT: . . . [T]o the extent

---

[5] GK9 conceded it is not prejudiced as to the Northeast cluster because AMK9 won the Northeast cluster and K2's disqualification would not have impacted this award. Tr. at 186:10–13 ("[GK9]: Now, as to prejudice, I would concede that the one that we're second in price and AMK9 won, it wouldn't have mattered if K2 was disqualified or not on that one.").

that K2 is disqualified for being not responsible[ and being] incapable of performing the contract [was GK9 prejudiced?]  [GOVERNMENT]:  . . . I hate to say it's close enough for government work because it isn't in my view.").

To prevail in a bid protest, "the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citing *LaBarge Prod.*, *Inc. v. West*, 46 F.3d 1547, 1556 (Fed. Cir. 1995)).  To establish prejudice, "a protester must demonstrate that but for the alleged error, there was a substantial chance that it would receive an award."  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (cleaned up) (citing *CACI, Inc. – Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983)).  Protesters must establish a "substantial chance of securing the award."  *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002), *abrogated on other grounds by CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023); *see also CACI*, *Inc.-Fed*, 67 F.4th at 1153 ("[P]rejudice is related to the issue of statutory standing.").

But for K2's misrepresentations and the USPS's reliance on the misrepresentations, GK9 would have had a substantial chance of securing awards for the International, Southwest, and Northwest Clusters, which GK9 bid on but USPS awarded to K2.  AR at 12458–59.  GK9 stands a particularly good chance of securing the Southwest Cluster because GK9 offered the lowest price of all bidders but lost to K2 because K2 had "a higher technical ranking."  AR at 12459 ("While the CO acknowledges that Global has a lower price, K2's price is only [XXXXX]% percent higher (total base plus both options), a $[XXXXX] difference and K2 has a higher technical ranking. Due to the numerous weaknesses in Global's technical proposal, which resulted in a technical rating of only Fair (two adjectival ratings below K2), Global is not considered as the best value for this cluster.").  GK9's remaining arguments from Count III support prejudice—GK9 was prejudiced in USPS's decision to (1) award to K2 despite GK9 offering the lowest price in the Southwest Cluster and to (2) choose a two-supplier solution instead of a three-supplier solution.  GK9 Compl. at 23–24.  GK9 therefore has a "substantial chance of securing the award."  *Myers Investigative*, 275 F.3d at 1369–70; *see also Data Gen. Corp.*, 78 F.3d at 1562.  When USPS made "a significant error in the procurement process" by relying on K2's material misrepresentation, GK9 was accordingly prejudiced as it otherwise would have had a substantial chance of award.  *Data Gen. Corp.*, 78 F.3d at 1562.

## X.    Whether the Court Should Grant a Permanent Injunction to Disqualify K2

The Court may grant injunctive relief "only in extremely limited circumstances." *CCL Serv. Corp. v. United States*, 48 Fed. Cl. 113, 120 (2000) (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  Despite being on notice of this protest since February 2023, K2 has not intervened.  Tr. at 133:23–134:6.  K2 is at the center of this protest, however, meaning the Court's ruling in this case necessarily will impact K2's status under the contract.  *See supra* Section VIII.  Further, while "[i]t is not the Court's role to micromanage . . . an agency," *Michael Stapleton Assocs., Ltd. v. United States*, 163 Fed. Cl. 297, 362 (2022) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)), the Court concludes it is appropriate to consider a limited injunction disqualifying K2 from award, *infra*,

given this contract potentially implicates "planes falling out of the sky." Tr. at 100:19–24 (the government). USPS may then decide appropriate next steps and timing of transition consistent with this Order.

### A.      K2's Disqualification While Not a Party to the Case

GK9 argues it does not matter whether K2 is a party to the case because GK9 notified K2 about this bid protest in February 2023, and USPS is "presumably" in "regular contact with K2 and knows who to tell if it thinks K2 should intervene." GK9 MJAR Reply at 15; Tr. at 133:23–134:5 ("[GK9]: Document 52-1 is my prefiling notice, and we sent it to K2, so we know that they know about this, and they work with the [g]overnment every day, apparently pretty close, to monitor all those performance failures, and so if the Government thought they should have intervened, I'm sure they would have told them to, and yet we sit here in December, and they're nowhere to be found."). GK9 relies on Appendix C of the RCFC to argue K2 has been given notice to join the case and therefore the Court may make a decision impacting K2 despite K2 not being a party. GK9 MJAR Reply at 15 ("Appendix C requires protestors to give notice to awardees, like K2, before filing the protest." (citing RCFC App. C)). In its briefing, the government responded: "K2 is not a party to this case [so] has had no opportunity to review or to contest GK9's allegations." Gov't Cross-Mot. and MJAR at 25. At oral argument, however, the government pivoted, noting K2's lack of intervention in this case is "not per se" an issue. Tr. at 151:24–152:2 ("THE COURT: Should [K2 not being a party to this case] have any bearing on the Cour—s decision to disqualify K2? [GOVERNMENT]: Not per se. I am not here to argue for them . . . ."). The parties likewise agreed there is no caselaw discussing whether an awardee's decision not to intervene impacts this court's ability to adjudicate a bid protest. Tr. at 134:7–16 ("THE COURT: Is there any case law that suggests their acknowledgment of the prefiling notice, acknowledgment of the protest and decision not to participate plays into the fact that there's less consideration for them to be able to respond? . . . [GK9]: Not that I know of, Your Honor."); Gov't Cross-Mot. and MJAR at 25. Given the parties' agreement K2's absence is "[n]ot per se" an issue, Tr. at 151:24–152:2, and as K2 was provided sufficient notice and opportunity to intervene, the Court finds it may rule on GK9's motion to enjoin the government's award to K2. K2 could have intervened at any time permitted by the RCFC if K2 deemed necessary. Tr. at 133:23–134:6 (GK9). The Court is not prevented from adjudicating this protest because a potentially interested party freely opted not to participate, particularly when the government is representing its interests.

### B.      Whether Injunction is Appropriate

GK9 argues it "succeeds on the merits" and (1) "will be irreparably harmed without a permanent injunction"; (2) "[t]he balance of harms favors GK9"; and (3) "[a]n injunction serves the public interest in honest, open, and fair competition." GK9 MJAR at 33–34. The government and AMK9 respond injunctive relief is not warranted because the balance of harms does not favor GK9. Gov't Cross-Mot. and MJAR at 29–30 (citing *PGBA LLC*, 389 F.3d at 1226–29) ("[T]he balance of harms warrants a denial of injunctive relief."); AMK9 Cross-MJAR and Resp. at 38 ("GK9's arguments on the merits fall short."). The government argues remand is the most appropriate remedy. Gov''s Reply at 4, 15 ("Accordingly, even if the Court were to supplement the record with these materials, a remand would be necessary for the Court to

consider the matter on the basis of USPS's analysis of the materials rather than on the basis of a record created solely in this Court."); Gov't's Cross-Mot and MJAR at 25 ("[I]f this Court were to determine that further actions on GK9's allegations are merited, the only proper remedy would be remand."); Tr. at 43:18–21; *see supra* Section II.  In the parties' 20 November 2023 JSR, however, the government stated the remand process would likely not be resolved until March 2024 because USPS planned to "solicit information regarding all bidders from any entity for whom [each] claim[ed] to have performed K9 screening services."  20 Nov. 2023 JSR at 2.  At oral argument, the government retreated from this position and instead sought a 14-day period for USPS to "review the veracity of the Beason Declaration," Tr. at 219:7–9, rather than four months to conduct a full investigation of all bidders.  *See* Tr. at 182:22–184:10; *supra* Section VIII (discussing how USPS has long been aware of K2's material misrepresentation but has not investigated or acted upon the allegations).

In evaluating whether permanent injunctive relief is warranted, a court must consider:  (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown it will experience irreparable harm without an injunction; (3) whether the balance of harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest.  *PGBA, LLC*, 389 F.3d at 1228–29 (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)).  "[T]he [C]ourt must consider the [balance of] equities, including the balance of harms, when" determining "[w]hether declaratory or injunctive relief is the appropriate remedy."  *Fisher Sand & Gravel Co. v. United States*, 143 Fed. Cl. 247, 254 n.8 (2019) (citing *PGBA, LLC*, 389 F.3d at 1228).  No one factor is dispositive, and "the weakness of the showing of one factor may be overborne by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  GK9 succeeds on the merits of its material misrepresentation claim, *supra* Section VIII, so this first factor weighs in its favor.  The Court next analyzes the remaining three factors.

## 1.    Irreparable Harm

To succeed on irreparable harm, a plaintiff must demonstrate, "[a]bsent injunctive relief . . . it would be irreparably damaged."  *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 94 Fed. Cl. 389, 392 (2010).  An irreparable injury is one for which there is no adequate remedy in the absence of injunctive relief.  *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993).  GK9 argues it will be irreparably harmed without a permanent injunction given its "loss of potential work and profits" from USPS's award to K2 in reliance on K2's material misrepresentation.  GK9 MJAR at 33.  GK9 further contends the "depriv[ation] of a fair opportunity to compete due to a flawed" evaluation process is a form of irreparable harm warranting injunction.  *Id.* (citing *Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 355 (2012) ("Recoupment of bid preparation costs or other legal remedy would not serve to remedy plaintiff's loss of profits, key employees, the benefits of incumbency, and the opportunity to participate in a fair procurement process.")).  The government avers, monetary loss, which according to the government is GK9's primary alleged injury, "is not considered 'irreparable.'"  Gov't's Cross-Mot and MJAR at 30 (quoting *Chapman Law Firm Co. v. United States*, 67 Fed. Cl. 188, 193 (2005)).

Generally, the "mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages."  *Heritage of Am., LLC v. United States*, 77 Fed. Cl.

66, 78 (2007) (quoting *Hawaiian Dredging Constr. Co., Inc. v. United States*, 59 Fed. Cl. 305, 317 (2004)); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.") (citations omitted).  Lost profits from an unfair award competition may be deemed irreparable, however.  *Essex Electro Eng'rs, Inc. v. United States*, 3 Cl. Ct. 277, 287 (1983) (finding plaintiff would suffer irreparable harm and granting injunctive relief because "an action at law would be unavailing because [plaintiff] could [not] recoup its . . . loss of anticipated profits."); *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 194, 207 (2012) ("Intervenor's continued performance on the illegally awarded contract will cause plaintiff irreparable harm in the form of economic loss and monetary damages for lost profits.  Recovery of bid and proposal costs would do little . . . to compensate for the loss."); *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 333 (2003).  This court considers the "depriv[ation] of a fair opportunity to compete for award" an irreparable injury.  *See Contracting, Consulting, En'g LLC*, 104 Fed. Cl. at 355; *Michael Stapleton Assocs., Ltd.*, 163 Fed. Cl. at 350 ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." (quoting *CW Gov't Travel, Inc., v. United States*, 110 Fed. Cl. 462, 494 (2013))).  "The loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and opportunity to work" on an important and profitable procurement.  *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) (citation omitted).

"Protester[s like GK9] suffer[] irreparable harm if . . . deprived of the opportunity to compete fairly for a contract."  *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 494.  In the instant case, the government's reliance on K2's material misrepresentation in making its award decision, *supra* Sections VIII–IX, "tainted the bidding and evaluation process."  *Plan. Rsch. Corp.* v. *United States*, 971 F.2d 736, 740–41 (Fed. Cir. 1992).  GK9 was therefore "deprived of a fair opportunity to compete for award" and thus suffered irreparably injury.  *Contracting, Consulting, En'g LLC*, 104 Fed. Cl. at 355.  Further, to the extent the government argues the Court should "reject GK9's . . . claim[] of irreparable harm based upon lost profits," the Court agrees monetary damages are generally not considered irreparable for purposes of injunctive relief.  Gov't Cross-Mot and MJAR at 30; *Heritage of Am., LLC*, 77 Fed. Cl. at 78.  Loss of profits stemming from an awardee's "performance of [an] illegally awarded contract," however, is often considered "irreparable harm."  *GTA Containers*, 103 Fed. Cl. at 207.  Indeed, in *MORI Associates*, Judge Wolski reviewed more than ten orders issued by this court and its predecessor "recognizing the lost potential profits of bid protestors cannot be recovered in an action at law and thus, by their very nature, constitute irreparable injury."  *See Michael Stapleton Assocs., Ltd.*, 163 Fed. Cl. at 349 n.23 (citing *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011)).  Here, USPS awarded a large portion of the contract to K2 in reliance on K2's material misrepresentation, *see supra* Section VIII.  Absent injunction, K2 will continue to profit from performance of the contract, and GK9 will (1) continue to lose potential profits and (2) not have an opportunity to fairly compete for the 3PK9 award.  The Court therefore finds GK9 will be irreparably harmed without injunctive relief.  *Essex Electro Eng'rs, Inc.*, 3 Cl. Ct. at 287; *Plan. Rsch. Corp.*, 971 F.2d at 740–41 (noting material misrepresentations taint the award process); *GTA Containers*, 103 Fed. Cl. at 207; *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 494.  Factor two weighs in favor of GK9.

### 2.      Balance of Hardship

In considering factor three, balance of hardships, a court must balance the potential harm to the plaintiff in not granting the injunction against the potential harm to both the government and the awardee should the injunction be granted. *ES–KO v. United States*, 44 Fed. Cl. 429, 435–36 (1999); *see PGBA, LLC*, 389 F.3d at 1228–29.

As noted, *supra*, GK9 will suffer irreparable harm without injunctive relief. Specifically, GK9 will: (1) be "deprived of the opportunity to compete fairly for a contract," *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 494, and (2) continue to lose potential profits while K2 "perform[s] . . . [the] illegally awarded contract," *GTA Containers*, 103 Fed. Cl. at 207; *MORI Associates, Inc.*, 102 Fed. Cl. 503. The government, on the other hand, alleges an injunction "would potentially . . . adversely affect USPS's progress under the new solicitation . . . , [hinder] financial and operational gains[,] and . . . pose risks to operational efficiency." Gov't's Cross-Mot. and MJAR at 31. Specifically, the government raises concern regarding potential disruption to "awardees . . . obtain[ing] the necessary regulatory clearances . . . and training for rollout." *Id.*

GK9's requested injunction is narrow; the Court is asked to disqualify the already severely underperforming K2 while leaving USPS to manage the contract as it sees fit going forward. Tr. at 189:21–22 ("[GK9]: I'm not asking the Court to direct award."). The Court will therefore not consider contract administration beyond disqualification of K2. *See Michael Stapleton Assocs.*, 163 Fed. Cl. at 362 (citing *Motor Vehicle Mfrs. Ass'n. of U.S., Inc.*, 463 U.S. at 43 (1983)) ("It is not the Court's role to micromanage how an agency adapts its contracts . . . ."). Thus, to the extent the government fears adverse impacts on "USPS's progress under the new solicitation," Gov't's Cross-Mot. and MJAR at 31, any injunction issued by the Court will be "tailor[ed] . . . in such a way as to minimize the hardship to the [g]overnment." *Heritage of Am., LLC*, 77 Fed. Cl. at 79. Further, although the government expresses concern regarding disruption to the rollout schedule, USPS has already paused rollout until at least "mid-January [2024]" due to K2's ongoing poor performance. Tr. at 215:23–216:3; *see also* 18 Sept. 2023 JSR; 3 Oct. 2023 JSR at 2; 20 Nov. 2023 JSR. The government is likewise preparing for the contingency of "transition[ing] . . . services" away from K2 in the event K2 "fails to cure its performance deficiencies." 18 Sept. 2023 JSR at 2–3. The harm to the government from injunctive relief thus appears minimal; indeed, disruption to the 3PK9 program will be further mitigated by AMK9 and MSA's continued performance of a large portion of the contract. *See* Rollout Schedule at 1, ECF No. 59-2; Tr. at 216:14–20 ("[AMK9]: . . . MSA . . . continues to get work because K2 is unable to perform."). Finally, given USPS "knew about the [material misrepresentation] issues" raised by GK9 since at least March 2023 and chose not to act, *supra* Section VIII, the government "assumed the risk of harm that they would suffer if an injunction is granted." *GTA Containers*, 103 Fed. Cl. at 207. On the other hand, without an injunction, GK9 will continue to lose potential profits and will be permanently deprived of a fair opportunity to compete for award, *supra*. The balance of harms therefore favors GK9. *ES–KO*, 44 Fed. Cl. at 435; *PGBA, LLC*, 389 F.3d at 1228–29.

### 3.      Public Interest

The final factor contemplates whether an injunction serves the public interest; when "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). GK9 argues there is a "public interest in honest, open, and fair competition in the procurement process," which is "compromised whenever an agency abuses its discretion in evaluating a contractor's bid." GK9 MJAR at 34–35 (quoting *Serco Inc v. United States*, 81 Fed. Cl. 463, 502 (2008)). GK9 notes an award based upon "material misrepresentation" likewise harms the public's interest "in obtaining the best value for its tax dollars." *Id.* at 35. The government disagrees, arguing an injunction would not serve the public interest as it "is likely to increase costs to the USPS and could lead to delays of mail and packages." Gov't's Cross-Mot. and MJAR at 31.

This court has repeatedly held "[i]t is axiomatic that the public has an interest in honest, open, and fair competition in the procurement process." *Cincom Sys. v. United States*, 37 Fed. Cl. 266, 269 (1997) (citing *Magellan Corp.*, 27 Fed. Cl. at 448). "It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *Labat-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 581 (2005) (quoting *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 578 (2004)) (internal quotation marks omitted). In the instant case, USPS relied on K2's material misrepresentation in making its award decision, *supra* Section VIII. The 3PK9 award process therefore did not feature "fair competition," *Cincom Sys.*, 37 Fed. Cl. at 269; rather, USPS's decision was part of a "bidding and evaluation process" "tainted" by K2's material misrepresentation. *Plan. Rsch. Corp.*, 971 F.2d at 740–41. The "overriding public interest in preserving the integrity of the federal procurement process," *Labat-Anderson, Inc.*, 65 Fed. Cl. at 581, therefore militates in favor of granting plaintiff injunctive relief.

Further, "determining that the grant of an injunction serves the public interest . . . implicates 28 U.S.C. § 1491(b)(3), which provides that, in the exercise of its bid-protest jurisdiction, 'the court [] shall give due regard to the interests of national defense and national security . . . .'" *GTA Containers*, 103 Fed. Cl. at 207 (quoting 28 U.S.C. § 1491(b)(3)). In its November 2022 *MSA* Order, the Court recognized these concerns but dismissed them as not present:

> On the public interest factor, the Court first appreciates the national security implications of the USPS's 3PK9 program and notes the initial concerns surrounding public security for the implementation of airport screening are no longer present. . . . In 2021, the government highlighted the national security concerns surrounding the solicitation, and, in fact, GK9 withdrew its motion for a preliminary injunction due to the need for new airport screenings to continue opening because of national security. *See Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 311 (2021). . . . In 2022, those same concerns are no longer present.

*Michael Stapleton Assocs., Ltd.*, 163 Fed. Cl. at 353. While the Court ultimately "disqualif[ied] MSA from future performance as a result of [organizational conflict of interest]-tainted solicitations," *Id.* at 308, the parties did not raise concerns regarding national security in 2022 as

MSA had not misrepresented its past performance or current ability to perform the contract. *Compare id.*, *with supra* Section VIII; *Michael Stapleton Assocs., Ltd.*, 163 Fed. Cl. at 343. Here, in contrast, K2 materially misrepresented the quality of its past performance in a purported attempt "to misrepresent present capabilities." *Supra* Section VIII; Tr. at 192:3–10 (GK9). In a case potentially implicating "planes falling out of the sky," Tr. at 187:25 (the government), a material misrepresentation of past performance relied upon by the agency to assess present capabilities raises national security concerns. USPS's reliance on K2's material misrepresentation in its February 2023 award decision therefore weighs in favor of a narrow injunction disqualifying K2 from this procurement. *See* 28 U.S.C. § 1491(b)(3); *GTA Containers*, 103 Fed. Cl. at 208 ("[T]he interests of national defense and national security must be accorded due regard in determining whether to award injunctive relief."); *see also Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 702 (2010) ("[W]hen . . . national security interests are implicated, the public interest factor gains 'inflated' importance in the court's balancing of the equities."), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021). Disqualifying K2 will remove the potential national security risk posed by USPS's reliance on K2's material misrepresentation, *supra*, but will not disrupt the large portion of this contract currently being performed by other contractors. *See* Rollout Schedule, ECF No. 59-2. Further, as USPS is *sua sponte* preparing to potentially remove K2 from this contract, *see* 3 Oct. 2023 JSR at 2 (USPS "accept[ed] K2's proposed [corrective] plan [and] . . . allow[ed] 60 days of performance to remedy deficien[cies] . . . [at which] point, [USPS] reserve[s] all possible options, including . . . terminating the contract."), disruption to the agency from K2's disqualification will likely be limited.

Finally, the government argues "an injunction is not in the public interest because it is likely to" hinder the "progress of the new solicitation," "increase costs to the USPS[,] and . . . lead to delays of mail and packages." Gov't's Cross-Mot. and MJAR at 31. At oral argument, however, USPS counsel acknowledged "[t]he rollout schedule is . . . stayed pending . . . [evaluation of] K2's performance issues" in "mid-January [2024.]" Tr. at 215:23–216:3; *see also* 20 Nov. 2023 JSR at 3. The government agreed "everything [is] . . . on hold until [about] 15 January [2024]." Tr. at 217:3–7. Thus, while "there is a . . . public interest in minimizing disruption" to the procuring agency, there will be limited disruption to USPS because the rollout is already stayed, and the government has spent at least three months since notifying the Court of K2's performance issues in September 2023 preparing for the possibility of K2's removal. *See Heritage of Am., LLC*, 77 Fed. Cl. at 80; *see* 3 Oct. 2023 JSR at 2 (USPS "accept[ed] K2's proposed [corrective] plan [and] . . . allow[ed] 60 days of performance to remedy deficien[cies] . . . [at which] point, [USPS] reserved all possible options, including . . . terminating the contract."). With K2 disqualified, progress on the re-solicitation may even proceed quicker as USPS will be forced to re-award K2's clusters to other offerors rather than wait to see whether K2 can remedy its deficiencies. Further, AMK9 and MSA are still performing, meaning a large portion of the contract work will continue without interruption. *See* Rollout Schedule, ECF No. 59-2 at 1; Tr. at 216:14–20 ("[AMK9]: . . . MSA . . . continues to get work because K2 is unable to perform."). Overall, the public's interests in fair competition in the procurement process and national security weigh in favor of granting GK9's requested injunction disqualifying K2 from award, and the government has not shown there will be meaningful disruption to the administration of this contract as a result of such relief. Thus, the fourth factor—the public interest—weighs in favor of granting an injunction. *See Cincom Sys.*,

37 Fed. Cl. at 269; *GTA Containers*, 103 Fed. Cl. at 207 (quoting 28 U.S.C. § 1491(b)(3)); *Heritage of Am., LLC*, 77 Fed. Cl. at 80.

### 4.      Whether K2 Should be Enjoined from Participation in this Procurement

Summarizing the discussion *supra*, GK9 has succeeded on the merits of its material misrepresentation claim.  *Supra* Section VIII; Tr. at 196:7–11 ("[GOVERNMENT:]  . . . [I]f the Court were to find that [K2 was] awarded this contract . . . because of [its] material misrepresentation . . . then [K2 is] not entitled to the contract.").  GK9 has likewise successfully alleged it will incur irreparable harm without injunctive relief, *supra* Section X.B.1.  Absent injunction, GK9 will be permanently deprived of the opportunity to compete in a fair award process and will continue to lose potential profits.  *Plan. Rsch. Corp.*, 971 F.2d at 740–41 (noting material misrepresentations taint the award process); *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 494; *GTA Containers*, 103 Fed. Cl. at 207.  Further, the balance of harms favors GK9.  *See Supra* Section X.B.2.  An injunction will prevent GK9 from sustaining the irreparable harm just discussed, while only minimally disrupting the already-paused rollout of the 3PK9 contract.  *Id.*; *PGBA, LLC*, 389 F.3d at 1228–29; *Heritage of Am., LLC*, 77 Fed. Cl. at 80; *GTA Containers*, 103 Fed. Cl. at 207; *ES–KO*, 44 Fed. Cl. at 435.  Finally, the public's interests in fair competition and national security weigh in favor of granting GK9's requested injunction, and the government has not provided evidence an injunction will disrupt administration of the 3PK9 contract any more than USPS's current reevaluation and potential *sua sponte* disqualification of K2.  *See Supra* Section X.B.3.  The injunction factors therefore all weigh in favor of GK9.  The issuance of a permanent injunction disqualifying K2 from the instant solicitation is accordingly warranted. *PGBA, LLC*, 389 F.3d at 1228–29.[6]

## XI.    Whether USPS Failed to Have Meaningful Discussions

Although the Court has already determined injunctive relief is appropriate, the Court turns next to GK9's final argument—USPS failed to "conduct meaningful discussions."  *See* GK9 MJAR at 19.  GK9 argues "USPS failed to conduct meaningful discussions" because "USPS did not mention any of the significant weaknesses in GK9's proposal during discussions with GK9" and therefore "deprived GK9 of an opportunity to address those significant weaknesses and improve its proposal."  GK9 MJAR at 18–9.  GK9 cites *Banknote Corp.* in its MJAR to argue, "[t]he Court of Federal Claims applies traditional [FAR] Part 15 discussions principles to USPS," meaning any discussion between GK9 and USPS had to be "meaningful"

---

[6] At oral argument, the government noted many of the idiosyncrasies in this case stem from the litigation and contract administration running in parallel.  Tr. at 197:8–13.  This observation further supports the Court's decision to grant an injunction as it reinforces the Court's conclusion, *supra* Section VIII, USPS has long been aware of K2's material misrepresentation but has not investigated or acted upon these issues.  During three years of contract administration "in parallel" with this litigation, Tr. at 197:8–13, the agency has had multiple opportunities to correct errors, including nearly nine months to review GK9's allegations of K2's material misrepresentation, but did not do so.  *See supra* Section VIII (discussing the government's inability to explain why it did not investigate K2's proposal when GK9 first raised material misrepresentation issues); Tr. at 61:2–4 ("[GK9]:  . . . We raised this issue in March [2023]."); *see also* Tr. at 71:24–25:6 ("THE COURT:  . . . I don't understand why USPS would not immediately investigate K2's statements.  [GOVERNMENT]:  I have nothing else I can offer to the Court at this point . . . .").

and "generally lead [GK9] into the areas of [its] proposal[] requiring amplification or correction." *Id.* at 18 (citing *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)).  The government disagrees and argues the applicable USPS "SP&P's do not require USPS to allow suppliers to correct all weaknesses in their proposals" because SP&P § 2-37.1 "provides that discussions *allow* USPS to 'generate further information and facts' and 'clarify any possible misunderstandings with a supplier.'"  Gov't's Cross-Mot. and MJAR at 19 (emphasis added) (quoting SP&P § 2-37.1, at 209).  AMK9 responds USPS need only follow the standard set out by the SP&Ps, which, unlike FAR Part 15, does "not mandate that the government . . . notify each offeror of significant weaknesses or deficiencies."  AMK9 Cross-MJAR and Resp. at 32.

GK9 and the USPS Purchase Team discussed seven weaknesses[7] during the procurement process.  AR at 10985 (GK9's Weaknesses Stated in Discussions).  On 23 February 2023, after USPS issued awards to K2 and AMK9, GK9 and USPS TET debriefed regarding GK9's proposal weaknesses, at which time USPS noted 13 issues with GK9's proposal.[8]  AR at 12738–39 (23 February 2023 GK9 Debriefing).

---

[7] The weaknesses discussed are as follows:

- Needed clarification on the exact number of resources (canine teams) they intend to use at each cluster site.
- Needed information on each of the canine teams (as per the SOW) regarding who the handler is, their experience, and the history of the canine and their individual testing.
- Need clarification on the exact number of resources they had for immediate deployment.
- Needed clarification on how Global intended to [XXXXX] to fulfil the requirements at the [XXXXX], [XXXXX], and [XXXXX] sites.
- Needed clarification on the number of recommended team compliment for each cluster site
- Needed additional clarification on the number of teams immediately available and the number of teams that Global will need to recruit for at the SAN, PHX, and ANC cluster sites
- Needed clarification on the amount of time Global estimates recruitment would take up (what the expected timeline would be).

AR at 10985 (GK9's Weaknesses Stated in Discussions).

[8] The weaknesses discussed are as follows:

Strengths and Weaknesses
- In reviewing Global's technical proposal, the Technical Evaluation Team identified strengths and weaknesses, and I'll review the significant strengths and weaknesses now.

Evaluation Factor 1 – Service Capability
. . . .
Weaknesses
- Did not detail organization's management plan or organizational structure.
- Did not directly address the ability to conduct research on air flow relating to packaging and containment types routinely encountered
- Failed to address how explosive odors were stored and secured and it did not provide a process for reconciling offered volume versus screened volume
  - Did not address ability to track the location of explosive odors in real time; or
  - The use of technology that triggers a response when the explosive odor leaves a set geographic boundary

**B.      Applicability of the SP&Ps to this Case**

USPS is exempt from the FAR and the Competition in Contracting Act.  39 U.S.C. § 410(a) ("[N]o Federal law dealing with public or Federal contracts . . . shall apply to the exercise of the powers of the Postal Service.").  USPS created the SP&Ps to supplement USPS's purchasing regulations; they are nonbinding and serve as guidance:

> These guidelines are intended for internal use only to assist the Postal Service in obtaining best value and to efficiently conduct its [supply chain management (SCM)] functions.  They are advisory and illustrative of approaches that may generally be used by Postal Service employees to conduct SCM activities, but are intended to provide for flexibility and discretion in their application to specific business situations.

SP&P at 1.  In a prior opinion related to this case, the Court explained:  "The text of the SP&Ps is clear they only provide guidance and are not binding regulations . . . ."  *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614, 2021 WL 1086225, at *13 (Fed. Cl. Mar. 19, 2021).  At oral argument, the parties agreed with the Court's interpretation of the SP&Ps in *American K9*.  Tr. at 14:9–13 ("[GOVERNMENT]:  [The SP&Ps and the FAR] are two completely different regiments.  One is basically more business-oriented, the SP&Ps, as this Court noted in the 2021 . . . *American K9* case . . . they are not binding at all.");  Tr. at 13:3–6 ("THE COURT: So do you agree with the Court's take on SP&Ps versus FAR from March 2021?  [GK9]: As best I recall it, Your Honor, yes, that the SP&Ps are just [nonbinding] guidelines.").

---

- Did not indicate it would self-report and perform root cause analysis within twenty-four (24) hours associated with a canine not passing certifications, covert assessments, and recertification
- Did not directly discuss documenting chain of custody
- Did not provide training records, photographs of the canine and the handler associated with assigned 3PK9-C, odor logs, or canine medical records
- Did not address collaborating with the Postal Service, the USPIS, and the Alarm resolution provider to create a 3PK9 script and playbook
- Did not provide CVs for all key personnel or list the certification dates of all certified 3PK9 teams
- Did not state it would be able to have access to scientific expertise and have the ability or willingness to share that data with all parties

Evaluation Factor 2 - Resource Allocation and Roll-out Responsiveness:
. . . .
Weaknesses
- Did not give a detailed roll-out plan. Global stated it has canines in training but did not say whether those canines or if the current resources it has would be utilized for this contract

Evaluation Factor 3 – Past Performance
- While there are some strengths, such as an established national footprint, there were unreconcilable discrepancies with the audit results. Did not provide verifiable TSA pass / fail rates"

AR at 12738–39 (23 February 2023 GK9 Debriefing)

FAR Part 15 does not apply to USPS because "no Federal law dealing with public or Federal contracts . . . appl[ies] to the exercise of the powers of the Postal Service." 39 U.S.C. § 410. Rather, as the Federal Circuit has noted, "[t]he Purchasing Manual, [the predecessor to the SP&Ps,] not the [FAR], applies to USPS procurements." *Banknote Corp. of Am.*, 365 F.3d at 1349 n.1. The SP&Ps "are intended for internal use only to assist the Postal Service in obtaining best value and to efficiently conduct its SCM functions," meaning they are applicable to USPS's actions under the procurement in this case. SP&P at 1. GK9's argument "[t]he Court of Federal Claims applies traditional [FAR] Part 15 discussions principles to USPS," GK9 MJAR at 18–19, therefore fails because "[t]he Purchasing Manual [and SP&Ps], not the [FAR], appl[y] to USPS procurements." *Banknote Corp. of Am.*, 365 F.3d at 1349 n.1. GK9, furthermore, concedes "SP&P [§] 2-37.1 governs USPS discussions" in its MJAR and stated at oral argument "if the FAR doesn't apply at all, then I can't give Your Honor any [binding] authority for the obligation to hold meaningful discussions." GK9 MJAR at 18; Tr. at 22:2–6.

B.      **Analysis of USPS's Discussions with GK9**

The relevant SP&P, SP&P § 2-37.1, states "discussions *may* be held with any supplier to clear up misunderstandings or uncertainties or to gain a better understanding of the supplier's proposal (including price) in order to obtain a more informed comparison of the relative value of individual proposals." *See* SP&P § 2-37.1, at 209 (emphasis added). Under SP&P 2-37.1, USPS need not hold discussions at all during the evaluation process, but rather has the option (i.e., "*may*") to hold discussions to the extent helpful to USPS. *Id.* (emphasis added). Indeed, even if the SP&Ps stated USPS "shall" hold discussions, it would not be clear such discussions are mandatory because the SP&Ps are nonbinding guidance. *Am. K-9 Detection Servs.*, 2021 WL 1086225, at *13; Tr. at 19:25–20:2 ("[GK9]: Well, there's nothing that's binding about the SP&Ps at all. They're just guidelines."). Therefore, when conducting discussions, USPS need not address every aspect of a supplier's proposal, including all those deemed weaknesses: "[I]t is well-accepted that '[COs] are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.'" *Banknote*, 56 Fed. Cl. at 385 (quoting *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 835 (1999)). GK9 ultimately conceded at oral argument discussions are optional: "[GK9]: I certainly think discussions are not always required, even under the FAR, even under 15.306. So I think the[] [SP&Ps and FAR are] parallel in the sense that [discussion is] optional. It's within the . . . [g]overnment's discretion to have discussions or not . . . ." Tr. at 11:9–14; *see also* Tr. at 22:2–6 ("[I]f the FAR doesn't apply at all, then I can't give Your Honor any authority for the obligation to hold meaningful discussions . . . ."). Accordingly, GK9's argument USPS failed to conduct mandatory meaningful discussions fails because the SP&Ps are nonbinding, and there is no requirement USPS must have discussions at all, let alone meaningful discussions. *See Banknote*, 56 Fed. Cl. at 385, *aff'd*, 365 F.3d at 1345; *Am. K-9 Detection Servs.*, 2021 WL 1086225, at *13; Tr. at 22:2–6 ("[I]f the FAR doesn't apply at all, then I can't give Your Honor any authority for the obligation to hold meaningful discussions . . . ."). GK9 remains entitled to injunctive relief, however, due to K2's material misrepresentation. *See supra* Sections VIII–X. The Court next turns to plaintiff MSA's arguments.

## XII.    **Whether MSA Has Standing to Protest the Solicitation**

MSA filed a Motion to Supplement and a MJAR.  *See supra* Section V.  Defendants argue the Court should not consider the merits of MSA's motions because MSA was "disqualified from award under the [S]olicitation" and therefore lacks standing.  *See, e.g.*, Gov't's Cross-Mot. and MJAR at 27 (citing *Michael Stapleton Assocs., Ltd. v. United States*, 163 Fed. Cl. 297, 360 (2022)).  As standing "an indispensable part of [a] plaintiff's case[]" and "is a threshold jurisdictional issue," the Court first addresses whether MSA has standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561; *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)), *abrogated on other grounds by CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023).

MSA argues it "is an interested party under 28 U.S.C. § 1491(b)(1) as an actual offeror whose direct economic interest in the procurements will be adversely affected by an award to other offerors."  MSA Am. Compl. at 3.  MSA argues "[i]f MSA's appeal is successful, MSA will no longer be disqualified from the 3PK9 procurement and will again be eligible to protest awards made to AMK9 and K2 that, had the USPS conducted a rational procurement in accordance with the Solicitation, would have resulted in the majority of awarded work going to MSA."  *Id.*  MSA also argues: "if MSA does not protest to this Court the SDRO's denial of MSA's initial disagreement now, and if this Court does not review USPS's evaluation and award decision under the 2022 3PK9 solicitation now, it will likely lose its opportunity to do so and will never be able to obtain the full number of awards to which it is entitled."  MSA Compl. at 3, *Michael Stapleton Assocs. Ltd v. United States*, 163 Fed. Cl. 297 (Fed. Cl. Mar. 1, 2023), ECF No. 1.  The government responds, "all of MSA's arguments fail for an overarching reason:  in the prior *MSA* bid protest, the Court disqualified MSA from award in the [S]olicitation under review."  Gov't's Cross-Mot. and MJAR at 27 (citing *Michael Stapleton Assocs., Ltd.*, 163 Fed. Cl. at 360).  The government reasons "no potential error by USPS in the September 2022 award recommendation could prejudice MSA because MSA is not currently eligible to receive award."  *Id.*  AMK9 responds MSA "lacks standing and cannot show prejudice" and therefore the "Court should dismiss MSA's protest" because "MSA is not an actual or prospective offeror" and "was not considered for award in USPS's final decision."  AMK9 Cross-MJAR and Resp. at 7–9.  MSA replies "MSA has the economic interest of an intervenor to protect its economic interests before this Court in GK9's appeal."  MSA Reply at 7 (citing *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 764 (2006)).

Under the Tucker Act, the "United States Court of Federal Claims . . . ha[s] jurisdiction to render judgment on an action by an *interested party* objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (emphasis added).  The Federal Circuit has stated an "interested party" under § 1491(b)(1) "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  Protestors must establish a "substantial chance of securing the award" to meet the standing requirement.  *Myers Investigative & Sec. Servs., Inc.*, 275 F.3d at 1369–70.  "The issue of prejudice is related to the issue of statutory standing."  *CACI, Inc.-Fed*,

67 F.4th at 1153–54 (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (describing various formulations of prejudice)).

The Court disqualified MSA as an offeror in the 2022 re-solicitation because of MSA's OCI. *Michael Stapleton Assocs., Ltd.*, 163 Fed. Cl. at 360 ("The Court finds while the USPS could have further mitigated remaining unequal access to information issues favoring MSA, the USPS could not have removed MSA's advantage stemming from biased ground rules OCIs, and therefore, MSA cannot participate in the 2022 re[-]solicitation."). MSA is therefore not an "interested party" under 28 U.S.C. § 1491(b)(1) because MSA was not, and could not be, a "bidder" or "offeror" for the 2022 re-solicitation or subsequent February 2023 re-award. 28 U.S.C. § 1491(b)(1); *Am. Fed'n of Gov't Emps., AFL-CIO*, 258 F.3d at 1302 ("[S]tanding under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."). MSA has no "direct economic interest" as required by 28 U.S.C. § 1491(b)(1) because, given its disqualification, MSA did not have a "substantial chance of securing the award." *Am. Fed'n*, 258 F.3d at 1302 (Fed. Cir. 2001); *Myers Investigative & Sec. Servs., Inc.*, 275 F.3d at 1369–70. Specifically, MSA had *zero* chance of being a recipient of the February 2023 award. *Id.* MSA thus fails to demonstrate the "direct economic interest" necessary to establish standing. *Id*; *Am. Fed'n of Gov't Emps., AFL-CIO*, 258 F.3d at 1302. MSA further cannot show prejudice from any alleged error because USPS could not and therefore did not consider MSA for award. *See CACI, Inc.-Fed.*, 67 F.4th at 1153–54 (citing *Data Gen. Corp.*, 78 F.3d at 1562).

MSA argues "[i]f MSA's appeal is successful, MSA will no longer be disqualified from the 3PK9 procurement and will again be eligible to protest awards made to AMK9 and K2." MSA Am. Compl. at 3. MSA concedes, however, its "ability to seek redress with the Court as to the 2022 3PK9 procurement will be necessarily limited" "if its appeal(s)" of the Court's disqualification of MSA is unsuccessful. MSA Reply at 3. MSA's argument is therefore untimely. The Federal Circuit has not yet ruled on MSA's appeal, meaning MSA's future ability to seek relief related to the 2022 3PK9 procurement is uncertain. The Court, however, must assess USPS's February 2023 award and cannot delay indefinitely while awaiting the outcome of MSA's appeal. MSA argues it "filed its MJAR to preserve its post-award protest rights . . . and to avoid the equitable doctrine of laches," not to "ask the Court for an advisory opinion or an end-around the normal appellate process currently before . . . the Federal Circuit." *Id.* In ruling on MSA's MJAR, however, the Court *would* be providing an advisory opinion because MSA lacks standing. *See Golden v. Zwickler*, 394 U.S. 103, 108 (1969) ("The federal courts . . . do not render advisory opinions." (cleaned up)); *Am. Fed'n of Gov't Emps., AFL-CIO*, 258 F.3d at 1302. MSA cannot file this protest to "preserve is post-award protest rights" because it was not eligible for award in February 2023. *Michael Stapleton Assocs., Ltd.*, 163 Fed. Cl. at 360. At oral argument, MSA conceded there is no caselaw supporting its stance MSA has standing while disqualified and awaiting adjudication of a related appeal. Tr. at 203:22–25 ("THE COURT: What case law supports the notion that a pending appeal qualifies you for standing? [MSA]: There's no case that's directly on point. There is no case that says that."). The Court cannot consider MSA's MJAR because MSA cannot establish it is an "interested party," 28 U.S.C. § 1491(b)(1), with a "substantial chance of securing the award" and, thus, cannot establish it has standing. *Myers Investigative & Sec. Servs., Inc.*, 275 F.3d at 1369–70; *Am. Fed'n of Gov't Emps., AFL-CIO*, 258 F.3d at 1302.

## XIII.    Whether the Court Should Grant MSA's MJAR

MSA makes numerous arguments related to USPS's evaluation of its proposal during the September 2022 award process, *see supra* Section V.  Specifically, MSA argues USPS did not conduct its review in accordance with the Solicitation because, for instance, "[t]he administrative record does not indicate that the TET ever evaluated or ranked the offerors' pricing proposals," as the proposals were "only evaluated by the Pricing/Purchase Team 'to see if price would become a determinative factor in assigning each cluster.'"  MSA MJAR at 11, 17 (quoting AR 11181); *see supra* Section V.  MSA also argues "USPS irrationally determined that K2 and AMK9 would provide it with the best value in the International, Central South, Central East, and Northeast 3PK9 clusters, despite MSA's proposal exhibiting a substantial comparative advantage over K2 and AMK9."  MSA MJAR at 26 (citing AR at 11181–11185); *see supra* Section V.

All of MSA's arguments relate to USPS's September 2022 award decision because MSA was disqualified before, and did not participate in, the February 2023 decision at issue in this Order.  *See* MSA MJAR; Tr. at 203:10–13 ("[MSA]:  . . . The whole point of our protest is we don't want to lose the ability to challenge the September 2022 decision . . . ."); AR at 12442 (February 2023 USPS Award Decision).  As noted, *supra* Section XII, MSA does not have standing in this case.  The Court therefore need not address the merits of MSA's MJAR, particularly because they involve the September 2022 award, which is not now before the Court. *Id.*  Accordingly, the Court finds as moot MSA's Motion for Judgment on the Administrative Record.  *See Lujan*, 504 U.S. at 561; *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002), *abrogated on other grounds by CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023).

## XIV.    Whether USPS's Decision Prejudiced MSA

Throughout its MJAR, MSA argues USPS's decision was prejudicial.  *See* MSA MJAR *passim*.  Specifically, MSA argues "USPS's failure to apply the terms of the Solicitation to its evaluation of 3PK9 proposals prejudiced MSA, whose pricing proposal included all costs associated with operating a TSA-compliant 3PK9 screening program."  MSA MJAR at 17 (citing Decl. of Shelton. ¶ 8, ECF No. 39-1).  MSA also argues:  "Because there was a substantial chance that MSA would have received a higher percentage of the 3PK9 awards absent USPS's failure to have the TET evaluate price [and conduct a proper risk assessment], USPS's actions prejudiced MSA."  *Id.* at 22 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999)).  MSA "requests an evidentiary hearing to determine whether MSA was prejudiced by USPS failing to conduct a risk assessment according to the terms of the Solicitation."  *Id.* at 24 (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005)).  The government argues "MSA cannot show prejudice from any alleged error because it was not a potential recipient of the February 2023 award."  Gov't's Cross-Mot. and MJAR (first citing *Alfa Laval Separation, Inc.*, 175 F.3d at 1368; and then citing *Sys. Stud. & Simulation, Inc. v. United States*, 122 F.4th 994, 997 (Fed. Cir. 2021)).  AMK9 argues "[t]he Court should dismiss MSA's protest because MSA lacks standing and cannot show prejudice," particularly because "the rankings would have remained the same" "[e]ven if MSA was correct that the TET did not evaluate pricing."  AMK9 Cross-MJAR and Resp. at 12–13.

"[A] protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info., Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (*citing GraphicData LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003)).  To prevail, "the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citing *LaBarge Prod.*, *Inc. v. West*, 46 F.3d 1547, 1556 (Fed. Cir. 1995)).

MSA's substantive arguments all relate to USPS's September 2022 award decision because it was under that decision USPS evaluated MSA's proposal.  *See* MSA MJAR *passim*. The September 2022 decision, however, is not at issue in this case.  *See supra* Sections XII–XIV. Further, given its disqualification, MSA cannot establish it had a "substantial chance of securing [either] the [September 2022 or February 2023] award," meaning MSA lacks standing.  *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002) (abrogated on other grounds by *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023)); *see supra* Section XII.  Given MSA's lack of standing and challenge to an award not at issue in this case, the Court finds as moot MSA's arguments related to prejudice.

## XV.   Whether the Court Should Grant MSA's Request for Injunctive Relief

MSA seeks injunctive relief ordering USPS "to set-aside awards made to parties other than MSA . . . on the grounds that USPS's determination to make contract awards to . . . AMK9 . . . and K2 . . . was both arbitrary and capricious and made in violation of the terms of the Solicitation"  MSA Am. Compl. at 1–2.  The government responds injunctive relief is not warranted as MSA cannot succeed on the merits and the balance of harms favors the government.  Gov't's Cross-Mot. and MJAR at 29–30 (citing *PGBA LLC v. United States*, 389 F.3d 1219, 1226–29 (Fed. Cir. 2004)).  AMK9 responds, not only does "MSA . . . not have standing," MSA also fails to demonstrate the injunctive relief factors support its request.  AMK9 Cross-MJAR and Resp. at 19; *see supra* Section X.

MSA does not have standing in this case because it is not an "interested party" pursuant to 28 U.S.C. § 1491(b)(1).  *See supra* Section XII; 28 U.S.C. § 1491(b)(1); *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("[S]tanding under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").  MSA has no "direct economic interest" as required by 28 U.S.C. § 1491(b)(1) because MSA did not have a "substantial chance of securing the award."  *Am. Fed'n*, 258 F.3d at 1302 (Fed. Cir. 2001); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002), *abrogated on other grounds by CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023). Accordingly, injunctive relief is not appropriate.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Am. Fed'n of Gov't Emps., AFL-CIO*, 258 F.3d at 1302.

## XVI.   Whether the Court Should Grant MSA's Motion to Supplement the Administrative Record

MSA seeks to supplement the administrative record with "with a declaration from MSA employee Chris Shelton . . . to aid [the Court] in its review of the administrative record and to help determine, if needed, whether. . . USPS['s] actions prejudiced MSA." MSA Mot. to Suppl. Admin. R. at 1–2. MSA argues: "If USPS would have fully considered all relevant costs in maintaining a . . . canine screening team when it evaluated pricing proposals, then there was a substantial chance that MSA would have won the bulk of USPS's 3PK9 awards if USPS found that other offerors' proposals did not fully account for . . . operational costs." *Id.* at 5 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999)). The government responds: "the Court should deny MSA's motion to supplement the record because MSA cannot receive award at present" and "cannot demonstrate prejudice due to its currently being ineligible to receive award." Gov't's Cross-Mot. and MJAR at 11, 28. The government also argues: "MSA has not shown that supplementation of the record with the declaration would be proper . . . [because] [t]he declaration is akin to an expert witness statement from a representative from its client rather than information that USPS should have considered during the proceeding." *Id.* at 28. AMK9 responds: "While MSA would like the court to believe that the costs discussed in Mr. Shelton's declaration were not included in AMK9's proposal (or K2's proposal), the record is sufficient on its face for the Court to make a determination." AMK9 Resp. to Mots. to Suppl. at 2.

The Court cannot grant relief to a party without standing. *See Lujan*, 504 U.S. at 561 (noting standing is "an indispensable part of [a] plaintiff's case"). To grant MSA's Motion to Supplement, the Court must first conclude MSA has standing to make such a motion. *Id.* As noted, *supra* Section XII, however, MSA does not have standing because it is not an "interested party" under 28 U.S.C. § 1491(b)(1). 28 U.S.C. § 1491(b)(1); *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("[S]tanding under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."). MSA has no "direct economic interest" as required by 28 U.S.C. § 1491(b)(1) because MSA did not have a "substantial chance of securing the award." *Am. Fed'n*, 258 F.3d at 1302 (Fed. Cir. 2001); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002), *abrogated on other grounds by CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023). The Court accordingly cannot grant MSA's requested relief.

## XVII.  Next Steps of the Contract

In its MJAR, GK9 requests bid and proposal costs. GK9 MJAR at 36. In the most recent order for case number 20-1614, the Court noted: "[T]he only issues unresolved [in Case No. 20-1614] are bid preparation and proposal costs and attorneys' fees." Order at 2, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614, (Fed. Cl. Feb. 3, 2023), ECF No. 183. The parties agreed and noted, "this case still presents a live controversy that must be adjudicated because GK9 and AMK9 each sought bid and proposal costs." JSR at 2, *Am. K-9 Detection Servs., LLC*, No. 20-1614 (Fed. Cl. Mar. 6, 2023), ECF No. 184. Case number 20-1614 is currently stayed pending resolution of this case. Order, *Am. K-9 Detection Servs., LLC*, No. 20-1614 (Fed. Cl. May 4, 2022), ECF No. 172.

"[B]id preparation and proposal costs are a primary remedy for violations of procurement law." *Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1379 (Fed. Cir. 2022). As such, the parties **SHALL FILE** a JSR within fourteen days of the issuance of this Order providing updates regarding:

> (1) The need for additional briefing in this case related to bid and proposal costs in consolidated cases, Nos. 23-210, 23-311;

> (2) The need for additional briefing in this case related to bid and proposal costs in consolidated cases, Nos. 20-1614, 21-1165, as mentioned in the parties' 6 March 2023 JSR in Case No. 20-1614, ECF No. 184, and a discussion of whether all bid and proposal cost issues can be consolidated across all cases; and

> (3) USPS's anticipated contract administration timeline considering the implementation of a permanent injunction disqualifying K2's performance, as well as updates on K2's continued performance before disqualification is fully implemented.

## XVIII. Conclusion

For the foregoing reasons, the Court (1) **GRANTS in part and DENIES in part** plaintiff GK9's Motion for Judgment on the Administrative Record and grants award of a permanent injunction disqualifying K2 from performance, ECF No. 41; (2) **GRANTS** plaintiff GK9's Motion to Supplement the Administrative Record, ECF No. 42, and **GRANTS** the government's supplementation of the administrative record, ECF No. 46-1; (3) **FINDS as MOOT** plaintiff MSA's Motion for Judgment on the Administrative Record, ECF No. 39; (4) **FINDS as MOOT** plaintiff MSA's Motion to Supplement the Administrative Record, ECF No. 38; (5) **GRANTS in part and DENIES in part** the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 46; and (6) **GRANTS in part and DENIES in** part AMK9's Cross-Motion for Judgment on the Administrative Record, ECF No. 44.

**IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge