# In the United States Court of Federal Claims

Nos. 23-210, 23-311
(Filed: 11 April 2024)

| | |
|---|---|
| GLOBAL K9 PROTECTION GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>AMERICAN K-9 DETECTION SERVICES, LLC,<br><br>Defendant-Intervenor. | No. 23-210 |
| MICHAEL STAPLETON ASSOCIATES, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 23-311 |

*Walter Brad English*, Maynard Nexsen PC, with whom were *Jon D. Levin*, *Emily J. Chancey*, and *Nicholas P. Greer*, all of Huntsville, AL, for plaintiff Global K9 Protection Group LLC.

*Ryan Christopher Bradel*, Ward & Berry PLLC, of Tysons, VA for plaintiff Michael Stapleton Associates, LTD.

*Steven Gillingham*, Assistant Director, with whom were *Reginald T. Blades*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, all of Washington, DC, for defendant.

    *Daniel Jonathan Strouse*, Cordatis LLP, with whom were *Joshua D. Schnell*, all of Arlington, VA, for defendant-intervenor.

*Tanya M. Salman*, Michael Best & Friedrich LLP, with who was *Nicole A. Vele*, of Madison, WI and Washington, D.C., for movant-intervenor K2 Solutions, Inc.

## OPINION AND ORDER

**HOLTE, Judge.**

On 22 September 2020, the United States Postal Service (USPS) issued Solicitation No. 2B-20-A-0087 to procure third-party canine mail screening for cargo on passenger airlines. Two months later, on 18 November 2020, American K-9 Detection Services (AMK9), now an awardee and defendant-intervenor but at that time a plaintiff, filed a protest before this court. *See* AMK9 2020 Compl., ECF No. 1, *Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl. Nov. 18, 2020). Now, after four years, two remands with related remand extensions,[1] two formal re-solicitations,[2] two injunctions,[3] three re-awards splitting the contract into two

[1] All remands related to this string of cases occurred in case No. 20-1614. *See Am. K-9 Detection Servs., LLC v. United States*, No. 20-1614 (Fed. Cl.). The following orders in case No. 20-1614 discuss the various instances of remand: 19 Mar. 2021 Unreported Order, ECF No. 55 (first formal remand "to USPS for complete OCI investigation"); 16 Aug. 2021 Reported Order, ECF No. 112 (second formal remand to "reopen the OCI investigation into MSA . . . according to the guidelines provided by the SP&Ps and reassess a complete and documented review of the OCI in light of the Court's" findings); 30 Aug. 2021 Order, ECF No. 117 (order granting motion for extension of time (EOT) to file USPS CO remand results); 13 Oct. 2021 Order, ECF No. 124 (order granting motion for EOT to file USPS Co remand results).

[2] The Solicitation in this case was first issued 22 September 2020. *See Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 257 (Aug. 2021). In February 2022, USPS took corrective action and "issued two new solicitations—one for Third-Party Canine Mail Screening ('Canine Screening') services and one for Mail Screening Alarm Resolution ('Alarm Resolution') services (collectively, '2022 resolicitation')." *See Michael Stapleton Assocs., Ltd v. United States*, 163 Fed. Cl. 297, 312 (Nov. 2022) (discussing USPS taking corrective action, resulting in the issuance of two new solicitations, to mitigate the organizational conflict of interest (OCI) by shortening MSA's contract by one year and cancelling all renewal options for the contract).

[3] On 26 October 2022, in light of CO Franklin's October 2021 report finding "MSA had an OCI involving unequal access to information and possibly biased ground rules" due to "a member of the [USPS] technical evaluation committee [sending] an [internal] presentation to . . . MSA," the Court issued an order "to seek USPS guidance on several reevaluation or resolicitation factors to craft an equitable remedy . . . in [a] forthcoming, more detailed order." 26 Oct. 2022 Sealed Order, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. 26 Oct. 2022), ECF No. 69; *see also* 31 Oct. 2022 Public Order, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. 31 Oct. 2022), ECF No. 72. On 23 November 2022, the Court, in a more detailed order, enjoined MSA from performance in light of the CO's October 2021 OCI directions being violated amid the 2022 contract award processes. 23 Nov. 2022 Order, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. 23 Nov. 2022), ECF No. 85 (citing 2020 AR at 3665–84 (CO Franklin's 22 October 2021 Decision Following Second Remand), ECF No. 125-5); *see also* 30 Nov. 2022 Public Reported Order, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. 30 Nov. 2022), ECF No. 89; *Michael Stapleton Assocs., Ltd v. United States*, 163 Fed. Cl. 297 (30 Nov. 2022). On 22 December 2023, in a related case, the Court enjoined USPS' award of the contract to K2 based on a finding of material misrepresentation in K2's proposal. Specifically, the Court had "ample reason . . . [to] find[] . . . falsity in K2's proposal related to past performance." *Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 142 (2023).

procurements,[4] and approximately 34 total dog years,[5] this case has finally reached its end.

On 22 October 2021, following the second formal remand of this case, *see supra* note 1, Contracting Officer (CO) Franklin filed a 20-page report on the "reopen[ing] [of] the [organizational conflict of interest (OCI)] investigation into [Michael Stapleton Associates (MSA)] . . . according to the guidelines provided by the [USPS Supplying Principles and Practices (SP&Ps)] and [provided] a complete and documented review of the OCI in light of the Court's findings," *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 312 (Aug. 2021). *See* 2020 AR at 3665–84 (CO Franklin's 22 October 2021 Decision Following Second Remand), ECF No. 125-5 (internal quotations omitted). CO Franklin found "it is impossible to conclude, looking back, that no OCIs existed" because "MSA had unequal access to information and possibly benefitted from biased ground rules." CO Franklin's 22 October 2021 Decision Following Second Remand at AR 3680–82; *see Michael Stapleton Assocs., Ltd v. United States*, 163 Fed. Cl. 297, 323, 328 (2022). CO Franklin reviewed in depth the actions of "Mr. X," a USPS Aviation Mail Specialist on the USPS technical evaluation committee, who sent "an internal presentation to . . . [an] Executive Vice President . . . at MSA during the 2020 solicitation process." *Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. at 319–20. Specifically, Mr. X shared competitively useful information regarding "USPS' expected savings related to the 3PK9 program, expected costs, and planned order of rollout of airports." *Id.* at 320 (citing CO Franklin's 22 October 2021 Decision Following Second Remand at 3677). CO Franklin explored the potential motivation for Mr. X to impermissibly share such competitive materials, and noted the explanations provided by the government and MSA—the most likely of which, according to the government, was Mr. X was "under the 'mistaken impression' the contract following MSA's 2019 pilot program was sole-source." *See id.* CO Franklin also reviewed MSA employee Mr. Shelton's involvement with the TSA Mail Amendment and pilot program; specifically, that Mr. Shelton "manage[d] MSA's air cargo business line and, while [previously] at TSA, was closely involved in the development of TSA's canine screening program." *See id.* at 308, 323 n.8 (discussing why Mr. Shelton was walled off given his "continued inclusion" in the disputes surrounding these contracts). While CO Franklin did "not f[i]nd evidence of any OCIs that MSA had through Mr. Shelton, as he was [voluntarily] walled off from the proposal process" by MSA, CO Franklin recommended, in light of the "unequal access to information and biased ground rules" "the Postal Service [] end the MSA contract early and conduct a new competition to fulfill the requirement for canine screening services," largely due to Mr. X's involvement. CO Franklin's 22 October 2021 Decision Following Second Remand at 3682–83 (discussing corrective action to be taken by USPS: "modify the MSA contract so that the base term expires on November 6, 2023, instead of November 6, 2024, [] not [] exercise any renewal options under the contract [and] . . . conduct a new competition so that a new contract to fulfill the 3PK9 requirements will be in place at the conclusion of the 3-year term."); *see Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. at 312, 323 n.8, 349 n.21. CO Franklin concluded Mr. X

---

[4] In November 2020, the first contract award in this case was issued to MSA. On 9 September 2022, USPS re-awarded canine screening clusters to MSA, AMK9 and K2 Solutions. *See* Redacted Compl. at 5, ECF No. 20. Following MSA's disqualification due to USPS Contracting Officer (CO) Franklin identifying OCIs, *see Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. 297; CO Franklin's 22 October 2021 Decision Following Second Remand, and K2's disqualification due to material misrepresentation, *see Glob. K9 Prot. Grp., LLC*, 169 Fed. Cl. 116, in January 2024, USPS made formal re-awards, *see* 2 Feb. 2024 Joint Status Report, ECF No. 89.

[5] *See* AMERICAN KENNEL CLUB, *How to Calculate Dog Years to Human Years* (Mar. 14, 2024), https://www.akc.org/expert-advice/health/how-to-calculate-dog-years-to-human-years/.

"should not be permitted to participate on the next technical evaluation team for the follow-on contract" given his sharing of competitive information was a potentially unmitigated OCI. CO Franklin's 22 October 2021 Decision Following Second Remand at AR 3683; *see Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. at 319.

On 18 February 2022, USPS took corrective action to mitigate the OCI by shortening MSA's contract by one year and cancelling all renewal options for the contract, along with unbundling the new solicitations. *See supra* note 2. In response, on 16 March 2022, MSA filed various disagreements at the agency level related to USPS' decision to unbundle the contract. 31 Oct. 2022 Public Order at 3, *Michael Stapleton Assocs., Ltd*, No. 22-573 (Fed. Cl. 31 Oct. 2022), ECF No. 72. Also in March 2022, offerors Global K9 Protection Group, LLC (GK9) and AMK9 submitted business disagreements pertaining to USPS' 18 February 2022 corrective action, arguing the measures were insufficient given MSA was still allowed to compete despite allegedly having an unfair advantage. *Id.* (citing AR at 6326–43 (AMK9's Initial Business Disagreement), 6344–50 (GK9's Initial Business Disagreement)). In May and June 2022, respectively, AMK9 and GK9 filed similar challenges before the Court. *See id.* Upon filing its Motion for Judgment on the Administrative Record (MJAR) and reviewing the administrative record, AMK9 discovered Mr. X participated in a "lessons learned" consultation for the 2022 re-solicitation. *Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. at 319. Concerning Mr. X's participation, the Court noted: "[i]f Mr. Shelton was walled off by MSA, the USPS should have followed suit regarding" Mr. X because "[t]he 'lessons learned' consultation and the TET are overlapping enough in content (analyzing the SOW) and members (including at least three members of both entities) to 'indicate the existence or potential existence of a conflict' because of the violation of the CO's directive to avoid OCIs." *Id.* at 324 ("CO Franklin reported [Mr. X's] correspondence with MSA likely 'further compounded' MSA's competitive advantage because the same [USPS] people were 'materially involved in both the development of the program and on the [USPS evaluation team]."). The Court reasoned: "USPS'[] continued inclusion of [Mr. X] was irrational as well as arbitrary and capricious because the USPS objectively—and in spirit—violated the directions of its own CO." *See id.* at 325 (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (additional citations omitted)).

On 31 October 2022, in response to the Court's request for information regarding, among other things, "a timeline [for] replacement of [MSA] . . . given [its] potential exclusion," 31 Oct. 2022 Public Order at 5, *Michael Stapleton Assocs., Ltd*, No. 22-573, the government filed a report and declaration from CO Baker. *See* Sealed Resp., *Michael Stapleton Assocs., Ltd*, No. 22-573, ECF No. 71 (explaining transition of MSA's alarm resolution contract could take up to "a year and a half"); *see also* Amended Sealed Resp., *Michael Stapleton Assocs., Ltd*, No. 22-573, ECF No. 77; *Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. at 346–47 (discussing CO Baker's declarations). In its subsequent 23 November 2022 decision addressing GK9 and AMK9's challenges to USPS' alleged insufficient corrective action, the Court reviewed USPS' plan to phase out MSA due to OCIs, including the prohibition of ongoing involvement with Mr. X, as detailed in CO Franklin's 22 October 2021 report. *Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. 297 (30 Nov. 2022); *see* CO Franklin's 22 October 2021 Decision Following Second Remand. After considering the CO's 22 October 2021 report finding OCIs, USPS' decision to slowly phase out MSA, and the 2022 ongoing involvement of Mr. X, the Court "discuss[ed]

whether the SP&Ps and FAR prescribe the same remedy of disqualification when biased ground rules OCIs exist." *Id.* at 334. Although "generally agree[ing] with the USPS' proposed plans to phase-out MSA and disqualify MSA from future performance as a result of OCI-tainted solicitations," the Court determined the SP&Ps required an immediate injunction so "ma[de] [an] equitable determination" disqualifying MSA. *Michael Stapleton Assocs.*, 163 Fed. Cl. at 308, 323 n.8. The Court accordingly denied MSA's 14 July 2022 MJAR in case No. 22-573, which "contend[ed] [] USPS'[] 'decision to conduct separate solicitations for 3PK9 and Alarm Resolution services was arbitrary and capricious.'" *Id.* at 318, 363; *see* MSA Sealed MJAR at 2, *Michael Stapleton Assocs., Ltd*, No. 22-573, ECF No. 52. The Court explained: "MSA is no longer a viable awardee for a follow-on contract [given] the injunction factors weigh in favor of MSA's exclusion." *Michael Stapleton Assocs.*, 163 Fed. Cl. at 349. This decision was in large part due to Mr. X's and Mr. Shelton's "continued inclusion," *see supra*, in the administration and solicitation of these contracts, including Mr. X's "participat[ion] in [a] 'lessons learned' consultation for the 2022 re[-]solicitation." *See Michael Stapleton Assocs., Ltd*, 163 Fed. Cl. at 319, 323 n.8, 325.

MSA promptly appealed this decision, along with two others related to this case. *See* 3 Nov. 2022 Notice, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. Nov. 3, 2022) (appealing the Court's October 2022 Order contemplating injunction of MSA), ECF No. 76; 29 Nov. 2022 Notice, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. Nov. 29, 2022) (appealing the Court's November 2022 Order enjoining MSA), ECF No. 86; 7 Feb. 2023 Notice, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. Feb. 7, 2023) (appealing the Court's January 2023 Order adopting USPS' proposed re-solicitation plan), ECF No. 110. On appeal, the Federal Circuit denied MSA's Motion to Expedite decision on the Court's injunction. *See Michael Stapleton Assocs., Ltd v. United States*, No. 23-1273 (Fed Cir. Mar. 23, 2023), ECF No. 30. Despite this injunction, which intended to quickly terminate MSA's performance soon after November 2022, USPS effectively maintained a contract period even longer than CO Franklin's decision to phase out MSA early by November 2023. *See Michael Stapleton Assocs.*, 163 Fed. Cl. at 349 n.21; CO Franklin's 22 October 2021 Decision Following Second Remand (discussing corrective action to be taken by USPS: "modify[ing] the MSA contract so that the base term expires on November 6, 2023, instead of November 6, 2024, [] not [] exercis[ing] any renewal options under the contract [and] . . . conduct[ing] a new competition so that a new contract to fulfill the 3PK9 requirements will be in place at the conclusion of the 3-year term."). MSA is therefore *still* performing work on this contract for a time period longer than CO Franklin intended in his October 2021 report and far longer than the Court intended in the November 2022 injunction order.

On 9 September 2022, following MSA's disqualification and the second re-solicitation, USPS awarded a contract to latecomer K2 Solutions, Inc. (K2). On 13 February 2023, plaintiff GK9 filed its most recent complaint, bringing a post-award bid protest against USPS in response to the September 2022 awards. AMK9, one of two awardees, joined soon after as a defendant-intervenor. K2, on the other hand, opted not to intervene despite receiving proper notice and tracking the docket—a decision uncharacteristic of awardees in procurement cases. *See* 19 March 2024 Oral Arg. Tr. ("Tr.") at 61:17–62:16, ECF No. 135; Tr. at 43:15–20. GK9 was later joined by plaintiff MSA in challenging USPS' awards.

In March 2023, after reviewing the administrative record, GK9 amended its Complaint to allege awardee K2 materially misrepresented the quality of past work summarized in its proposal. On 22 December 2023, following briefing on the parties' cross-MJARs, the Court enjoined USPS' award to K2 based on a finding of material misrepresentation in K2's proposal. Specifically, the Court had "ample reason . . . [to] find[] . . . falsity in K2's proposal related to past performance." *Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 142 (2023). The Court considered the significance of enjoining non-party K2 but ultimately concluded it was "not prevented from adjudicating th[e] protest because a potentially interested party freely opted not to participate." *Id.* at 151.

On 10 January 2024, in response to the Court's Order, K2 filed a Motion to Intervene, ultimately requesting the Court reconsider its material misrepresentation findings. Unbeknownst to the Court and plaintiffs, during this timeframe, USPS was moving forward with plans to terminate K2's services for default due to ongoing performance failures. *See infra* Section IV. As the Court would find out later, on 24 January 2024, USPS—in a decision unrelated to the Court's December 2023 injunction but highly consequential to K2's Motion to Intervene—terminated K2 for default. Although K2 mentioned this in passing at a pre-oral argument status conference on 15 February 2024, *see infra*, it was not until 16 March 2024—three days before the 19 March oral argument—that the government provided formal notice to the Court and parties of this termination for default due to the "continued inability of K2 to satisfy the [contract] requirements." 24 Jan. 2024 Letter at 3, ECF No. 127-1. Piling onto the list of communication and contract management failures plaguing this contract since its 2020 inception, USPS counsel received, but did not open, the letter detailing K2's termination in January 2024. USPS thus did not notify government counsel or the Court of the termination for default for nearly two months. Tr. at 10:22–24 ("THE COURT: So [today is 19 March 2024,] when did you open the [24 January 2024] letter and read it? [USPS COUNSEL:] Last week sometime."). When filing the 24 January 2024 letter in mid-March, the government explained USPS counsel "had not reviewed the letter when he received it, not long after it was issued, because at that time, he believed, it was sufficient for him to know that K2 had in fact been terminated, and USPS'[] focus then was on the re-award of the K2 contracts." Gov't Suppl. to Mot. Suppl. at 2, ECF No. 131. This explanation is particularly problematic as the Court requested government counsel provide an update on the termination for default as "part of the [parties']" joint status report in February 2024. *See* 15 Feb. 2024 Status Conf. Tr. at 44:6–8, ECF No. 142. Upon their eleventh-hour receipt of this information, the named parties agreed this termination for default substantively changes the Court's analysis of K2's Motion to Intervene as K2 no longer has a legally protectible interest upon which to intervene. USPS, as a result of the termination for default, has moved forward with rolling out the contract with new awardees GK9 and AMK9.

The government's extreme delay in filing the termination for default notice is yet another example of improper contract management and communication breakdowns between USPS and government counsel—a trend in this case demonstrated by the four-year history of re-solicitations, re-awards, and remands.[6] The Court suggests the mistakes in this case are primarily due to USPS' poor contract administration and communication. To the extent USPS

[6] The Court recognizes some of these issues may be due to frequent changes in government and USPS counsel on this case.

has argued during this protracted litigation "the Court must award it special treatment" because it is not bound by the Federal Acquisition Regulations (FAR) and the Competition in Contracting Act (CICA), *Am. K-9 Detection Servs.*, 155 Fed. Cl. at 269, USPS' performance related to this contract suggests to the Court USPS needs more standardized procurement procedures.  The Court held previously, "the purpose of the SP&Ps is to create a 'fair, objective' standard for business."  *Id.*  This applies with equal force today, yet in this case, USPS has drained the parties' and the Court's resources as it continuously fails to properly award this contract, a contract potentially implicating "planes falling out of the sky."  30 Nov. 2023 Oral Argument Tr. at 100:19–24 (the government), ECF No. 75.  Many of these issues stem from USPS' use of the SP&Ps rather than using FAR and CICA standards, the latter of which are notably used by all other federal agencies for procurement—perhaps using FAR and CICA would increase USPS' proficiency in contract administration.

Now, a year after this seventh protest was filed—"an eternity" in a bid protest—after the Court made a final decision on an injunction, and after being terminated for default, K2 seeks to intervene for the first time.  For the foregoing reasons, the Court:  (1) finds as moot K2's Motion to Intervene; (2) finds as moot K2's Amended Motion to Intervene; (3) finds as moot GK9's Motion to Seal; (4) grants the government's Unopposed Motion for Extension of Time; (5) grants the government's Motion for Leave to File Supplement the Record; (6) finds as moot K2's Motion for Leave to File a Surreply; and (7) strikes GK9's Objection as deficient.  The Court also finds as moot all remaining motions in the original related stayed protest *American K-9 Detection Services*, *LLC v. United States*, No. 20-1614 (Fed. Cl.), as judgment in this case resolves all pending motions, *see infra*.  As concluded *infra*, the Court now finally resolves this four-year bid protest saga of contract mismanagement and party dispute.

## I.    Background

### A.    Factual Background

The Court recounted the extensive factual background in this case and related cases in its December 2023 Order granting plaintiff GK9's MJAR.  *See Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 122–28 (2023).  Relevant to K2's instant Motion to Intervene, in February 2023, GK9 and MSA brought post-award bid protests against the United States Postal Service (USPS) and defendant-intervenor AMK9.  *Id.* at 127.  After filing its protest, GK9 served awardee K2 with a pre-filing notice in accordance with the Rules of the United States Court of Federal Claims (RCFC).  *Id.* at 151.  Despite receiving this notice, K2 opted not to intervene.  *See id.*  The parties subsequently engaged in MJAR briefing.  In its MJAR filed 7 July 2023, *see* ECF No. 41, GK9 argued:

> K2 should be disqualified from this competition due to its material misrepresentation about its past performance, specifically because K2 misrepresented its performance capabilities in connection with prior work for GK9 during 2021. . . . Relying upon the Beason Declaration attached to its Amended Complaint, GK9 cites numerous prior performance deficiencies by K2, most of which surround staffing issues and a potential misrepresentation of K2's certified team capability. . . . Specifically, GK9 argues "K2 misrepresent[ed] that it '[met]

> all contract requirements'" when it caused many performance failures and "misrepresented [the] number of teams" used to support GK9, which was approximately 66 *individuals* rather than 78 *teams*. GK9 MJAR at 28; AR at 10392 . . . Using the Beason Declaration, GK9 assumes K2 represented in its proposal for this Solicitation every. . . person who ever billed time to the [GK9] Subcontract constituted a "team," which is how K2 calculated it had 78 teams.

*Id.* at 128 (cleaned up); *see also* GK9's Redacted MJAR at 24, ECF No. 108. After analyzing the parties' MJAR briefing, including 200 pages of supplemental documentation supporting GK9's allegations, the Court found K2 materially misrepresented its past performance:

> Per the Solicitation, K2 had to "[d]emonstrate[ ] [successful] support for the execution of cargo or mail screening. . . . K2, in response, asserted it "me[t] all contract requirements" during past performances in its proposal. . . . In reality, during its work for GK9, K2 failed to cover shifts, arrived months late to multiple locations, and had inadequate staffing. . . . K2 likewise stated in its proposal it adequately assisted "a larger provider [who] accepted more work than they were able to perform." . . . In reality, GK9 "lost work with ... customers at sites that K2 was supposed to support." . . . Finally, K2 stated it had "78 3PK9-C teams" on standby. . . . In reality, K2 had no more than 40 individual employees at any one time. . . . These misstatements go to the heart of the Solicitation's past performance requirements. . . . Without its misrepresentations, K2 completely lacked relevant successful past performance. . . . The "facts and circumstances" surrounding these express misstatements require a finding they were intentional—K2 intended to represent its past performance was sufficient to warrant contract award when this was not the case. *Klein*, 866 F.2d at 415. These misrepresentations are therefore material. *Allied Tech. Grp.*, 649 F.3 d at 1329; *Golden IT, LLC*, 157 Fed. Cl. at 700 n.32.

*Glob. K9 Prot. Grp.*, 169 Fed. Cl. at 145. The Court accordingly enjoined the government from awarding the contract to K2. *Id.* at 156. In doing so, the Court considered the impact K2's non-party status should have on its decision and determined K2's lack of intervention did not prevent the Court from issuing an injunction:

> GK9 argues it does not matter whether K2 is a party to the case because GK9 notified K2 about this bid protest in February 2023, and USPS is "presumably" in "regular contact with K2 and knows who to tell if it thinks K2 should intervene." GK9 MJAR Reply at 15; Tr. at 133:23–134:5 ("[GK9]: Document 52-1 is my prefiling notice, and we sent it to K2, . . . if the Government thought they should have intervened, I'm sure they would have told them to, and yet we sit here in December, and they're nowhere to be found."). . . . [T]he government responded: "K2 is not a party to this case [so] has had no opportunity to review or to contest GK9's allegations." . . . At oral argument, however, the government pivoted, noting K2's lack of intervention in this case is "not per se" an issue. Tr. at 151:24–152:2 ("THE COURT: Should [K2 not being a party to this case] have any bearing on the Court's decision to disqualify K2? [GOVERNMENT]: Not per se. I am not

> here to argue for them. . . ."). The parties likewise agreed there is no caselaw discussing whether an awardee's decision not to intervene impacts this court's ability to adjudicate a bid protest. . . . Given the parties' agreement K2's absence is "[n]ot per se" an issue . . . , and as K2 was provided sufficient notice and opportunity to intervene, the Court finds it may rule on GK9's motion to enjoin the government's award to K2. K2 could have intervened at any time permitted by the RCFC if K2 deemed necessary. . . . The Court is not prevented from adjudicating this protest because a potentially interested party freely opted not to participate, particularly when the government is representing its interests.

*Id.* at 151. Although not impacting its decision, the Court also recognized the parties' discussion of K2's ongoing performance issues, including USPS considering terminating K2 for poor performance in the August to November 2023 timeframe. *Id.* at 130–31.

### B. Procedural History Related to K2's Motion to Intervene

On 10 January 2024, 19 days after the Court issued its Order enjoining the government from awarding the contract to K2, K2 filed its Motion to Intervene ("K2's Mot. to Intervene"), ECF No. 80. On 24 January 2024, the government ("Gov't's Resp."), GK9 ("GK9 Resp."), and AMK9 ("AMK9 Resp.") filed their Responses to K2's Motion to Intervene, ECF Nos. 85, 86, & 87. On 31 January 2024, K2 filed its Reply ("K2's Reply"), ECF No. 88.

On 2 February 2024, the parties filed a Joint Status Report (JSR) updating the Court on the status of the contract, ECF No. 89. On 15 February 2024, the Court held a telephonic status conference to determine next steps in the case, 5 Feb. 2024 Order, ECF No. 90. At this status conference, K2 clarified it was seeking to intervene *solely* to correct the Court's finding K2 materially misrepresented its past performance. 15 Feb. 2024 Status Conf. Tr. at 34:2–15, ECF No. 142. K2 also noted in passing USPS terminated its contract *for default*, independent of the Court's 27 December 2023 injunction order. 15 Feb. 2024 Status Conf. Tr. at 33:14–18. The Court ultimately found (on 16 March 2024, *see infra*) USPS did indeed terminate K2 for default on 24 January 2024 due to the "continued inability of K2 to satisfy the requirements of the Contract." 24 Jan. 2024 Letter at 3. At the 15 February status conference, the parties likewise discussed alleged conflicts between the Court's 27 December 2023 factual findings and documentation within K2's possession not yet submitted to the Court. *See* 15 Feb. 2024 Status Conf. Tr. at 41:18–42:18.

On 22 February 2024, the Court issued an order permitting K2 to "file an Amended Motion to Intervene, attaching any documents for the Court's consideration regarding the material misrepresentation finding in the 27 December 2023 Order . . . for the Court to consider in advance of oral argument," ECF No. 91. On 27 February 2024, GK9 filed an Objection to Order Allowing K2 to Make an Evidentiary Record as a Non-Party, ECF No. 92.[7] On 28

[7] As there is no rule in the Rules of the Court of Federal Claims (RCFC) for this Objection, the filing is deficient. The Court accordingly strikes this filing, *see infra*. Regardless, at oral argument, GK9 noted it did not "see a problem" with the Declarations. 19 March 2024 Oral Arg. Tr. ("Tr.") 103:20–22 ("[PLAINTIFF:] We don't see a problem with the evidence. We think it supports, and we've highlighted it, Your Honor, it supports everything we've said.").

February 2024, K2 filed its Motion to Amend its Motion to Intervene[8] ("K2's Am. Mot. to Intervene"), ECF No. 93, attaching three Declarations "for the Court's consideration regarding the material misrepresentation finding in the December 27, 2023 Order," *id.* at 1—the Amanda Begins Declaration ("Begins Decl."), ECF No. 93-1; the Mark Holbrook Declaration ("Holbrook Decl."), ECF No. 93-2; and the Lane Kjellsen Declaration ("Kjellsen Decl."), ECF No. 93-3–93-10.  Also on 28 February 2024, K2 filed a Motion for Extension of Time, as its Amended Motion to Intervene was filed after the Court-ordered deadline, ECF No. 94, which the Court granted, ECF No. 96.  On 29 February 2024, the parties filed a JSR with an update on the contract, 29 Feb. 2024 JSR, ECF No. 95.  On 6 March 2024, GK9 filed its Motion to Seal in part Doc. 93-2, Doc. 93-4, Doc. 93-7, and Doc. 93-10, as such documents contain confidential information, ECF No. 97.[9]  On 7 March 2024, the Court directed (1) the Clerk to seal ECF Nos. 93-2; 93-4; 93-5; 93-7; and 93-10 in full and (2) GK9 to file redacted versions of ECF Nos. 93-2; 93-4; 93-5; 93-7; and 93-10, redacting only the words and characters GK9 stated were sensitive in its Motion, including commercial and financial figures and personal contacts, on or before 11 March 2024 by 5:00 p.m. (ET).  7 Mar. 2024 Order at 2, ECF No. 98.  On 11 March 2024, GK9 filed the redacted versions of K2's Holbrook and Kjellsen Declarations.  GK9 Redacted Doc.s, ECF No. 100.  The Court stated it would address GK9's Motion to Seal, ECF No. 97, at oral argument on 19 March 2024.  7 Mar. 2024 Order at 2.  On 11 March 2024, K2 filed its Response Opposing GK9's Motion to Seal.  K2's Opp'n. to GK9's Mot. to Seal, ECF No. 99.  K2 attached four exhibits to its Motion.  K2's Opp'n. to GK9's Mot. to Seal, Ex.s 1–4, ECF Nos. 99-1, 99-2, 99-3, 99-4.  Also on 11 March 2024, the Court directed the Clerk to seal ECF Nos. 99-1 and 99-4 because K2's Exhibits 1 and 4 contained non-public call-in details, ECF No. 101.[10]

On 13 March 2024, the Court ordered the parties to file redacted versions of all MJAR-related briefing, including attachments, and status reports, ECF No. 102.  On 15 March 2024, GK9 filed its Reply in support of its Motion to Seal, ECF No. 103.  On 15 March 2024, GK9 and AMK9 filed redacted versions of their respective MJAR-related briefing, including attachments, and status reports.  *See* ECF Nos. 104–118, 121–124.[11]  On 16 March 2024, the government filed an Unopposed Motion for Extension of Time, ECF No. 126,[12] and a Notice regarding its late

---

[8] The Court permitted K2's Amended Motion to Intervene, ECF No. 93, as a vehicle for K2 to file documents related to its original Motion to Intervene, ECF No. 80, as it does not put forth any new arguments.  *See* Order, ECF No. 91.  Given the Amended Motion to Intervene does not put forth new arguments, and K2's Motion to intervene is moot, the Court accordingly finds as moot K2's Amended Motion to Intervene, *see infra*.

[9] At oral argument, GK9 agreed its Motion to Seal, ECF No. 97, is moot because the Court permitted GK9 to file redacted versions of K2's Declarations, ECF No. 98, and such redactions sufficiently protect GK9's non-public information, ECF No. 100, *see infra*.  Tr. at 145:14–25 ("THE COURT:  Sounds like we can find that motion moot now . . . [GK9]:  As long as, if I understand correctly, the stuff we said should not be available publicly on Westlaw and things like that, if that's going to stay sealed, absolutely.  THE COURT:  I think your redacted version is already up, right?  [GK9]:  Those are fine.  THE COURT:  So then that moots it?  [GK9]:  As long as it's going to stay that way, yes.").

[10] At oral argument, the parties agreed ECF Nos. 99-1 and 99-4 may remain sealed as they contain non-public call information.  Tr. at 146:3–9 ("THE COURT:  In addition, K2 filed response ECF 99 that attached additional documents that the court sealed.  Some of those included court communication information that was also not public. . . . is K2 comfortable with those remaining sealed at this point . . . ?  [K2]:  Yes, Your Honor.").

[11] AMK9 filed ECF Nos. 119 and 120 under seal, which were seemingly intended to be redacted versions of ECF Nos. 44 and 45.  In compliance with the Court's 13 March 2024 Order, AMK9 subsequently filed ECF Nos. 121 and 122, which are redacted and publicly available versions of ECF Nos. 44 and 45.

[12] As this Motion was unopposed by all parties, the Court grants the government's Motion for Extension of Time, ECF No. 126.  *See infra.*

compliance with the Court's 13 March 2024 Order, attaching its redacted versions of its MJAR-related briefing, including attachments, and status reports, ECF No. 125.

Also on 16 March 2024, the government filed its Motion for Leave to Supplement the Record, Gov't Mot. Suppl., ECF No. 127,[13] and attached a 24 January 2024 letter from USPS to K2 terminating K2 for default. 24 Jan. 2024 Letter at 3. On 16 March 2024, the Court ordered the parties to file Responses to the government's Motion and directed the government to file a supplement to its Motion explaining "why the government did not share information related to the termination for default letter in the parties' 29 February 2024 . . . JSR . . . after the 15 February 2024 status conference when the government stated it would 'provide a[n] . . . update' on the contract." 16 Mar. 2024 Order at 2, ECF No. 128. On 18 March 2024, GK9 ("GK9 Resp. to Gov't Mot. Suppl."), the government ("Gov't Suppl. to Mot. Suppl."), K2 ("K2 Resp. to Gov't Mot. Suppl."), and AMK9 ("AMK9 Resp. to Gov't Mot. Suppl.") filed Responses to the government's Motion, ECF Nos. 129, 131, 132, & 133. K2 attached an email chain[14] to its Response, detailing the termination for default conversation between USPS and K2. Termination for Default Email Chain, ECF No. 132-1. Also on 18 March 2024, K2 filed its Motion for Leave to File a Surreply Brief in Support of Its Objection to GK9's Motion to Seal, ECF No. 130.[15] On 19 March 2024, the Court held oral argument on all pending motions, *see* ECF No. 91. On 22 March 2024, MSA, after the Court-ordered deadline, filed redacted versions of its respective MJAR-related briefing. *See* ECF Nos. 137, 137, 138.

## II.    Parties' Arguments

K2 argues the Court should grant its Motion to Intervene because it "only became aware of [GK9's material misrepresentation] allegations . . . nine business days ago—when this Court released a redacted version of its . . . [27 December 2023] Order, enjoining K2 from the contract." K2's Mot. to Intervene at 2, ECF No 80. K2 "acknowledges it received a[] [pre-filing notice for this bid protest] from GK9[] . . . [on] February 10, 2023 . . . [but] K2 was . . . unaware that GK9 had asserted any wrongdoing on the part of K2." *Id.* at 5. K2 "initially believed USPS was able to and would adequately represent K2's rights and interests." *Id.* K2 requests the

---

[13] As no party has objected, *see* GK9 Resp. to Gov't Mot. Suppl.; AMK9 Resp. to Gov't Mot. Suppl., the Court grants the government's Motion for Leave to File to Supplement the Record, ECF No. 127, *see infra*.

[14] The parties did not object to the Court considering the email chain attached to K2's Response. *See* Tr. at 31:22–32:3 ("THE COURT: . . . Is there any objection to including those [emails]? [GK9]: No, Your Honor. . . . [AMK9]: No, Your Honor. [GOVERNMENT]: No, Your Honor.").

[15] At oral argument, GK9 agreed its Motion to Seal is moot, *see supra* n.9. Likewise, K2 agreed its Motion to File a Surreply, ECF No. 130, is moot because GK9's redactions are proper. Tr. at 144:7–11 ("THE COURT: [K2], are you satisfied with the minor word redactions that GK9 has submitted in the updated documents? [K2]: Your Honor, ultimately, I do think that the redactions are fine."). Further, related to K2's agreement its Motion is moot, K2 agreed bid protests should generally remain sealed due to national security interests, providing further support for GK9's redactions to K2's Declarations. Tr. at 144:25–145:7 ("[THE COURT:] [Y]ou agree that there are significant national security concerns at play in this case, and that like some bid protests where there is national security in addition to company proprietary information, that the documents have to remain redacted throughout the briefing and litigation process, correct? [K2]: . . . I agree."). The Court therefore finds as moot ECF No. 130, *see infra*.

following relief: "[(]1) That K2 be added as a defendant-intervenor[16] in this action; [(]2) That K2 be permitted to file a motion to dissolve, reconsideration and/or appeal under RCFCs 65(b)(4), 59(a)(1)(C), 58.1, . . . after the Court rules on K2's Motion to Intervene; [(]3) The Court stay the injunction pending a ruling on all of K2's motions; and [(]4) Any other relief the Court deems just and proper." *Id.* at 10. In its Reply, K2 distinguishes this case from the cases GK9 cites, *SAGAM* and *Excelsior*, *see infra*, because those dockets were public. K2's Reply at 4–6. K2 stresses it will suffer "reputational ruin" as a result of GK9's material misrepresentation arguments. *Id.* at 8.

The government responds K2's motion is untimely under both RCFC 24(a), which sets forth the criteria for intervention as of right, and the intervention standard established by the Federal Circuit in *Wolfsen Land & Cattle Co. v. Pac. Coast Fed. of Fishermen's Ass'n*, 695 F.3d 1310, 1315 (Fed. Cir. 2012). Gov't's Resp. at 1–2. The government reasons "[t]his case's context of proceedings alone defeats K2's application [as] [t]he case was filed almost one year ago (February 13[, 2023])." *Id.* at 3. The government asserts "K2 [does not] deny that it had actual notice of this suit . . . [and] the 'right' at issue is knowledge of the suit, not how one's opponents may pursue it." *Id.* at 4–5. The government reasons "K2 ignores the prejudice to the other parties caused by indulging K-2's insistence on a re-do." *Id.* at 6 (citing *SAGAM Securite Senegal v. United States*, 156 Fed. Cl. 124, 128 (2021)). The government also notes there are no "unusual circumstances" here that warrant intervention. *Id.* at 6–7. Regarding USPS' termination of K2 for default, the government explains it did not raise this fact to the Court until 16 March 2024 because "USPS counsel . . . had not reviewed the letter when he received it [in January 2024], not long after it was issued, because at that time, he believed, it was sufficient for him to know that K2 had in fact been terminated, and USPS'[] focus then was on the re-award of the K2 contracts." Gov't Suppl. to Mot. Suppl. at 2. The government alleges the termination for default "fortif[ies]" its argument K2 is not entitled to intervene. *Id.* at 3.

GK9 agrees with the government "K2's motion is too little, way too late," particularly because "K2 is an experienced protestor [who] . . . knew about its right to intervene in February of last year." GK9 Resp. at 2–3. GK9 reasons this court "regularly rejects unfounded and untimely motions to intervene like K2's," and "the prejudice to GK9 in having to relitigate this protest greatly outweighs any alleged prejudice K2 could suffer." *Id.* at 5, 7. GK9 cites *SAGAM* and *Excelsior* in arguing this Court rarely permits intervention post-judgment or in cases in similar postures. *Id.* at 2, 5–8 (first citing *SAGAM*, 156 Fed. Cl. at 126; and then citing *Excelsior Ambulance Serv., Inc. v. United States*, 126 Fed. Cl. 69 (2016)).

AMK9 likewise argues "K2's motion is untimely" as "K2 knew or reasonably should have known of its rights to intervene in February of 2023." AMK9 Resp. at 2–3. AMK9 reasons "the prejudice to the parties that have litigated this case for years far outweighs the prejudice to K2" as "no unusual circumstances [exist] that would make K2's motion timely." *Id.* at 4–5. AMK9 notes, "[f]or the first time in more than three years of litigation, GK9, AMK9, and the

[16] K2 raises both intervention as of right, RCFC 24(a), and permissive intervention, RCFC 24(b), as bases for intervention in this Court. K2's Mot. to Intervene at 3 n.1. The Court will only substantively address K2's intervention as of right as the Court has discretion whether to permit a party to intervene permissively. RCFC 24(b); *see also Natl. Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 365–66 (1973) (emphasis added); *see Am. Mar. Transport, Inc. v. United States*, 870 F.2d 1559, 1560 n. 4 (Fed. Cir. 1989). Permissive intervention also requires a timely motion, which K2 has not made here, *see infra*.

Government agree:  K2's decision to hold off on its request to intervene until after the Court issued a decision is untimely and should not be granted either as of right or permissively."  *Id.* at 2.

In response to the termination for default letter, K2 argues "[t]he notice of termination . . . has no bearing on K2's interest in this litigation."  K2 Resp. to Gov't Mt. Suppl. at 1.  K2 argues the termination for default does not "extinguish[] [its] right to intervene" as K2 has "reputational interests as well as additional property interests [that] have been implicated by this Court's decision."  *Id.* at 1–2.  K2 attached an email correspondence between K2 and USPS to its Response to the Government's Motion to Supplement detailing the termination for default to show USPS' termination for default was "pretextual."  *See* Termination for Default Email Chain; K2 Resp. to Gov't Mot. Suppl. at 3 n.3.

On the other hand, GK9 argues "USPS terminated K2's contract expressly and primarily for default, based on its performance failure."  GK9 Resp. to Gov't Mot. Suppl. at 2.  GK9 reasons "the Court should not reopen the litigation over GK9's material misrepresentation claim because it would likely be moot" given "USPS terminated K2's contract for a different reason [and] the Court could not afford K2 any meaningful remedy on that claim if reopened."  *Id.*  GK9 argues K2 no longer has an interest in the contract or this case as a result of the termination for default.  *Id.* at 4 ("GK9 cannot conceive of an interest that K2 has in belatedly intervening in this case to relitigate a claim that would be moot if reopened.  But even if we could, it is K2's burden, not GK9's, to establish that interest.").  GK9 explains "[e]ven if K2 can prove that USPS'[] termination was in bad faith, that is a dispute to be resolved under the Contract Disputes Act, not in this bid protest."  *Id.* at 5 n.3.  GK9 also reasons:  "the termination for default ups the ante on the prejudice issue."  *Id.* at 6.  "AMK9 concurs with the position set forth by GK9."  AMK9 Resp. to Gov't Mot. Suppl. at 1.

## III.   Standard of Review

RCFC 24(a) states this Court's standard for intervention:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

RCFC 24(a).  The Federal Circuit in *Wolfsen* set out a test further defining the standard for intervention under RCFC 24(a) in this Court:

> [(1)]  First, the motion must be timely.
> [(2)]  Second, the movant must claim some interest in the property affected by the case.  This interest must be "legally protectable"—merely economic interests will not suffice.  . . .

> [(3)] Third, that interest's relationship to the litigation must be "of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment." . . .
> [(4)] Fourth, and most importantly for this case, the movant must demonstrate that said interest is not adequately addressed by the government's participation.

*Wolfsen Land & Cattle Co. v. P. Coast Fedn. of Fishermen's Associations*, 695 F.3d 1310, 1315 (Fed. Cir. 2012). Timeliness is a threshold analysis for intervention. *See Natl. Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 365–66 (1973) ("Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.' If it is untimely, intervention must be denied.").

## IV. USPS' Termination for Default

### A. K2's Termination and the Parties' Related Arguments

On 24 January 2024, USPS terminated K2 for default "[d]ue to K2's demonstrated performance failures and [K2's] . . . inability to correct such failures." 24 Jan. 2024 Letter at 1. The letter recounted:

> On July 7, 2023, [USPS] sent K2 a Demand for Corrective Action Plan, which identified numerous failures on the part of K2 to adhere to the Contract . . . :

| Date | Site(s) | Performance Issues |
|---|---|---|
| 3/22/23 | [redacted] | During a field visit to the [redacted], K2 did not have sustainment odor setup as required. The K2 storage cabinet, containing the odor was locked and there was no available key on site. |
| 3/23/23 | [redacted] | K2 handler arrived late on the second day for screening operation. |
| 4/24/23 | [redacted] | K2 handler was found on the floor in the canine office, with no visible sign(s) of physical injury. USPS employees reported an odor of alcohol. The K2 handler had to be taken home. Mail was not screened at the scheduled time. |
| 5/30/23 | [redacted] | K2 handler failed to report for duty between the hours of 2000 - 0200. |
| 6/7/23 | [redacted] | K2 handler failed to report to the [redacted] site for the screening at scheduled time of 0600 hours. |
| 6/8/23 | [redacted] | K2 canine was not screening mail as contracted to due to the canine performance issues. |
| 6/9/23 | [redacted] | Only one handler reported from 1100 to 1900; the schedule requires two handlers. |
| 6/10/23 | [redacted] | K2 handler failed to report as scheduled. Mail was not screened as contracted. |
| 6/19/23 | [redacted] | K2 canine was not screening mail as contracted due to canine performance issues. |
| 6/28/23 | [redacted] | While screening Priority Mail, the canine alerted the handler several times of false positive hits on the several Priority containers during the screening. |
| N/A | All Sites | K2 repeatedly expressed an inability to comply with the inverted V screening process, which is the process required under the Contract. |

> The July 7 demand letter required . . . K2 provide . . . a detailed, written corrective action plan thoroughly explaining how K2 intended to correct its persistent performance deficiencies, which include both canine performance and staffing issues. . . . On July 14, 2023, K2 submitted a response to the . . . demand letter [and][] K2's response [did] . . . not provide a satisfactory plan for correcting the performance deficiencies . . . Following K2's July 14 response . . . the Postal Service sent K2 a Cure Notice, which required K2 to provide an adequate plane that addressed the steps it intended to implement to cure its deficiencies . . . The Postal Service has completed its evaluation of K2's performance following your implementation of your corrective action plan, and observed and documented that performance failures have continued, and that K2 has failed to meet the requirements of the Contract. Accordingly, termination for default of the Contract is an appropriate remedy. This determination is based on the performance deficiencies identified above as well as subsequent deficiencies. Specifically, since K2's September 18, 2023, response to the Cure Notice, the Postal Service identified the following additional deficiencies:

| Date | Site(s) | Performance Issues |
|---|---|---|
| 11/7/23 | [redacted] | An audit at [redacted] revealed that K2 did not have a fan in place at a canine's kennel and did not screen according to the required schedule for [redacted]. |
| 11/8/23 | | An audit at [redacted] revealed that K2: (i) did not screen according to the required schedule; (ii) was not complying with the inverted V sniff pattern; (iii) did not lock the file cabinet; and (iv) did not have a copy of the playbook.<br><br>An audit at [redacted] revealed that K2: (i) did not have a sustainment bag tracker, and (ii) did not screen according to the required schedule. |
| 11/9/23 | | K2 was not complying with the inverted V sniff pattern. |
| 11/24/23 | | K2's handler did not follow the instructions regarding the time to begin screening. |
| 12/30/23 – 1/2/24 | | K2 personnel violated [redacted] policy by covering windows to the office where K2 personnel were stationed and did not timely respond to instructions to remove the covering. |
| 1/19/24 | | K2's handler did not arrive to screen mail, and K2 did not provide the Postal Service the required notice of the no-show. |

> These deficiencies demonstrate a continued inability of K2 to satisfy the requirements of the Contract. Therefore, [USPS] is hereby terminating the Contract for default.

*Id.* at 1–3. USPS differentiated its termination for default from the Court's December 2023 injunction:

> In addition to terminating the Contract for the deficiencies outlined above, the Court of Federal Claims recently issued a decision that provides a further basis for this termination decision. Specifically, on December 22, 2023, in its decision in *Global K9 Protection Group, LLC v. United States*, the court found that K2 made a material

> misrepresentation in its proposal . . . regarding its past performance as a subcontractor for Global K9. . . . That a court of competent jurisdiction found that K2's proposal contained material misrepresentations warranting disqualification of K2 from the canine screening program provides a further justification for terminating the Contract for default.

*Id.* at 3.

As noted *supra*, K2 argues "[t]he notice of termination . . . has no bearing on K2's interest in this litigation." K2 Resp. to Gov't Mot. Suppl. at 1. K2 believes the termination for default does not "extinguish[] [its] right to intervene," as K2 has "reputational interests as well as additional property interests [that] have been implicated by this Court's decision." *Id.* at 1–2. K2 reasons "the notice is irrelevant [because it] . . . relates to K2's current contract performance with USPS [so] it should not be considered on any level or for any purpose to resolve the instant bid protest." *Id.* at 2. K2 attached an email correspondence between K2 and USPS detailing the termination for default, *see* Termination for Default Email Chain, which K2 argues "provides the necessary context—the [g]overnment intended to terminate the contract based on the Court's decision." K2 Resp. to Gov't Mot. Suppl. at 3. K2 reasons it "wishes to use [these emails] to demonstrate that the notice is pretextual as with the majority of [USPS'] reasons for claiming K2 was in default." *Id.* at 3 n.3. Included in the email chain is the following message from CO Moore to K2 on 4 January 2024 offering a "no-cost termination" in lieu of a termination for default:

> Because of K2's ongoing performance issues, the Postal Service has been contemplating termination of K2's contract for default, as stated in the cure notice that was sent to K2 on September 6, 2023. K2's material misrepresentations, as determined by the court, provide additional grounds to support a default termination of K2's contract.
>
> In lieu of a default termination, and to avoid a protracted disputes process, the Postal Service is willing to offer K2 a no-cost termination. A no-cost termination involves an agreement between the Postal Service and K2 to terminate the current contract at no cost to either party and without the determination that either party has breached the contract. As a condition of the no-cost termination, K2 would agree not to pursue any claims related to the termination.
>
> . . .
>
> A no-cost termination would benefit K2 in that it would allow K2 to avoid having its contract terminate for default and the consequences of having a termination for default on its record (including having to acknowledge the termination for default in competitions for future government business). In addition, K2 would continue to receive compensation through the remainder of its performance.

Termination for Default Email Chain at 4–5. On 10 January 2024, K2 rejected USPS' offer. *Id.* at 3 ("I am writing to inform you that K2 respectfully declines your offer [of a no-cost, mutual termination].").

GK9 argues "USPS terminated K2's contract expressly and primarily for default, based on its performance failure." GK9 Resp. to Gov't Mot. Suppl. at 2. GK9 reasons "the Court should not reopen the litigation over GK9's material misrepresentation claim because it would likely be moot" given "USPS terminated K2's contract for a different reason [and] the Court could not afford GK9 any meaningful remedy on that claim if reopened." *Id.* GK9 argues the Federal Circuit's decision in *Mitchco* is directly on point: "In *Mitchco*, the plaintiff sought an injunction preventing the awardee from performing the contract. . . . However, prior to the appeal, the Army terminated the contract for default . . . Thus, the Federal Circuit held that there was '[n]o question that the injunctive relief Mitchco seeks is moot insofar as Mitchco seeks an order enjoining [the awardee's] performance of the contract, since the Army has already terminated [the awardee's] contract.'" *Id.* at 2–3 (citing *Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1377–78 (Fed. Cir. 2022)). GK9 explains USPS made formal re-awards as a result of the Court's December Order, and GK9 consequently officially withdraws its bid and proposal costs. *Id.* at 3 ("GK9 recently received its signed contract. As promised, GK9 hereby withdraws its claims for bid and proposal costs."). GK9 argues K2, like the plaintiff in *Mitchco*, no longer has an interest as a result of the termination for default: "GK9 cannot conceive of an interest that K2 has in belatedly intervening in this case to relitigate a claim that would be moot if reopened. But even if we could, it is K2's burden, not GK9's, to establish that interest." *Id.* at 4. GK9 notes it did not know about the termination for default until the government's 16 March 2024 filing and argues K2 had an independent responsibility to inform the Court of its termination for default: "Had USPS'[] counsel not discovered the termination notice and shared it with the rest of us, we would not have it at all. K2 was content to let the Court decide its motion without this critical information." *Id.* at 5. GK9 explains "[e]ven if K2 can prove that USPS'[] termination was in bad faith, that is a dispute to be resolved under the Contract Disputes Act, not in this bid protest." *Id.* at 5 n.3. GK9 also reasons: "the termination for default ups the ante on the prejudice issue." *Id.* at 6. At oral argument, the government agreed "a termination for default is significantly different than a termination due to injunction" with respect to analyzing K2's requested intervention. *See* Tr. at 20:14–21:6 ("THE COURT: . . . [You] agree . . . K2 has already been terminated [for default] and thus has no interest in the contract? [GOVERNMENT:] Right. . . . [THE COURT:] [Y]ou agree, then, that a termination for default is significantly different than a termination due to injunction? [GOVERNMENT:] Yes. THE COURT: And that the termination for default update is significant with respect to analyzing the intervention issue? [GOVERNMENT:] Yes.").

### B. The Parties' Failure to Apprise the Court of K2's Termination for Default

Before determining whether K2's termination for default impacts its ability to intervene in this case, the Court notes its disappointment with the quality of contract management and lawyering surrounding this termination for default. *Indeed, the Court was not notified of the termination for default until nearly two months after it occurred*. *See* Gov't Mot. Suppl. (filed on 16 March 2024). At oral argument, USPS counsel explained, despite the ongoing litigation, he did not read the termination for default letter when USPS CO sent it to him in January. Tr. at

8:22–9:10 ("THE COURT: So when did you receive the 24 January 2024 termination for default letter that was issued by CO Moore? [USPS COUNSEL]: I'm not sure exactly when. . . . But it was . . . very shortly after . . . maybe the day of or day after . . . but it was within a day or two of when it was sent. THE COURT: . . . And then what did you do with it? [USPS COUNSEL]: I noted that we had received it and I archived it in my folder for that. THE COURT: So did you read it? [USPS COUNSEL]: No."). USPS counsel conceded he only read the 24 January 2024 termination for default letter *in mid-March* in anticipation of oral argument. Tr. at 10:16–24 ("THE COURT: So when did you open the letter and read it? [USPS COUNSEL]: Last week sometime . . . [A]fter my management, counsel and I were discussing the case, I read it, and then talked with some other procurement attorneys about what it meant and what we could . . . say about the termination in this proceeding."). The government attempted to excuse this failure by noting USPS counsel was "focus[ed] on re-awards and any possible protests there could be about a re-award." Tr. at 12:7–9. This explanation—weak as it is—is made significantly less compelling given, at the 15 February status conference, the government stated, "I don't know now but I can certainly find out where we are as to K2's termination" for default and confirmed the next joint status report would have an update on the termination for default. 15 Feb. 2024 Status Conf. Tr. at 43:10–44:8 ("THE COURT: [Government counsel], . . . response on the termination for default discussion we had a couple minutes ago? . . . [GOVERNMENT:] As far as termination, I don't know now, but I can certainly find out where we are as to K2's termination. THE COURT: And that will be part of the next JSR? [GOVERNMENT]: Sure. We will put that in the report, Your Honor."). Despite this on-the-record guarantee by the government, both USPS counsel and counsel from the Department of Justice neglected to update the Court on the termination in the 29 February 2024 JSR. *See* 29 Feb. 2024 JSR. The government could not justify this failure at oral argument: "Yeah, so I don't know what to say, Your Honor. We said what we said. . . . I was focusing on what was to come next, and that was this hearing and the orders that followed." Tr. at 14:12–15:12; *see also* Tr. at 15:13–16:13 ("THE COURT: . . . I can't imagine from your perspective, that after what K2 mentioned during the 15 February status conference, that when the call ended, you didn't immediately follow up on that in order to get any clarification from the Post Office related to what termination there was. [GOVERNMENT]: We knew there was a termination. We knew that we were now focusing on these other awards. The nature of the termination I didn't know. . . . I don't remember those exact words, I'm sure they were spoken because you just have been reading I assume from the transcript, Your Honor."). Instead, USPS counsel agreed not reviewing the termination for default letter was a mistake and recognized—had the government known of the termination for default earlier—it would have filed a motion to dismiss based on mootness. Tr. at 11:16–23 ("THE COURT: . . . Was that a mistake? [USPS COUNSEL]: Yes, Your Honor. THE COURT: And you agree at this point that you should have reviewed the 24 January termination letter as soon as you received it and updated the court as soon as you reviewed it? [USPS COUNSEL]: Or at least filed a motion to dismiss based on mootness, yes, Your Honor."). The government agreed K2's performance deficiencies meant USPS was bound to terminate K2 for default for many months. *See* Tr. at 15:9–12 ("[GOVERNMENT]: For years, or for months, anyway, the record reflects that K2 was headed down the path of termination, and the court noted that in its decision.").

Given the discussion at oral argument, the Court notes government and USPS counsel were seemingly not in regular communication with one another throughout this litigation. Even

when termination for default was raised at the 15 February 2024 status conference, government counsel and USPS counsel—both in attendance at the conference—did not confer about the nature of the termination. *See* Tr. at 15:13–16:13. The Court suggests the prolonged litigation timeline and related contract issues are largely due to poor contract administration and communication by USPS. As noted earlier in this saga, USPS wanted the Court to "award it special treatment" because it is bound by USPS Supplying Principles and Practices ("SP&Ps")—not the FAR and CICA. *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 269 (2021); *see supra*. The Court emphasized then, and stresses now, USPS is not exempt from having "fair, objective[,]" and expedient procurement. *Id.* While it is true USPS is not bound by the FAR and CICA, *Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 158 (2023) (citing 39 U.S.C. § 410(a) ("[N]o Federal law dealing with public or Federal contracts ... shall apply to the exercise of the powers of the Postal Service.")), USPS is not "special;" it—like all other federal agencies and departments—is obligated to foster fair competition in its procurements. Perhaps USPS should consider following FAR and CICA—two legal cornerstones in government procurement—as all other agencies do, to increase proficiency in its contract administration.

  Further, even though movant-intervenor K2 was terminated for default on 24 January 2024 and noted this in passing at the 15 February status conference, K2 similarly did not file the termination for default letter with the Court. *See* 24 Jan. 2024 Letter; *see also* 15 Feb. 2024 Status Conf. Tr. at 33:14–18. When asked why K2 did not submit the termination for default letter at oral argument, K2 argued the termination for default letter is a "contract disputes matter . . . [that] has no bearing on this bid protest issue." Tr. 22:15–23:2 ("THE COURT: Well, we went back to the status conference and listened to it, sure enough K2 did mention a termination for default. . . . [K2]: But [K2] did say that that's a contract disputes matter . . . and it has no bearing on this bid protest issue."). At the same time, however, K2 averred it raised the termination for default at the Court's 15 February 2024 status conference. Tr. at 35:16–22 ("THE COURT: [T]he court began this oral argument with concern over the government and K2 not having been up front with it on a termination for default having issued two months ago. [K2]: Your Honor, we identified the termination for default at the February 15th status [conference]."). As K2 only mentioned the termination for default in passing at the status conference, *see* 15 Feb. 2024 Status Conf. Tr. at 33:14–18, and never officially filed the 24 January 2024 letter, the Court finds K2's argument it "identified the termination for default" to be disingenuous. 15 Feb. 2024 Status Conf. Tr. at 35:23–36:12 ("THE COURT: Does K2 want to clarify [the termination for default]? [K2]: Your Honor, we're opposing that to begin with, but ultimately, at the end of the day, it doesn't make this process academic. We . . . still have standing ultimately, especially with respect to the fact that we are an awardee in this case. Any issues that were specifically addressed during the performance were not at issue with respect to a bid protest action, and I think counsel can all agree that with respect to a bid protest action, what's at issue is what's before the contracting officer at the time of an award in a post-award bid protest. So we would absolutely have standing to address issues, especially findings of fact made with respect to K2's representations to the Government."). K2 should have filed the 24 January 2024 termination for default letter as soon as it was received because, under Federal Circuit precedent, a termination for default greatly alters the procedural posture in a given case—even rendering a protestor's requested relief moot. *See Mitchco Int'l, Inc.*, 26 F.4th at 1378

(holding the relief sought by the protestor was moot because the Army "ha[d] already terminated the awardee's contract") (internal citations omitted).

Finally, as discussed *supra*, the Court notes USPS offered K2 a no-cost termination instead of a termination for default. *See* Termination for Default Email Chain at 3–5; *see also* FAR 49.402-4 ("The following course[] of action . . . [is] available to the contracting officer in lieu of termination for default when in the Government's interest: . . . execute a no-cost termination settlement agreement."). K2 could have avoided "the consequences of having a termination for default on its record (including having to acknowledge the termination for default in competitions for future government business)" by accepting USPS' offer and thereby would have received "compensation through the remainder of its performance." Termination for Default Email Chain at 4. Instead, K2 forced USPS to enter a termination for default by rejecting USPS' offer, *id.* at 3 (CO Moore stating "please see attached . . . my formal response to you[r] desire to decline our mutual termination offer"), in an apparent attempt to improve its future litigation position. *See* Tr. at 35:3–15 ("THE COURT: . . . I don't understand how a misrepresentation injunction and a no-cost termination is worse than a misrepresentation, injunction and now a termination for default. [K2]: Well, Your Honor, we're hoping that we are able to intervene and we can overcome and reverse this court's finding on a material misrepresentation. . . . [T]o be called a liar . . . [is] a reputational harm that is worse than any termination for default."); *see* Tr. at 123:18–22 ("[K2:] [T]his is the only time, this is the only venue, this is the only way we can unwind that finding is here before this court. And there's no other action that can be filed. There's nothing."). Counsel for K2 refused to acknowledge the benefits of a no-cost termination at oral argument: "THE COURT: But wouldn't a no-cost termination in early January have limited K2 a lot of additional reputational concerns? [K2]: The reputational concerns, Your Honor, with a material misrepresentation finding, affects every single government contract." Tr. at 34:15–20. K2 even labeled the Court's finding of material misrepresentation a "greater" harm than any reputational harms stemming from the termination for default. Tr. at 34:25–35:2 ("[K2:] Those are reputational interests that are greater than a termination for default.").

### C. Whether the Termination for Default Impacts K2's Motion to Intervene

Having outlined the unique facts underlying K2's termination for default, the Court assesses whether termination for default impacts K2's right to intervene in this case. Termination for default is "the exercise of the Government's contractual right to completely or partially terminate a contract because of the contractor's actual or anticipated failure to perform its contractual obligations." FAR 49.401. When an agency independently terminates a contract, requests for relief related to the reinstatement of the contract become moot. *Mitchco Int'l, Inc.*, 26 F.4th 1373, 1377–78 (Fed. Cir. 2022).

At oral argument, the government agreed an agency-ordered termination for default related to ongoing contract performance is distinct from the Court entering a permanent injunction for material misrepresentation. Tr. at 20:24–21:2 ("THE COURT: So you agree . . . a termination for default is significantly different than a termination due to injunction? [GOVERNMENT]: Yes."). The named parties in this case agree the termination for default alters the Court's analysis related to K2's intervention as, without an award to K2, the instant

protest is moot.  Tr. at 10:6–15 ("[USPS COUNSEL]: . . . [O]bviously now having read [the termination for default letter] . . . we think that it makes a difference. . . . [O]bviously we think that the letter makes [K2's motion to intervene] moot[.]"); GK9 Resp. to Gov't Mot. Suppl. at 3 ("There is now no question that GK9's material misrepresentation claim would be moot if the Court reopened it (which it should not)."); AMK9's Resp. to Gov't Mot. Suppl. at 1 ("AMK9 concurs with the position set forth by GK9 set forth in ECF 129.").  In other words, there is no award for GK9 to protest *and* no injunction for K2 to request the Court reconsider.

In contrast, despite the termination for default, K2 argues it has two remaining interests: (1) its interest in the contract and (2) its reputational interests related to the Court's material misrepresentation finding.  At oral argument, however, K2 struggled to articulate what interests remain after termination for default.  First, K2 attempted to tie its interest in the contract to the Court's material misrepresentation finding.  Tr. at 26:16–27:4 ("THE COURT:  Just to clarify, . . . K2 argues that it would have a right to appeal what exactly?  [K2]:  The court's finding that there was a material misrepresentation in the proposal.  That material misrepresentation finding, Your Honor, has implicated our current government contracts, our future government contracts, and has effectively destroyed the reputation of a company that has worked so hard to maintain that reputation.  Those are legally cognizable interests.").  Further, when asked whether its interests have been extinguished as a result of the termination for default, K2 responded reputational harm—similar to that animating a defamation claim—keeps its Motion alive.  Tr. at 25:14–19 ("[K2]:  A reputational interest that was triggered by the misrepresentation claims. . . . [I]t's like a defamation claim, Your Honor.  THE COURT:  It is a defamation claim?  [K2]:  It is like.  It is akin.  It is not a defamation claim.").  Indeed, in attempting to make its case, K2 referenced Burger Court-era Supreme Court decisions—*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) and *The Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972)—as applicable caselaw recognizing reputational interests as legally protectable.  Tr. at 137:7–15.  In doing so, K2 conceded reputational interests are not relevant in bid protests, particularly because there is no caselaw recognizing such in the government procurement context.  Tr. 25:14–26:4 ("THE COURT:  Is there any case that recognizes that?  [K2]:  Reputational interest?  Yes, the Supreme Court has found reputational interest as legally cognizable interest.  THE COURT:  No, I understand what a reputational interest is, I just don't know if I have ever heard of it in a bid protest context.  [K2]:  Well, in a bid protest context, no[.]").  For example, without citing caselaw, K2 argues, "[t]he Government seems to be trying to claim that the notice [of termination for default] somehow extinguishes K2's right to intervene.  The Government is wrong.  In addition to its interests under the USPS contract, which it still is performing, K2's reputational interests as well as additional property interests also have been implicated by this Court's decision."  K2 Resp. to Gov't Mot. Suppl. at 1–2.  By failing to cite to any cases, K2 merely makes unsupported claims about having a viable reputational interest at issue.  *Id.* Ultimately, K2 struggled to articulate concretely what its interests are in this protest given (1) K2 has been terminated for default and (2) it has no caselaw to support its reputational harm theory in the context of a bid protest.  *See* Tr. at 25:14–26:4.

The Court disagrees K2's termination for default has "no bearing on this bid protest issue," Tr. 22:25–23:2.  To the contrary, termination for default greatly alters this bid protest's procedural posture.  The Federal Circuit provided relevant guidance in *Mitchco*.  *See Mitchco Int'l, Inc.*, 26 F.4th 1373, 1377 –78 (Fed. Cir. 2022).  There, plaintiff Mitchco challenged the

Army's award of a contract to the Kentucky Office of Vocational Rehabilitation ("KOVR") for "food and dining room operation services . . . at Ft. Knox" and sought injunctive relief. *Id.* at 1375. The Army terminated awardee KOVR's contract "for cause" due to "several deficiencies with performance" amid the litigation. *Id.* at 1377–78. As a result, on appeal, the defendants argued the case was moot. *Id.* The Federal Circuit accordingly held Mitchco's request to enjoin KOVR's performance of the contract was moot because the Army had already terminated the contract. *Id.* ("There is no question that the injunctive relief Mitchco seeks is moot insofar as Mitchco seeks an order enjoining KOVR's performance of the contract, since the Army has already terminated KOVR's contract."). Like the Army in *Mitchco*, USPS already terminated K2's contract for deficiencies related to its performance. *See id.*; 24 Jan. 2024 Letter. Given the contract has been terminated, the underlying suit here—GK9's request to enjoin USPS from awarding the contract to K2—and any future attempts to move for reconsideration of the Court's injunction are moot as K2's award was rescinded for default unrelated to the Court's decision. *Mitchco Int'l, Inc.*, 26 F.4th 1373, 1377 –78 (Fed. Cir. 2022) ("[T]he injunctive relief Mitchco seeks is moot insofar as Mitchco seeks an order enjoining [the awardee's] performance of the contract, since the Army has already terminated [the awardee's] contract."); Tr. at 127:13–128:5 ("[GK9]: . . . I'm the plaintiff. I don't want to go forward anymore. I've got what I want, right now. Whether the court unwinds the injunction or not, I'm going to be performing the clusters that have been awarded to us. . . . [T]he case is moot. . . . It's over[,] . . . and we think the proper thing for the court to do is close the file.").

At oral argument, K2 attempted to argue the Federal Circuit's holding in *Mitchco* does not necessarily undercut K2's interests because "*Mitchco* identifies that if you are able to get any effectual relief whatsoever, the case is not moot. It also recognizes . . . [that if you have] a legally cognizable interest in the outcome, a case is not moot." Tr. at 27:6–10. This interpretation of *Mitchco* is incorrect as the Federal Circuit held once the contract is terminated, requests to enjoin performance on the contract are moot. *Mitchco Int'l, Inc.*, 26 F.4th at 1377–78 ("There is *no question* that the injunctive relief Mitchco seeks is moot insofar as Mitchco seeks an order enjoining KOVR's performance of the contract, since the Army has already terminated KOVR's contract.") (emphasis added). To the extent the Federal Circuit found "the case not moot" as Mitchco might still be "entitled to bid preparation and proposal costs," *id.* at 1379, this is irrelevant here as no parties seek such costs or any other comparable relief. *See* Tr. at 148:23–149:1 ("THE COURT: . . . [T]o confirm, GK9 will no longer be pursuing bid and proposal costs? [GK9]: Correct, Your Honor."). The Federal Circuit did not hold the mere existence of any other "legally cognizable interest[s] [necessarily impact] the outcome" of a court's mootness analysis, as K2 alleges. Tr. at 27:6–10.

Here, K2's ultimate intention is to relitigate the case—to "unwind" the Court's findings related to material misrepresentation. Tr. at 46:19–47:22 ("[K2]: . . . We . . . are focusing on the material misrepresentation finding and are seeking to unwind that finding, and we do think that the injunction would be unwound if there's no material misrepresentation finding. . . ."); *see also* Tr. at 123:3–10 ("[K2]: . . . Our intention is to unwind the court's finding regarding the material misrepresentation . . ."). K2 explained its litigation strategy consists of two steps. First, K2 will intervene in this case. Second, K2 will seek a reversal of the Court's finding of material misrepresentation through a motion for reconsideration. Tr. at 46:19–47:22 ("THE COURT: So being able to intervene . . . that's step one. [K2]: Correct. THE COURT: So let's assume the

court grants it. What's step two? [K2]: A motion to reconsider based off of the evidence that we have submitted to this court . . . THE COURT: Motion to reconsider what? [K2]: Motion to reconsider the court's factual finding that there was a material misrepresentation in its proposal. THE COURT: So not reconsider the injunction, just reconsider a factual finding? [K2:] [We] are focusing on the material misrepresentation finding and are seeking to unwind that finding, and we do think that the injunction would be unwound if there's no material misrepresentation finding. . . ."). K2's relief sought—to unwind the material misrepresentation and relitigate the case—presupposes the pre-termination status quo. *Id.* In other words, K2's desire to undo the Court's December 2023 Order assumes doing so would—or at least could—result in K2 being reinstated as the contract awardee. Like the permanent injunction sought by the plaintiff in *Mitchco*, however, the reconsideration K2 seeks would have no impact on the current contract award. *Mitchco Int'l, Inc.*, 26 F.4th at 1375, 1377–78. Given K2 has been terminated for default, there is nothing "live" related to K2's request for relief; K2 no longer has an interest in the award at issue. *Id.* at 1377–78 ("[T]he injunctive relief Mitchco seeks is moot insofar as Mitchco seeks an order enjoining [the awardee's] performance of the contract, since the Army has already terminated [the awardee's] contract."). In fact, as K2 has been terminated and the contract re-awarded, GK9's original request for an injunction against USPS awarding to K2 is moot. K2's request for reconsideration is accordingly moot. *Id.*

As such, the Court finds as moot K2's motion to intervene, and its related amended motion to intervene, *see supra* n.8, because USPS terminated K2 for default due to ongoing poor performance; termination for default severs any right K2 has to the contract. *Mitchco Int'l, Inc.*, 26 F.4th at 1378 (holding the relief sought by the protestor was moot because the Army "ha[d] already terminated [the awardee's] contract") (internal citations omitted).

## V. *Wolfsen* Factor 1 – Whether K2's Motion to Intervene is Timely

While USPS' termination for default moots any potential right to intervention K2 may have to reverse the injunction, *supra* Section IV, the Court next addresses, in the alternative whether K2 may intervene as of right under RCFC 24(a) and K2's claim termination for default having "no bearing on this bid protest issue" because of the alleged reputational interests at stake. Tr. at 22:25–23:2 ("[K2: K2] did say that [the termination for default is] a contract disputes matter, if I recall correctly, and it has no bearing on this bid protest issue."); *see also* Tr. 25:14–19 ("[K2]: A reputational interest that was triggered by the misrepresentation claims. . . . [I]t's like a defamation claim, Your Honor. THE COURT: It is a defamation claim? [K2]: It is like. It is akin. It is not a defamation claim."). Specifically, the Court will address whether K2's "motion [is] . . . timely." *Wolfsen Land & Cattle Co. v. P. Coast Fedn. of Fishermen's Associations*, 695 F.3d 1310, 1315 (Fed. Cir. 2012); RCFC 24(a). In interpreting Rule 24 of the Federal Rules of Civil Procedure (FRCP),[17] the Supreme Court stated timeliness is the threshold analysis for intervention:

[17] Rule 24 of the Federal Rules of Civil Procedure (FRCP), *see* FED. R. CIV. P. 24, conforms very closely to RCFC 24. As the RCFC rules committee noted in its 2002 committee notes "interpretation of the [RCFC] will be guided by case law . . . [interpreting] the Federal Rules of Civil Procedure," the Supreme Court and Federal Circuit's analysis of FRCP 24 is directly applicable here.

> Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.' *If it is untimely, intervention must be denied*. Thus, the court where the action is pending must first be satisfied as to timeliness. Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances.

*See Natl. Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 365–66 (1973) (emphasis added). The parties acknowledged this at oral argument and agreed timeliness is a threshold issue for both intervention as of right and permissive intervention. Tr. at 40:16–19 ("[THE COURT]: So [timeliness] is a threshold issue? [K2]: Yes, it is a threshold issue, Your Honor."). The Supreme Court has further explained, timeliness is "to be determined by the court in the exercise of its sound discretion." *Natl. Ass'n for Advancement of Colored People*, 413 U.S. at 365–66. This court in its discretion often considers "timeliness" exclusively and forgoes the remaining three factors of RCFC 24(a) when a motion is deemed untimely. *See, e.g., SAGAM Securite Senegal v. United States*, 156 Fed. Cl. 124, 126–28 (2021) (holding the bid protest awardee's motion to intervene to be untimely and denying the awardee's motion on timeliness grounds); *Excelsior Ambulance Serv., Inc. v. United States*, 126 Fed. Cl. 69, 71–72 (2016) (holding the bid protest awardee's motion to intervene to be untimely and denying the awardee's motion on timeliness grounds).

The Federal Circuit explained in *Belton* what constitutes a "timely" motion for intervention, highlighting three factors:

> (1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] rights . . . ;
> (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention[; and]
> (3) [the] existence of unusual circumstances militating either for or against a determination that the application is timely.

*Belton Industries, Inc. v. United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (internal citation omitted) (assessing a Rule 24(a) motion to intervention on appeal from the Court of International Trade); *see also Sumitomo Metal Indus., Ltd. v. Babcock & Wilcox Co.*, 669 F.2d 703 (C.C.P.A. 1982); *SAGAM Securite Senegal*, 156 Fed. Cl. at 126; *Chippewa Cree Tribe of Rocky Boy's Reservation v. United States*, 85 Fed. Cl. 646, 658 (2009).

### A.    Whether K2 Knew or Reasonably Should Have Known of Its Intervention Right in February 2023

In accordance with *Belton*, the Court first assesses "the length of time during which [K2] . . . actually knew or reasonably should have known of [its] rights." *Belton*, 6 F.3d at 762. K2 argues the "first factor [of the *Belton* test] weighs in favor of timeliness because K2 only became aware of its right being implicated on December 27, 2023." K2's Mot. to Intervene at 4; *Belton*, 6 F.3d at 762. K2 concedes "it received an email from GK9's counsel on February 10, 2023,

indicating that GK9 intended to file a bid protest." K2's Mot. to Intervene at 5 (citation omitted). Despite this notice, K2 argues as a result of the protective order "K2 had no visibility of the [material misrepresentation] claims that GK9 was lodging against it, nor could it have become aware that GK9's main objective, which is notably absent from the redacted version of its original complaint, was to disqualify K2." *Id.* at 5. K2 explains it did not intervene because it "initially believed USPS was able to and would adequately represent K2's rights and interests in this case." *Id.* K2 cites to the D.C. Circuit's *Acree v. Republic of Iraq* to argue: "'[p]ost-judgment intervention is often permitted . . . where the prospective intervenor's interest did not arise until the appellate stage.'" *Id.* at 4 (quoting *Acree v. Republic of Iraq*, 370 F.3d 41, 50 (D.C. Cir. 2004), abrogated on other grounds by *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009)).

The government responds the "'right' at issue is knowledge of the suit, not how one's opponents may pursue it." Gov't's Resp. at 4–5. The government reasons K2 "admits" it had actual notice of this suit in February 2023; its right was triggered upon receiving the pre-filing notice. *See id.* at 3, 4 ("This case's context of proceedings alone defeats K2's application [as] [t]he case was filed almost one year ago (February 13)."). The government argues: "[i]t would be reasonable to assume that a protest by an unsuccessful offeror could involve some criticism of the government's evaluation of the successful offeror. [The potential intervenor] sat on its rights in a circumstance where it was not reasonable to do so." *Id.* at 5 (citation and internal quotations omitted). The government also responds, "the Government . . . defend[ed] the award," contrary to K2's assertion, and to the extent K2 is focused on its reputational interests, "K2 could not have expected the Government to zig and zag with the evidence as K2 apparently suggests it might have—if it had elected to intervene." *Id.* at 5–6.

GK9 responds "K2's reliance on the *Acree* case is misplaced [because] *Acree* is not a bid protest," which "is important because, in protests, the awardee's right to intervene generally arises as soon as its contract is challenged, not at the appellate stage." GK9 Resp. at 3 (citing *Acree*, 370 F.3d at 43). GK9 reasons "K2 knew, or certainly should have known, that its contract was at risk when it received GK9's prefiling notice[,]" particularly because "K2 . . . is an experienced protestor itself." *Id.* at 3 (citing *K2 Solutions, Inc.*, B-417689, Sept. 24, 2019, 2019 CPD ¶ 330). GK9 explains: "[e]ven if GK9's prefiling notice did not put K2 on notice that this protest imperiled its contract—[which] it certainly did—K2 acknowledged that risk in August of last year" by email, in which K2 stated it was concerned about "the ongoing litigation between Global and the post office where [K2's] current contract is" at issue. *Id.* at 4 (quoting GK9 Resp. Appx. A). Responding to K2's argument about the docket being sealed, GK9 explains: "[e]xperienced protestors like K2 know that most protest filings are sealed." *Id.* GK9 also notes, contrary to K2's argument the government did not defend K2, "DOJ and agency counsel vigorously defended against GK9's allegations." *Id.* GK9 cites to *SAGAM* and *Excelsior* to argue this Court "regularly rejects unfounded and untimely motions to intervene like K2's." *Id.* at 5–6 (first citing *SAGAM Securite Senegal*, 156 Fed. Cl. at 126; and then citing *Excelsior*, 126 Fed. Cl. at 71–72).

In response to K2, AMK9 argues "K2's argument misses the mark. K2's right to intervene is not premised on the specifics of the facts in a complaint, but on when it knew or should have known of its right to intervene." AMK9 Resp. at 3. AMK9 further reasons: "K2's

argument ignores the fact that if it timely intervened, it would have known the basis of GK9's protest." *Id.*

To determine "the length of time during which [K2] . . . actually knew or reasonably should have known of [its] rights," *Belton*, 6 F.3d at 762, the Court must first turn to the timing of when this case was filed. On 10 February 2023, K2 received a pre-filing notice regarding GK9's post-award challenge to USPS' award of the contract; K2 acknowledges this notice. K2's Mot. to Intervene at 5 (citation omitted); Tr. 114:21–115:9 ("THE COURT: . . . So when K2 received GK9's prefiling notice back in February of 2023, K2 was aware at that point that the contract award was in dispute . . . [?] [K2]: It was aware that Global K9 would be making claims that the procurement process was unfair as to the Postal Service, correct. THE COURT: . . . [S]pecifically, K2 was aware that their contract award could be removed as an outcome of the case? [K2]: Yes. . . ."). As such, K2 concedes it knew of this protest beginning in February 2023. *See* Tr. at 114:21–115:9. K2 argues, though it knew of the protest since February, it "had no visibility of the [material misrepresentation] claims that GK9 was lodging against it," which is why K2 did not intervene until now. K2's Mot. to Intervene at 5. K2 stated at oral argument it was only aware of GK9's material misrepresentation claims beginning in December 2023. Tr. at 42:16–23 ("THE COURT: . . . [I]t's K2's contention that the focus is time after entering the injunction and after the court's December order was made public? [K2]: After it was made aware of the material misrepresentation finding and finding out that its reputational interests were being implicated by Global, yes."). The timing for intervention, particularly in bid protests, does not hinge upon what specific claims the plaintiff in the case may make regarding the award to a potential defendant-intervenor; rather, the timeliness of intervention turns on "the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[]" to intervene. *Belton*, 6 F.3d at 762. Here, K2 "knew or reasonably should have known," *Belton*, 6 F.3d at 762, its contract award and all associated rights and interests were at risk on 10 February 2023, when it received GK9's pre-filing notice. *See* K2's Mot. to Intervene at 5.

In addition, the content of GK9's public Complaint specifically put K2 on notice its award was at risk. In February 2023, GK9 filed its redacted complaint, which publicly requested the Court "[p]ermanently enjoin USPS from proceeding with performance on the clusters on which GK9 bid." GK9 Redacted Compl. at 13, ECF No. 20. K2 thus knew not only of the protest itself but also of GK9's request to enjoin USPS from proceeding with K2's awarded clusters since the beginning of this case. *See id.* K2 therefore knew of this protest, containing a potential threat to its award, for approximately 11 months before K2 filed its Motion to Intervene on 10 January 2024. *See Belton*, 6 F.3d at 762.

Regarding the sealed filings in this case, at oral argument, the government suggested K2 could have tracked the public docket and "stars, bells and whistles should have gone off" when GK9 filed a sealed amended complaint after GK9 received the administrative record. Tr. at 59:19–60:4 ("[GOVERNMENT]: So if complaints were important, and if K2's view was, we knew about the first complaint, so we're good, what did it think when it saw on the docket or could have seen that there was a second amended complaint filed? At that point, if the complaints are important, all sorts of stars, bells and whistles should have gone off."). K2 conceded it tracked the docket but chose not to intervene anyway. Tr. 61:17–18 ("THE COURT:

Was K2 tracking the docket?  [K2]:  Yes.").  While true GK9 raised its material misrepresentation claim in its *sealed* amended complaint, *see* ECF No. 37; *see also* GK9's Redacted Am. Compl., ECF No. 107.  K2 agreed many bid protests, like this one, have sealed and redacted dockets throughout litigation to protect national security and proprietary information.  Tr. at 144:25–145:7 ("[THE COURT]:  [Y]ou agree that . . . like some bid protests where there is national security in addition to company proprietary information, that the documents have to remain redacted throughout the briefing and litigation process, correct?  [K2]: . . . I agree.").  Given K2's familiarity with the nature of bid protests, K2's failure to intervene based on GK9's sealed Complaint is inexcusable.  As K2 was tracking the public docket and was therefore aware of GK9's sealed Amended Complaint, the Court agrees with government counsel, the post-administrative record sealed filings should have further motivated K2 to intervene.  *See* Tr. at 59:19–60:4.

As Judge Sweeney remarked in *SAGAM*, "five months . . . in a bid protest[] is an eternity."  *SAGAM*, 156 Fed. Cl. at 127; *see also* 28 U.S.C. § 1491(b)(1), (3) ("[T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation . . . [or] the award of a contract  . . . in connection with a procurement.  . . . [T]he court[] shall give due regard to the interests of national defense and national security and the need for *expeditious resolution* of the action.") (emphasis added).  Here, K2 waited more than twice as long as what Judge Sweeney considered an "eternity" in bid protest timing to intervene.  *See* K2's Mot. to Intervene.  K2 agreed at oral argument, in discussing Judge Sweeney's remark in *SAGAM*, "bid protests move quickly."  Tr. at 42:12–13 ("[K2]:  Generally, bid protests move quickly, Your Honor, I agree with that.").  K2 also acknowledged the Tucker Act, which establishes this court's jurisdiction, calls for the "expeditious resolution" of procurement cases and calls upon the Court to give due regard to national defense and national security interests, which many procurement cases—including this one—involve.  *See* Tr. at 43:4–14 ("THE COURT:  . . . [L]ooking at the court's procurement jurisdiction in the Tucker Act, . . . the court is called in order to pay particular attention on 'the need for expeditious resolution of the action in procurement cases, as well as give due regard to the interests of national defense and national security.'  You would agree that both of those are certainly implicated in this protest?  [K2]:  I understand that, Your Honor, I would agree with that."); *see also* Tr. 43:15–44:12 ("THE COURT:  And that's one of the reasons why many intervenors join in on a protest from the beginning, not only are their rights implicated, but the fast-moving nature of the case and the sealed nature of how procurement cases are handled, especially in the national security context[.]")  Given K2's agreement on the principles established by the Tucker Act and the timing of procurement litigation, it is baffling K2 did not intervene earlier.  *SAGAM*, 156 Fed. Cl. at 127; *see also* 28 U.S.C. § 1491(b)(3).

In addition to 11 months being an eternity in this context, K2 seeks to intervene after the Court has made a final decision on an injunction.  *See* K2's Mot. to Intervene; *Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 123–28 (2023).  While other courts, such as the D.C. Circuit in *Acree*, have permitted intervention after a final decision or judgment in "unusual circumstances," K2 at oral argument agreed the Federal Circuit has never permitted a party to intervene after the court made a final decision or entered judgment.  Tr. at 48:18–21 ("THE COURT:  Is there any Federal Circuit case where a party was permitted to intervene after a final decision and injunction?  [K2]:  Not that I could find, Your Honor."); *see Acree*, 370 F.3d 41.

This Court only found one instance of intervention after a final decision or judgment to be permissible—in *Red River Holdings, LLC v. United States*, No. 09-185 C, 2009 WL 3423838 (Fed. Cl. Oct. 22, 2009). In *Red River*, the awardee "move[d] to intervene in order 'to seek appellate review of the jurisdiction of this [c]ourt.'" *Red River Holdings*, 2009 WL 3423838, at *1. Judge Merow found plaintiff's "Motion to Intervene for the purpose of appealing the jurisdictional ruling [to be] timely" and noted, "[h]ad [plaintiff] intervened at the inception of this litigation[,] the present circumstances *would not be different*." *Id.* at *2. Judge Merow reasoned, "[t]he appeal possibility only arises upon the conclusion of the case," *id.*; no such circumstances are present here. Had K2 intervened at the inception of this litigation, the present "circumstances would [almost certainly have been] different," as K2 would have been able to view the sealed docket and specifically challenge GK9's claims. *Id.* Contrary to K2's argument "this case is far from over," K2's Reply at 2, K2 moved to intervene *after* the Court's final decision to enjoin the contract award. *See* K2 Mot. to Intervene. Indeed, at oral argument K2 agreed, had it not intervened in this case, the case would be over. Tr. at 122:8–17 ("THE COURT: Without the motion to intervene, the case would be over? [K2]: . . . [C]orrect, without a motion to intervene pending, the case would likely be over."). Given K2 "actually knew or reasonably should have known of [its] rights" for 11 months but chose to move to intervene *after* the Court resolved all dispositive motions in this case, this factor weighs against finding K2's Motion timely. *Belton*, 6 F.3d at 762.[18]

### B. Whether Prejudice Weighs in Favor of K2

The Court next turns to the second factor of the *Belton* test to determine timeliness: "whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[] by denying intervention." *Belton*, 6 F.3d at 762. K2's primary argument for why it will be prejudiced if unable to intervene relates to its reputation: "K2's reputation has been damaged and will continue to be damaged if K2 is unable to intervene and submit evidence disproving the false allegations made by GK9—a reputation K2 has worked more than 20 years to build." K2's Mot. for Intervene at 6. K2 reasons "[a]llowing K2 to

[18] As discussed *supra*, were K2 permitted to intervene, it intends to ask the Court for a reversal of its December 2023 misrepresentation findings. Tr. 123:3–10 ("[K2]: . . . Our intention is to unwind the court's finding regarding the material misrepresentation . . ."). Despite tracking the public docket and being involved in this litigation for nearly three months, however, K2 has not yet filed a motion for reconsideration allegedly because it is waiting for "access . . . [to] the record" once it is permitted to intervene, *see* Tr. at 53:12–22 ("THE COURT: . . . [W]hy was a motion for reconsideration not attached to the motion to intervene? [K2]: Because again, Your Honor . . . we would like access to . . . the record to be able to reconsider. THE COURT: But you're asking to reconsider what the court decided in December. That's fully public. [K2]: But we don't have everything that Global said about us. . . ."); *see also* Tr. 52:11–25 ("THE COURT: . . . K2 seeks to file motions to dissolve, reconsider and/or appeal, but has not yet done so. [K2]: Your Honor, we don't have access to the complete record. We just received access to, you know, these redacted versions, and so to be able to put our best foot forward, we need an opportunity to have a visual into . . . what's in the record, and what else was stated against it. . . ."). K2 has failed to cite any caselaw in which a court extended the timeline for filing a reconsideration motion pending intervention. Tr. at 56:18–24 ("THE COURT: So your argument is if granted a motion to intervene, then a motion to reconsider would still be timely? [K2]: Yes, Your Honor, because there is no separate entry of judgment which is required for a final judgment."). K2 argues, however, any motion for reconsideration is not yet late because the Court made a final decision on the merits but has not officially entered judgment. *See id.*

intervene now by granting this motion will ensure this Court has a complete record to rely on before issuing a final order that does not blatantly prejudice any of the parties in this case or K2." *Id.* at 7. K2 further argues "[t]his Court afforded the current parties the opportunity to submit evidence regarding K2's purported past performance, but K2 has not been afforded that opportunity." *Id.* at 6.

The government responds: "K2 ignores the prejudice to the other parties caused by indulging [K2's] insistence on a re-do." Gov't's Resp. at 6 (citing *SAGAM*, 156 Fed. Cl. at 128). GK9 agrees "[i]t is prejudicial when a party is 'forced to litigate against a second, late-arriving opponent and expend additional resources in doing so.'" GK9 Resp. at 8 (citing *SAGAM*, 156 Fed. Cl. at 128). GK9 also argues "the termination for default ups the ante on the prejudice issue" because "[t]he 'waste of additional time and resources' litigating issues that could have been raised long ago outweighs the prejudice to a potential intervenor" when intervention offers no remedy. GK9 Resp. to Gov't Mot. Suppl. at 6 (citing *Excelsior*, 126 Fed. Cl. at 72). GK9 reasons: "the Court must consider how much more of a burden it would be for GK9 to relitigate its moot-if-reopened misrepresentation claim, and how much less prejudice would K2 suffer if not allowed to belatedly litigate a moot claim now that USPS terminated for a different reason. These circumstances overwhelmingly militate against intervention." *Id.* AMK9 responds: "[t]he prejudice to the existing parties outweighs the prejudice to K2. AMK9, GK9, MSA, the government, and the Court, have all expended considerable time, resources, and money on protests related to this procurement." AMK9 Resp. at 4. AMK9 explains: "every other party in this case would be prejudiced by having to relitigate a case that has been heard and decided by the Court." *Id.* at 5.

At oral argument, K2 demonstrated its ultimate intention is to re-litigate the case, as it seeks to intervene and requests the Court "[r]econsider the material misrepresentation finding in its December 27, 2023 Order." K2's Amend. Mot. to Intervene at 2; Tr. at 123:3–10 ("[K2]: . . . Our intention is to unwind the court's finding regarding the material misrepresentation . . ."). As determined *supra*, however, K2's Motion and this protest as a whole, which is part of a "case [that] is nearly four years old" and has had "multiple re-solicitations, re-awards, and remands," *Glob. K9 Prot. Grp.*, 169 Fed. Cl. at 122, is moot. *See* Tr. at 20:4–10 ("[GK9:] But here, now we know that the case is going to be moot if we reopen. So not only are they late, but we're going to go through all this in basically an academic exercise, because the injunction I asked for can't be entered anymore, given the nature of the termination. So if we reopen it, there is not a remedy the court can give us."). As this court has acknowledged it is prejudicial when protestors are "forced to litigate against a second, late-arriving opponent and expend additional resources in doing so," *SAGAM*, 156 Fed. Cl. at 128, and given the parties have spent countless hours and dollars litigating this now-moot protest, which K2 knew of for 11 months but neglected to act upon, the government's, GK9's, and AMK9's burden to re-litigate is significant.

In contrast, K2 argues its "reputation has been damaged" and alleges "[t]his Court afforded the current parties the opportunity to submit evidence regarding K2's purported past performance, but [not] K2." K2's Mot. for Intervene at 6. First, if K2's primary concern is protecting its reputation, it should have intervened in February 2023 when it received the pre-filing notice in this case and read GK9's redacted complaint calling for the permanent injunction of its award. *See* GK9 Redacted Compl. at 13. K2 neglected to intervene. As such, K2 has

forfeited its opportunity to defend its award and itself against attacks by GK9, all of which are typical in bid protest litigation. *See, e.g., SAGAM*, 156 Fed. Cl. at 126–28 (holding the bid protest awardee's motion to intervene to be untimely and denying the awardee's motion on timeliness grounds); *Excelsior*, 126 Fed. Cl. at 71–72 (holding the bid protest awardee's motion to intervene to be untimely and denying the awardee's motion on timeliness grounds); *Northeast Military Sales, Inc. v. United States*, 100 Fed. Cl. 100, 100–03 (2011) (holding the bid protest awardee's motion to intervene to be untimely). Further, K2 declined USPS' offer of a no-cost termination in lieu of a termination for default even though accepting the offer would have likely dampened any further reputational damage from K2's termination. *See* Termination for Default Email Chain at 4 ("A no-cost termination would benefit K2 in that it would allow K2 to avoid having its contract terminate for default and the consequences of having a termination for default on its record (including having to acknowledge the termination for default in competitions for future government business)."). K2 was aware of the benefits of a no-cost termination and turned down the offer to pursue a "better" litigation strategy. *See* Tr. at 35:3–15 ("THE COURT: I don't understand how a misrepresentation injunction and a no-cost termination is worse than a misrepresentation, injunction and now a termination for default.  [K2]: Well, Your Honor, we're hoping that we are able to intervene and we can overcome and reverse this court's finding on a material misrepresentation. . . . [T]o be called a liar . . . is a reputational harm that is worse than any termination for default."); *see* 123:18–22 ("[K2:]  [T]his is the only time, this is the only venue, this is the only way we can unwind that finding is here before this court.  And there's no other action that can be filed.  There's nothing."). K2 now calls upon the Court to protect its reputation when K2 itself has repeatedly failed to do so. The Court is bound only to determine "whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[] by denying intervention," *Belton*, 6 F.3d at 762; it is not the Court's place to mend K2's self-inflicted wounds.

Second, to the extent K2 argues it was not afforded the opportunity to submit evidence to combat the material misrepresentation claim, this allegation is moot as the Court permitted K2 to submit over 300 pages of evidence allegedly refuting the Court's material misrepresentation finding in anticipation of oral argument, *see infra* Section VI, n.20. Given the parties' burden to relitigate is significant and K2's alleged prejudice of reputational harm has been mitigated, "the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to [K2] . . . by denying intervention." *Belton*, 6 F.3d at 762; *see also SAGAM*, 156 Fed. Cl. at 128. As such, this factor weighs against finding K2's Motion timely. *Belton*, 6 F.3d at 762.

### C.      Whether Unusual Circumstances Weigh in Favor of Intervention

The Court next turns to the third factor of the *Belton* test to determine timeliness: whether the "existence of unusual circumstances militat[es] either for or against a determination that the application is timely." *Belton*, 6 F.3d at 762. K2 argues "the highly unusual circumstances of this case favor K2's intervention." K2's Mot. for Intervention at 7. K2 reasons:  "USPS has done nothing to support K2's performance" as "USPS refused to hold a kick-off meeting with K2, then shuffled the contract clusters, and subsequently blamed K2 for performance delays." *Id.* K2 explains, "USPS has done little to nothing to protect the awards or K2's reputational interests" as, "when asked by this Court how to handle K2 as a missing party and whether it could enjoin K2 from the awards, USPS passed the buck." *Id.* K2 argues,

because it is rare "the Government does little to nothing to protect an award it has made, fails to notify a non-party awardee that there is a chance it could be enjoined from performing altogether based on false allegations of material misrepresentations, . . . fails to initiate joinder of that non-party in the proceedings," and "refuses to meet with the awardee and then claims the awardee is not following instructions and performing poorly," this Court should permit intervention. *Id.* at 8.

The government responds "'unusual circumstances' is simply a label that K2 attaches to [its] arguments . . . , adding complaints about USPS'[] administration of K2's contract and a perceived lack of support of K2's interests in the protest." Gov't's Resp. at 6. The government reasons: "K2 ignores the entire point of this examination: timeliness." *Id.* (citations omitted). GK9 responds: "'[T]he loss of an award opportunity because of a decision not to intervene in a bid protest is not unusual[.]'" GK9 Resp. at 9 (quoting *SAGAM Securite Senegal*, 156 Fed. Cl. at 128). AMK9 responds: "K2 has not pointed to any circumstances that would warrant a 10-month late motion to intervene." AMK9 Resp. at 5.

At oral argument, K2 argued "unusual circumstances" need not be tied to "timeliness," but rather may relate to the "totality of the circumstances" of the case. Tr. at 69:6–18 ("[K2]: My understanding, Your Honor, is that because the timeliness [factor] considers the totality of these circumstances, that it also will consider what is going on with regards to the . . . need to intervene. . . . THE COURT: So you argue that the *Belton* unusual circumstances are just any unusual circumstances? [K2]: Related to the case at hand in the proceedings . . . not just anything whatsoever. THE COURT: Anything unusual related to the case? [K2]: Regarding the circumstances regarding what is also triggering the request to intervene, yeah. All the circumstances, Your Honor."). This interpretation goes against the plain language of Rule 24(a)—"[o]n timely motion"—and *Belton*. *See Belton*, 6 F.3d at 762. *Belton* suggests, for unusual circumstances to warrant permitting late intervention, the circumstances must have reasonably impacted the movant-intervenor's decision not to intervene earlier; they cannot be irrelevant peculiarities of the case. *Belton*, 6 F.3d at 762 (holding "[n]o unusual circumstances warrant granting" motions to intervene when the movant-intervenors "were aware of the . . . proceedings" but "wait[ed] nearly two years before seeking to intervene"); *see* Tr. at 70:15–22 ("[GK9:] The case law . . . wants to know if there are unusual circumstances, essentially that prevented or would have led a reasonable person not to intervene earlier.").

In an effort to support its Motion, K2 frames the way in which the government and USPS interacted with K2 throughout this litigation as "unusual" but cites no caselaw in which a court granted an untimely motion to intervene due to unusual circumstances associated with timeliness. K2's Mot. for Intervention at 7–8 (arguing "USPS has done nothing to support K2's performance"; "USPS refused to hold a kick-off meeting with K2, then shuffled the contract clusters, and subsequently blamed K2 for performance delays"; "USPS has done little to nothing to protect the awards or K2's reputational interests"). For example, without citation to caselaw, K2 argues "USPS has done little to nothing to protect the awards or K2's reputational interests," so intervention is warranted. *Id.* To the contrary, however, the government defended K2's award and disputed any additional claims against K2 during the MJAR litigation period, *see infra*. *Glob. K9 Protec. Grp.*, 169 Fed. Cl at 129–30. As the Court described in its December 2023 order:

> The government notes: . . . GK9's request for the Court to disqualify K2 as a result would be unfounded[] because "K2 is not a party to this case." . . . The government also argues GK9 "fails to show that the Court should assume that K2's ranking would have been lowered absent, at minimum, reevaluation by USPS." . . . The government further reasons, "GK9 does not demonstrate that supplementation of the record is necessary to correct a material misrepresentation" because K2 "was [not] required to furnish the detail on its past performance to the degree that GK9 puts forth for K2[ ]" and K2, nonetheless, gave "USPS sufficient notice of the nature of the contract and an opportunity to investigate by checking references or taking other steps." . . . The government also argues "[e]ven if the Court were to allow GK9 to supplement the record, however, GK9 would still fail to demonstrate that K2 should be disqualified or that USPS'[] best value determination should be changed as a result." . . .
>
> [T]he government argues "GK9's argument is speculative because the Government has given no indication that the Postal Service would ignore information in its possession regarding K2's past performance in the event of a remand" and "has shown no reason why the Court should direct results on a remand rather than allowing the Postal Service to conduct its own analysis." . . . In response to GK9's argument about the Moore Declaration, the government reasons "GK9's argument misinterprets the declaration because the declaration discusses a hypothetical re-weighing of K2's past performance . . . as of the February 6, 2023 contract award" and "K2's performance after the February 6, 2023 contract award would not have been relevant to its past performance rating as of February 6, 2023.". . . The government also notes "GK9 does not show any reason why K2's current performance issues are relevant to GK9's past performance misrepresentation argument." . . .
>
> . . .
>
> The government further stated at oral argument, "there's nothing in [the Moore] [D]eclaration that suggests [the CO] would have pulled the award according to the terms of the solicitation." Tr. at 98:2–4.

*Id.* at 129–31, 146. The government argued GK9 failed to establish a misrepresentation and, if the Court found a misrepresentation, the proper remedy would be remanding to the agency rather than injunction. *Id.* at 130 ("GK9 does not 'demonstrate a material misrepresentation ... [and,] if the Court were to order any relief as a result of these materials, the proper remedy would be remand for the Postal Service to consider these materials in the first instance.'"). The government thus squarely defended K2's award and any allegation of material misrepresentation against K2, so K2's argument the government did not fails. *Id.* at 129–130.

K2's other "unusual circumstances" arguments relate to ongoing contract administration concerns "after the filing of this protest" in February 2023. K2's Mot. to Intervene at 7. Specifically, K2 alleges "USPS refus[ing] to hold a kick-off meeting . . . [,] shuffl[ing] the contract clusters, . . . subsequently blam[ing] K2 for performance delays" and "refus[ing] to

meet with [K2] . . . and then claim[ing K2] . . . [wa]s not following instructions and performing poorly" are examples of unusual circumstances. *Id.* The Court acknowledged related ongoing contract administration concerns in its December 2023 Order:

> On 18 September 2023, . . . the government notified the Court of "K2 performance issues" necessitating . . . "changes to the rollout schedule." . . . In light of this update, in which the government indicated some or all of GK9's protest could be mooted as "there may be a transition or change in service[s]" if "K2 fails to cure its performance deficiencies," . . . the Court held a status conference on 21 September 2023. Given the government's indication it might transition away from K2, . . . on 22 September 2023 the Court ordered the parties update it regarding K2, including information gleaned from the government's upcoming meeting with K2. . . After the 3 October 2023 update, in which the government stated it failed to meet with K2 but would "allow 60 days [until 1 December 2023] ... for K2 to remedy its deficient performance[,]". . . the Court granted the parties' request for supplemental MJAR briefing regarding these contract administration issues, further delaying resolution of this case. . . . The 3 October 2023 JSR provided the Court insight into K2's underperformance. 3 Oct. 2023 JSR at 3 ("On March 3 [2023] in Columbus, a dog was unable to do "inverted V" searches, so a new handler-canine team from K2 had to take over. . . . On March 9 [2023] in the Cincinnati rollout, there were several improper handling issues, such as handlers not using gloves, not doing safety checks prior to screening, and stickering without putting their dog away first.... On March 22 [2023] in Chicago, K2 failed to satisfy contract requirements because the K2 storage cabinet with necessary materials was locked without any key available on site. On March 24 [2023] in Detroit, a handler was late with conflicting explanations. And, when the canine alerted, that handler was not familiar with the refined screening process."). On 17 October 2023, GK9 filed its Supplement to its MJAR regarding its claim of K2's material misrepresentation and K2's ongoing performance issues. . . . On 20 November 2023, the parties filed a JSR addressing their positions regarding remand, should the Court ultimately do so. . . . In the 20 November JSR, the government stated: (1) it planned to push the conclusion of K2's probationary period from 1 December to "approximately Jan[uary 15, 2024]"; and (2) any remand would likely take until March 2024.

*Glob. K9 Prot. Grp.*, 169 Fed. Cl. at 127–28. Unusual circumstances under *Belton*, however, must relate to the question of whether K2's "application is timely." *Belton*, 6 F.3d at 762 (explaining unusual circumstances "militat[e] either for or against a determination that the application is timely"); *see* Tr. at 70:15–22 ("[PLAINTIFF:] The case law . . . wants to know if there are unusual circumstances, essentially that prevented or would have led a reasonable person not to intervene earlier."). K2's examples of "unusual circumstances" are merely contract administration issues with no bearing on K2's ability to timely intervene. *Id.* Indeed, a failure by USPS to "hold a kick-off meeting," K2's Mot. to Intervene at 7, for example, has no impact on K2's decision or ability to intervene at an appropriate time. As such, K2's contract administrative issues do not "militat[e] either for . . . a determination that the application is timely." *Belton*, 6 F.3d at 762.

Further, despite K2's claims to the contrary, pursuant to the Court's standard protective order, the government was not permitted to discuss GK9's specific allegations of material misrepresentations with non-party K2. K2's Mot. to Intervene at 7–8; RCFC Appx. C., Form 8; *see* Tr. at 134:25–135:5 ("[K2]: Your Honor, [the government] could have asked the parties to follow the protective order and submit redactions of the amended complaint and any other filings for the parties, and that would not have been a violation of the protective order or the fact that the matter was under seal."). This Court's standard protective order for bid protests requires sealed dockets to "safeguard" propriety information, RCFC Appx. C., Form 8, and there was no basis for the government to breach this confidentiality to assist K2 in deciding whether to intervene. *See* Tr. at 134:25–135:5. While perhaps the docket being sealed in this case cuts in K2's favor as it was unable to see GK9's material misrepresentation argument, this is not an "unusual circumstance" reasonably impacting the timing of K2's attempt to intervene. *Belton*, 6 F.3d at 762. K2 even agreed dockets in bid protest cases are typically sealed and/or redacted for national security and proprietary concerns. Tr. at 144:25–145:7 ("[THE COURT]: [Y]ou agree that . . . like some bid protests where there is national security in addition to company proprietary information, that the documents have to remain redacted throughout the briefing and litigation process, correct? [K2]: . . . I agree"). As no unusual circumstances are present "militating either for . . . a determination that the application is timely," this factor cuts against a finding K2's Motion was timely. *Belton*, 6 F.3d at 762.

Accordingly, as all three *Belton* factors cut against K2, K2's Motion is not "timely" under the first prong of the *Wolfsen* test. *Id.*; *Natl. Ass'n for Advancement of Colored People*, 413 U.S. at 365–66 (noting timeliness in requesting intervention is "to be determined by the court in the exercise of its sound discretion."). Although the Court already found K2's Motion moot, *supra*, in the alternative, the Court denies K2's Motion to intervene for failing the threshold question of timeliness. *Natl. Ass'n for Advancement of Colored People*, 413 U.S. at 365–66; *Wolfsen*, 695 F.3d at 1315; RCFC 24(a).

## VI. Other *Wolfsen* Factors

As agreed by the parties at oral argument, RCFC 24(a)'s timeliness requirement is a precondition for intervention. Tr. at 40:16–19 ("[THE COURT:] So [timeliness] is a threshold issue? [K2]: Yes, it is a threshold issue, Your Honor."); *see* RCFC 24(a) ("On timely motion, the court must permit anyone to intervene who . . ."). As K2's motion is untimely and therefore denied, the Court will only briefly address the remaining *Wolfsen* factors.

Regarding whether K2 has a "legally protectable interest," *Wolfsen Land & Cattle Co. v. P. Coast Fedn. of Fishermen's Associations*, 695 F.3d 1310, 1315 (Fed. Cir. 2012), the Federal Circuit explained in *American Maritime*, this interest must be one "the substantive law recognizes as belonging to or being owned by the applicant." *Am. Mar. Transport, Inc. v. United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989) (cleaned up). Here, K2 argues its interests are (1) its award clusters and (2) its reputation as impacted by the Court's material misrepresentation finding. K2's Mot. to Intervene at 8; K2 Resp. to Gov't Mot. Suppl. at 1–2; Tr. at 25:14–19. As USPS terminated K2's award for default and there is no caselaw recognizing a reputational interest in bid protests, however, K2 struggles to articulate its claim to these interests. *See supra* Section IV; Tr. at 25:14–26:4. Regarding K2's claim of an interest in its contract award, USPS

terminated K2 for default independent of this litigation, meaning K2 no longer has an interest in the award at issue. *See supra*; *Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1377–78 (Fed. Cir. 2022) ("[T]he injunctive relief Mitchco seeks is moot insofar as Mitchco seeks an order enjoining [the awardee's] performance of the contract, since the Army has already terminated [the awardee's] contract."). Similarly, as there is no caselaw recognizing a reputational interest in the government procurement context, K2 has failed to adequately allege a single legally protectable interest. *Wolfsen*, 695 F.3d at 1315; *see* Tr. 25:14–26:4.

With respect to the third *Wolfsen* factor—whether "the interest's relationship to the litigation [is] . . . of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment," *Wolfsen*, 695 F.3d at 1315—the Federal Circuit clarified, "[t]he interest . . . may not be either indirect or contingent." *Am. Mar. Transport, Inc.*, 870 F.2d at 1561. Here, K2 argues by operation of the Court's injunction order it "will not only lose the awards at issue . . . [but also] lose the reputation it has built," "impair[ing] and imped[ing]" K2's interests. K2's Mot. to Intervene at 8. In a related argument, K2 also asserts it "should have been added as an indispensable party[19] under RCFC 19." *Id.* (citing *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 731 (2d. Cir. 1983)).

K2 does not have a "legally protectable interest" in this case, *see supra*, so K2 cannot reasonably argue its non-existent interests have a "direct and immediate" relationship with this litigation. *Wolfsen*, 695 F.3d at 1315. Assuming *arguendo* K2 adequately asserted the existence of a legally protectable interest in the contract, however, K2's motion to intervene does not provide it with the opportunity to "protect" its interests as USPS terminated K2 for default, meaning this litigation has not had—and cannot have—an impact on the current status of the contract. *Compare Glob. K9 Protec. Grp., LLC v. U.S.*, 169 Fed. Cl. 116, 141–48; *with* 24 Jan. 2024 Letter. As intervention is "proper only to protect those interests which are 'of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment,'" the Court need not grant intervention here, where K2's intervention cannot impact the contract underlying this dispute. *Am. Mar. Transport, Inc.*, 870 F.2d at 1561.

Further, to the extent K2 argues it is an indispensable party, *see* K2's Mot. to Intervene at 9, this argument fails because "the court [was able to] accord complete relief among existing parties" without K2's intervention, RCFC 19(a)(1)(A), and the Court's decision did not "impair or impede" K2's "ability to protect" a relevant interest, *supra*. RCFC 19(a)(1)(B)(ii). Nor did the Court's decision leave K2 at risk of being subject to "inconsistent obligations." *Id.* To the extent K2 cites *B.K. Instrument*, a Second Circuit decision addressing whether an awardee should be added as an indispensable party when it was not properly served, in support of its

[19] At oral argument, GK9 elaborated on its response "USPS was the only party GK9 could sue here, and the only necessary party" in the bid protest context. GK9 Resp. at 12. GK9 stated: "[W]hat does [RCFC] 4 say about summonses in the Court of Federal Claims? . . . [I]t says, 'serving a complaint on the United States.' It's not talking about suing anybody else. . . . [O]nly the United States is the properly named defendant. And that's who I sued." Tr. at 125:17–126:5. GK9 also discussed RCFC 14: "And then how does the government bring a party in? Well, usually, that would be [RCFC] 14. . . . [B]ut the commentary to [RCFC] 14 says it doesn't apply in a bid protest, because you get the notice to a prospective or to a potentially successful offeror. And we notified them. That's not disputed." Tr. at 126:16–23. GK9 concluded: "So there is no way for [K2] to have been made an indispensable party." Tr. at 126:24–25.

argument, this case is distinguishable. K2's Mot. for Intervention at 9 (citing *B.K.*, 715 F.2d at 731); *see B.K.*, 715 F.2d at 730–31 ("The district court did not deal with the question whether the action must be dismissed because of the impossibility of serving process upon [plaintiff]. The legal consequences of this fact, if it be one, are governed by Fed.R.Civ.P. 19(a) and (b)."). Here, unlike the awardee in *B.K.*, K2 was properly served with a pre-filing notice as required by the RCFC and had access to GK9's redacted complaint from the time it was filed. *See id.*; *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 151. *B.K.* is therefore inapposite. K2 thus has no protectable interests that could be impacted by the Court's decision and its arguments related to RCFC 19 are meritless. *Id.*; *Wolfsen*, 695 F.3d at 1315.

Turning finally to whether K2's "interest is not adequately addressed by the government's participation," the Federal Circuit explained in *Wolfsen*, "[t]o merit intervention as of right, [plaintiff] has the burden to make a compelling showing that its interests may not be adequately protected by the government." *Wolfsen*, 695 F.3d at 1315–16. K2 argues "neither the Government nor the other parties to this case have adequately represented nor will adequately represent K2's interests." K2's Mot. to Intervene at 9. Although some judges of this court have found a movant's interests "may not be adequately articulated by the Government" in bid protests, *see CHE Consulting, Inc. v. United States*, 71 Fed. Cl. 634, 635 (2006); *see also Air Borealis Ltd. P'ship v. United States*, 162 Fed. Cl. 778, 782 (2022); *Northrop Grumman Info. Tech., Inc. v. United States*, 74 Fed. Cl. 407, 418 n.14 (2006), other judges have held the government is "presumed adequately to represent the applicants' interest." *John R. Sand & Gravel Co. v. United States*, 59 Fed. Cl. 645, 656 (2004), aff'd sub nom. *John R. Sand & Gravel Co. v. Brunswick Corp.*, 143 F. App'x 317 (Fed. Cir. 2005); *see also Freeman v. United States*, 50 Fed. Cl. 305, 310 (2001); *Anderson Columbia Env't, Inc. v. United States*, 42 Fed. Cl. 880, 883 (1999). At oral argument in this case, the government explained it adequately represented K2's interests as required by *Wolfsen*, *see* Tr. at 118:23–119:7, and characterized K2's argument to the contrary as merely complaining the government had not *acted as its counsel*. Tr. at 118:12–22 ("[GOVERNMENT]: It sounds like K2 wanted the government to act as its lawyers . . . But under the . . . term 'adequate representation,' [K2's incorrect] interpretation seems to be, [']well we didn't win, so by definition that is not adequate representation[']. . . ."). Although acknowledging K2 and the government have somewhat divergent interests because "the[] job [of contracting officers and contract administrators] is to administer contracts" and K2's job is "to defend its interests," Tr. at 131:10–132:23, government counsel emphasized it emphatically defended its award to K2 throughout the course of this litigation. *See* Tr. at 118:23–119:7. The government vigorously defended K2's award and likewise defended K2 from any additional claims against it during the MJAR litigation period. *See supra* Section V.C.; *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 129–30. While the Court agrees the government's and movant-intervenor's interests can be distinct, *CHE Consulting, Inc.*, 71 Fed. Cl. at 635; *see also Air Borealis Ltd. P'ship v. United States*, 162 Fed. Cl. at 782; *Northrop Grumman*, 74 Fed. Cl. at 418 n.14, the government's and K2's interests in this case were not so divergent as to lead the Court to find the government did not "adequately address[]" K2's interests. *Wolfsen*, 695 F.3d at 1315; *see Glob. K9 Prot. Grp.*, 169 Fed. Cl. at 129–31. The government defended K2 against GK9's allegations of material misrepresentation, the same claims animating K2's instant Motion for Intervention. *Glob. K9 Prot. Grp.*, 169 Fed. Cl. at 146 ("[The government argues] 'GK9's request for the Court to disqualify K2 as a result would be unfounded' because 'K2 is not a party to this case.' . . .); K2's Amend. Mot. to Intervene at 2 ("K2 respectfully requests the Court . . . [a]dd K2 as a

defendant-intervenor in this action [and] [r]econsider the material misrepresentation finding in its December 27, 2023 Order . . ."). Further, the government argued the Court should remand the case to the agency if it found a material misrepresentation, advocating against GK9's requested injunction against an award to K2. *See Glob. K9 Prot. Grp., LLC*, 169 Fed. Cl. at 130 ("[T]he government argues . . . [GK9] 'has shown no reason why the Court should direct results on a remand rather than allowing the Postal Service to conduct its own analysis.'"). Given the government's defense of K2 during this litigation with regard to material misrepresentation and permanent injunction, *see supra*, the Court finds K2 has not met its "burden to make a compelling showing that its interests [were] not . . . adequately protected by the government insofar as there are aspects of the case that the government might not [have] . . . pursue[d] to their fullest."[20] *Wolfsen*, 695 F.3d at 1315–6.

---

[20] In further consideration of the adequacy of the government's defense of K2, the Court notes it permitted K2 to submit evidence regarding its material misrepresentation claim prior to oral argument. *See* Order, ECF No. 91. As discussed *supra*, K2's Motion to Intervene is moot, but the Court reviews K2's evidence to address whether the Court's holding of material misrepresentation has been refuted. In its December 2023 Order, the Court found K2 made material misrepresentations in stating: (1) "K2's Canine Training Academy (CTA) certified 78 3PK9-C teams"; (2) K2 "m[et] all contract requirements"; and (3) K2 "m[et] all contract requirements" to assist "a larger provider [who] accepted more work than they were able to perform." *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 141–48. In its December 2023 Order, the Court noted the government argued, "the proper remedy would be remand for the Postal Service to consider [the Beason and Moore Declarations] in the first instance" "if the Court were to order any relief as a result of [the evidence before the Court]." *Id.* at 130. Despite the government's request to remand the case, the Court held, in the Moore Declaration, "CO Moore did not adequately assess GK9's allegations of material misrepresentation or the core substance of the Beason Declaration despite having all relevant information before him." *Id.* at 148. To refute each of the Court's material misrepresentation findings leading to the grant of injunctive relief, K2 submitted three declarations. *See* Begins Decl., ECF No. 93-1; Redacted Holbrook Decl., ECF No. 100; Kjellsen Decl., ECF No. 93-3; 93-6, 93-8, 93-9 *see also* Redacted Kjellsen Decl., ECF Nos. 100-1, 100-2, 100-3, 100-4 (redacted versions of 93-4; 93-5; 93-7; and 93-10 filed per the Court's 7 March 2024 Order, ECF No. 98).

First, to refute the Court's finding as to K2's certification of 78 teams, K2 argues it *did* actually certify 78 teams. Begins Decl. at 4 (citing Begins Decl., Ex. 1). The Begins Declaration, however, clarifies a different time period in which 78 teams were certified: "[t]he proposal states that K2 certified 78 teams from July 2021 through December 2021. *This was a scrivener's error* that was not caught prior to proposal submission. K2 actually certified 78 teams from May 2021 through January 2022." *Id.* (emphasis added). For July 2021 through December 2021, K2, as it conceded at oral argument, had *only 60 teams*. Begins Decl., Ex.1 at 1; Tr. at 73:3–4 ("THE COURT: So the number I come up with is 60. [K2]: Yes, 60."). This concession came after the Court corrected K2 on its calculation of teams at oral argument, as K2 first alleged it had 64 teams from July 2021 through December 2021. Tr. at 72:3 ("[K2]: It was I think 64 teams, Your Honor."). K2 also explained it had only discovered this error in preparing the Begins Declaration and remarked "mistakes happen in proposals." Tr. at 74:8; *see* Tr. at 83:15–18 ("THE COURT: When did you discover that error? [K2]: When we were . . . working with Ms. Begins and preparing the declaration, Your Honor."). Though "a scrivener's error," it is an error, nonetheless. *See* Tr. at 74:7–15 ("[K2;] You know, we've seen mistakes happen in proposals. THE COURT: . . . I understand it might have been a mistake, and Ms. Begins clarifies it as I think a scrivener's error. [K2]: Correct. THE COURT: But it was an error. [K2]: There was an error, Your Honor, that's correct, but again, it's not a material misrepresentation."). In short, K2 concedes it made a "mistake" in the time frame and number of teams it provided in its proposal as K2 only had 60 "certified teams" from July 2021 through December 2021, Begins Decl. at 4, but listed 78 in its proposal. *Id.*; *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 141–48. Even if unintentional, this "scrivener's error" resulted in K2 listing the incorrect time period and number of teams in its proposal, which is a material misrepresentation consistent with the Court's December finding. *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 138; Tr. at 74:7–15.

K2 ultimately agreed with all of the allegations in the Beason Declaration related to the number of teams certified, including only having approximately 60 certified teams and approximately 40 teams working at a given time. *See* Tr. at 73:3–4 ("THE COURT: So the number I come up with is 60. [K2]: Yes, 60."); Tr. at 74:19–75:3 ("THE COURT: So the Beason declaration also notes . . . , 'at its highest point, K2 had 40 employees working on the contract.' Is that a correct number? [K2]: It was approximately that much."). K2 even conceded some of its handlers quit during the time period listed, which likely created uncertainty in counting the number of certified teams. Tr. at 88:17–19 ("[THE COURT]: [D]id K2 find it difficult to keep handlers? [K2]: We had issues."). The Court in December stated, K2's "misstatements led USPS to give K2 a strength based on K2's work for GK9, as well as a positive past performance grade," meaning USPS relied on and "used K2's misstatements in its consideration of '[p]ast performance and supplier capability.'" *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 147. If, ignoring USPS' termination for default, the Court granted K2's Motion to Intervene and remanded, the agency would almost certainly confirm a finding of material misrepresentation, *see id*., because K2 admittedly included an "error" in its proposal with regard to the number of teams stood up. Begins Decl. at 4.; *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 145 ("K2 stated it had "78 3PK9-C teams" on standby. . . . In reality, K2 had no more than 40 individual employees at any one time. . . . These misstatements go to the heart of the Solicitation's past performance requirements. . . .Without its misrepresentations, K2 completely lacked relevant successful past performance."). K2's supplemental materials therefore confirm this finding of material misrepresentation. *See* Tr. at 73:3–4; Tr. at 74:19–75:3; Tr. at 74:7–15.

Second, to refute the Court's finding of material misrepresentation regarding K2 meeting all contract requirements, K2 argues "K2 never stated in its proposal . . . that it 'met all contractual requirements' with respect to its subcontract with GK9." Begins Decl. at 7. The Begins Declaration attempts to distinguish meeting contract requirements from "K2 certif[ying] teams in order to meet the requirement to 'stand-up work' for GK9 . . . [and] to help GK9 meet all of its contractual requirements . . ." *Id.* Similarly, in the Holbrook and Kjellson Declarations, K2 attempts to shift blame to refute the Court's finding K2 "'had trouble covering shifts'; . . . 'did not arrive at. . . locations until' months after promised; ' . . . [failed to] report[] to work for a two week period'; ' . . . missed three consecutive shifts'; and ' . . . reach[ed] out to the personnel who worked at local baseball stadiums and other locations for personnel to work for a day or a few days [when K2 could not sufficiently staff its sites].'" *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 141–48 (citing Beason Decl. at 1–6); *see* Kjellson Decl. at 3–9 (ECF No. 93-3); Redacted Holbrook Decl. at 4–7. K2 explains, "GK9 frequently changed the schedule requirements," which "[was] a constant challenge for K2." Redacted Holbrook Decl. at 4–5. K2 further argues its handlers did not have proper badging, *see* Kjellson Decl. at 4 (ECF No. 93-3), which made it "difficult . . . to keep handlers" as without such badges "[K2's handlers'] hours [were limited]. . . . [which would cause the] handlers [to] . . . get frustrated and quit." Redacted Holbrook Decl. at 6. K2 further alleges GK9 failed to inform customers K2 would be performing the work, leading to some turning K2 away. *Id.* at 6. K2 did concede, however, it would pull additional personnel to complete work on occasion. *Id.* at 7. Like Holbrook, Kjellson describes GK9's schedule changes and failure to support badging as reasons for K2's inadequate performance. Kjellson Decl. at 6 (ECF No. 93-3). Kjellson concedes: "K2 never stated it performed the Subcontracting Agreement flawlessly, or even well. Rather, K2 only represented GK9 selected K2 to help with its contract requirements, which K2 undoubtedly did." *Id.* at 11.

In its proposal, K2 stated:

> From July to December 2021, K2 *certified 78 teams* to stand up screening . . . as a subcontractor of Global K9, *who needed K2 to help fulfill their contractual obligations*. . . .
> Today, K2 provides dozens of 3PK9-C teams . . . When a larger provider [GK9] provided more work than they were able to perform, K2 was selected as the subcontractor to stand up work for them . . . *In order to meet this requirement,* K2's Canine Training Academy (CTA) *certified 78 3PK9-C teams* in a 6-month period *to meet all contract requirements in the latter part of 2021*.

Begins Decl. at 3, 5 (emphasis added); *see also Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 138. K2 argues it did not claim to meet all subcontractor requirements with respect to supporting GK9; rather, it only "certified teams in order to meet the requirement to 'stand-up work' for GK9 . . . to help GK9 meet all of its contractual requirements with its customers, as well as those of K2's clients requiring 3PK9-C teams." Begins Decl. at 7. K2 attempts to distinguish

between claiming to have met all subcontracting requirements in performing work for GK9 and merely "meeting all contract requirements." *Id.* Indeed, at oral argument, K2 stated "there's a difference between saying meet and met." Tr. at 85:22–23 ("[K2]: But, Your Honor, there's a difference between saying meet and met."). K2 could not articulate, however, what this difference is and merely repeated its proposal language. Tr. at 86:10–19 ("THE COURT: What is the difference between claiming to have met all subcontracting requirements in performing work for GK9 and meeting the requirement to stand up work? [K2]: Your Honor said it. So in order to meet the requirement to stand up work, which we did, we certified 78 teams in the six, eight-month period, to then meet all contract requirements in the latter part of 2021 to assist them in doing so. Assist Global to do that.").

K2's proposal states it certified teams to meet the requirement to stand up work to ultimately meet all contract requirements in the latter part of 2021. *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 138. The plain language of K2's proposal demonstrates K2's past performance experience consisted of "meet[ing] all contract requirements." *Id.* K2's proposal, as such, claimed to support and meet all contract requirements in its subcontracting experience for GK9. *Id.* This proposal language, coupled with K2's admission it "never stated it performed . . . well," Kjellson Decl. at 11 (ECF No. 93-3), and corresponding evidence of poor performance, support the Court's finding of material misrepresentation. *Glob. K9 Protec. Grp.*, 169 Fed. Cl. at 141–48 (finding K2 misrepresented its past performance of "meet[ing] all contract requirements" in its proposal when it did not meet all contract requirements, as evidenced by "'ha[ving] trouble covering shifts'; ' . . . not arriv[ing] at the … locations until' months after promised; ' . . . [failing to] report[] to work for a two week period'; ' . . . miss[ing] three consecutive shifts'; and 'when K2's employees were unable to work, K2 [had to] reach out to the personnel who worked at local baseball stadiums and other locations for personnel to work for a day or a few days.'"). K2's elaboration on the *reasons* for its poor performance in the Holbrook and Kjellson Declarations only confirm K2 did not meet all contract requirements. *See* Redacted Holbrook Decl. (discussing "handlers . . . get[ting] frustrated and quit[ting]"; "K2['s lack of ability] to effectively support GK9's contracts"; and "pull[ing] [outside handlers] to work on the GK9 Subcontracting Agreement"); Kjellson Decl. (discussing failing to get "badging at a number of sites"; clarifying "K2 never stated it performed the Subcontracting Agreement flawlessly, or even well") (ECF No. 93-3). Much of the evidence attached to K2's Declarations actually mirrors documentation filed by GK9 in connection with its 2023 MJAR. *Compare* Begins Decl.; Redacted Holbrook Decl.; Kjellsen Decl. *with* Redacted Moore Decl., ECF No. 125-7; Redacted Beason Declaration, ECF No. 107-1; *Glob. K9 Prot. Grp.*, 169 Fed. Cl.  at 145; *see supra* Section I.A (discussing over 200 pages of documents submitted by GK9 in conjunction with its material misrepresentation claim). For example, a set of emails in Exhibit 3 of the 2024 K2 Kjellsen Declaration is the same set of emails cited in Attachment 4 of the 2023 GK9 Beason Declaration—both discussing scheduling concerns and delayed start dates. *Compare* Redacted Kjellson Decl., Ex. 3, ECF No. 100-1 *with* Redacted Beason Decl., Attach. 4, ECF No. 107-1. Further, the Beason Declaration and Kjellson Declaration both attach the same work schedule, which exemplifies an initial task order schedule altered due to ongoing scheduling issues. *Compare* Redacted Kjellson Decl., Ex. 4, ECF No. 100-1 *with* Redacted Beason Decl., Attach. 3, ECF No. 107-1. K2 ultimately agreed "it would be disingenuous . . . to say that the whole [contract] was . . . perfect and sunny." Tr. 89:6–8. K2's evidence thus does not refute the Court's December 2023 finding of a material misrepresentation; this holding is underscored by K2's 2024 declaration evidence being largely the same as GK9's 2023 declaration evidence.

Third, to refute the Court's finding K2 lost work for GK9 and therefore misrepresented the success of its past performance, K2 argues it is "not aware of any instances where GK9 lost work solely because of K2's actions or inactions." Redacted Holbrook Decl. at 6. K2 concedes GK9 lost work during the period K2 was its subcontractor, but alleges it was because of GK9's failure to "get preapproval for K2 to subcontract their work." *Id.* (citing Holbrook Decl., Ex. 3). According to K2, "[t]he only exception is one customer in Seattle [where] GK9 [] lost the work because the customer wanted to work with K2, not GK9." *Id.* at 7. The evidence attached to K2's declarations, however, support the Court's December 2023 finding GK9 lost customers when K2 was its subcontractor. For example, in Exhibit 7 to the Kjellson Declaration, K2 included an email from GK9 to K2 stating "[m]ost, if not all adjustments [i.e., cutting subcontracts with K2] made are either because GK9PG outright lost the business due to the delay it's taken to fulfill the client's needs and/or due to K2's current inability to get SIDA badged at a number of locations where escorting is not available / GK9PG is unable to sponsor, and therefore adjustments were made." Kjellson Decl., Ex. 7, ECF No. 93-6. Likewise, in the email in K2's Exhibit 8, GK9 notifies K2 "[i]n the last 48 hours [], we were notified by [multiple airports], that they are Cance[l]ling Service. We

## VII.    Entering Judgment in No. 23-210 and Related Case No. 20-1614

Before issuing final judgment on the joined cases in 23-210, 23-311, the Court addresses the procedural steps in *American K-9 Detection Services, LLC v. United States*, No. 20-1614 (Fed. Cl.). GK9 withdrew its requests for bid and proposal costs in this case, obviating the need for any litigation related to fees. GK9 Resp. to Gov't Mot. Suppl. at 3 ("GK9 recently received its signed contract. As promised, GK9 hereby withdraws its claims for bid and proposal costs."); Tr. at 148:23–149:1 ("[THE COURT:] And, [GK9], to confirm, GK9 will no longer be pursuing bid and proposal costs? [GK9]: Correct, Your Honor."). USPS formally re-awarded K2's clusters to GK9 and AMK9. *See* GK9 Resp. to Gov't Mot. Suppl. at 3; Tr. at 147:24–148:5 ("[GK9]: So the international cluster has been awarded to Global K9. There was one other airport and I will not say which, that was removed from another cluster and given to . . . Global K9 . . . for some logistical reasons, and all the other former K2 clusters are with AMK9."). Further, USPS planned to replace K2 and MSA starting 26 March 2024, and as the Court has not yet received an update to the contrary, the Court assumes USPS has commenced the intended roll out. Tr. at 146:20–25 ("THE COURT: . . . the current plan for timing is USPS will replace K2 and MSA beginning March 26th. Is that correct? [GOVERNMENT]: That was what we said last, for sure."); Tr. at 148:6–8 ("THE COURT: So the current transition will be fully executed by March 26th? [GK9]: I believe so."); Tr. at 148:18–22 ("[USPS COUNSEL:] The transition is scheduled to start March 26th and that they're proceeding at pace and not waiting on the litigation to move forward."). Indeed, the parties confirmed the Court need not issue a rushed decision on K2's Motion to Intervene by 26 March 2024 because USPS already terminated K2, separate and independent from this Court's injunction. Tr. at 148:11–22 ("THE COURT: So long story short, nothing is waiting on the court to make a decision here? [GK9]: No, Your Honor. THE COURT: And, [government counsel], you agree? [GOVERNMENT]: Yes. [GK9]: Particularly in light of the termination. . . . [USPS]: . . . I just wanted to confirm that . . . the transition is scheduled to start March 26th and that they're proceeding at pace and not

---

are still digging into the details but preliminary reports are there were three (consecutive?) missed shifts by K2 in the last month at [one of them]." Redacted Kjellson Decl., Ex. 8, ECF No. 100-3. In Exhibit 10, emails from GK9 to K2 echo the same sentiment as the Beason Declaration: "It is unfortunate GK9PG has lost so much money and even customers because K2 wasn't able to fill the positions to which it agreed in a timely manner. We understand K2 has problems gaining the required badging and being able to recruit for the positions, and GK9PG continues to grant lenience (over 6 months in some cases!) in allowing K2 to fill posts (rather than pull the posts back and subcontract to someone else)." Kjellson Decl., Ex. 10, ECF No. 93-9. These are the same examples the Court looked to in its December 2023 decision to enjoin K2 as a result of its material misrepresentation. *Glob. K9 Prot. Grp., LLC*, 169 Fed. Cl. at 145 ("K2 likewise stated in its proposal it adequately assisted 'a larger provider [who] accepted more work than they were able to perform' . . . In reality, GK9 'lost work with ... customers at sites that K2 was supposed to support.'").

As discussed *supra*, much of the evidence within K2's 2024 Declarations are identical to the evidence filed by GK9 in the 2023 Beason Declaration; both Declarations contain emails discussing GK9's loss or potential loss of work. *Compare* Redacted Kjellson Decl., Ex. 3, ECF No. 100-1 *with* Redacted Beason Decl., Attach. 4, ECF No. 107-1 ("Our customer . . . just backed out and said they're going in a different direction"). As such, K2's evidence does not refute the Court's December 2023 finding of material misrepresentation. Ultimately, K2's "interest [was] . . . adequately addressed by the government's participation." *Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Associations*, 695 F.3d 1310, 1315–16 (Fed. Cir. 2012). Even if K2 were permitted to intervene and submit the evidence it has before the Court now, the Court's material misrepresentation and injunction holdings would stand, *supra*. The termination for default and K2's Declarations only confirm the Court's findings on the record.

waiting on the litigation to move forward."). In sum, except for K2's pending Motion to Intervene, the parties agree all other matters in this case are closed.

Regarding K2's position on final judgment, although K2 expressed it intended to protest USPS' decision to re-award its clusters to GK9 and USPS in a separate case, *see* Tr. at 146:10–18 ("THE COURT: Closing up, related to the contract timeline and next steps, is K2, it sounds like, challenging separately USPS' re-award of the contract . . . [K2]: Yes, Your Honor. . . . At the agency level [with the SDRO]."), K2 agreed *this case* would be over had K2 not filed a motion to intervene. Tr. at 122:8–17 ("THE COURT: Without the motion to intervene, the case would be over? [K2]: . . . [C]orrect, without a motion to intervene pending, the case would likely be over.").

In addition, in related case No. 20-1614, which is currently stayed pending the resolution of this case, the following motions are still pending:

- AMK9's Motion for preliminary injunction. Mot. for Prelim. Injunc., *American K-9 Detection Services*, *LLC v. United States*, No. 20-1614 (Fed. Cl. Dec. 3, 2020), ECF No. 21;
- AMK9's Motion for Hearing. Mot. for Hearing, *American K-9 Detection Services*, *LLC v. United States*, No. 20-1614 (Fed. Cl. March 2, 2021), ECF No. 46;
- The government's Motion to Dismiss Following Corrective Action. Mot. to Dismiss, *American K-9 Detection Services*, *LLC v. United States*, No. 20-1614 (Fed. Cl. Dec. 17, 2021), ECF No. 132;
- MSA's Motion to Dismiss Following Corrective Action. Mot. to Dismiss, *American K-9 Detection Services, LLC v. United States*, No. 20-1614 (Fed. Cl. Dec. 17, 2021), ECF No. 133; and
- AMK9's Motion to Complete the Administrative Record. Mot. to Complete. Admin. R., *American K-9 Detection Services, LLC v. United States*, No. 20-1614 (Fed. Cl. March 3, 2022), ECF No. 149.

The parties agreed these motions are all moot. Tr. at 149:17–150:12 ("THE COURT: . . . So just to confirm, in that case, . . . for GK9, there's no pending motions left in . . . 20-1614, everything there is now moot? [GK9]: Yes, Your Honor. THE COURT: [AMK9]? [AMK9]: . . . They're all moot. . . . THE COURT: [government counsel]? [GOVERNMENT]: Yes, Your Honor."). As such, the Court finds as moot ECF Nos. 21, 46, 132, 133, and 149 from case No. 20-1614, *see infra*.

Finally, MSA confirmed its pending appeal with the Federal Circuit relates to lead case No. 22-573 from 2022, which is closed. 29 Nov. 2022 Notice, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. 29 Nov. 2022) (appealing the Court's November 2022 Order enjoining MSA); 7 Feb. 2023 Notice, *Michael Stapleton Assocs., Ltd v. United States*, No. 22-573 (Fed. Cl. 7 Feb. 2023) (appealing the Court's January 2023 Order adopting USPS' proposed resolicitation plan); *see also* Tr. at 151:8–12 ("[GK9]: It's the 2022 case where they have the appeal pending. THE COURT: That one was closed and then MSA is appealing that? [MSA]: Correct.").

With all parties having withdrawn requests for bid and proposal costs and agreeing all prior motions in related case 20-1614 are moot, the parties agreed "all items and briefs that are pending have been fully addressed and the court, if denying the motion to intervene, could enter final judgment." Tr. at 149:2–14 ("THE COURT:  So . . . in this case, all items and briefs that are pending have been fully addressed and the court, if denying the motion to intervene, could enter final judgment?  [GK9]:  Absolutely, Your Honor.  THE COURT:  [Government counsel], would you agree?  [GOVERNMENT]:  Yes . . . [AMK9:]  Yes, Your Honor, I agree as well. [GK9]:  And to be clear, Your Honor, we are not seeking bid proposal costs in the 2021 case either.  We withdraw all."); *see also* Tr. at 150:13–18 ("THE COURT: So to the extent that the 2023 case[, No. 23-210,] is closed with final judgment, the court could issue final judgment and close the 2020 case as well?  [AMK9]:  Mazel tov.  [GK9]:  Yes, Your Honor.  THE COURT: All in agreement.").  The Court accordingly enters final judgment in this case, No. 23-210, and related case No. 20-1614, *see infra*.

## VIII.   Conclusion

For the foregoing reasons, the Court now (1) **FINDS AS MOOT** K2's Motion to Intervene, ECF No. 80, *see supra* Section IV; (2) **FINDS AS MOOT** K2's Amended Motion to Intervene, ECF No. 93, *see supra* n.8; (3) **FINDS AS MOOT** GK9's Motion to Seal, ECF No. 97, *see supra* n.9; (4) **GRANTS** the government's unopposed motion for extension of time, ECF No. 126, *see supra* n.12; (5) **GRANTS** the government's Motion for Leave to File Supplement the Record, ECF No. 127, *see supra* n.13; (6) **FINDS AS MOOT** K2's Motion for Leave to File a Surreply, ECF No. 130, *see supra* n.15; and (7) **STRIKES** GK9's Objection as deficient, ECF No. 92, *see supra* n.7.  The Clerk is directed to enter judgment accordingly.  The Court will address all motions as discussed *supra* and enter judgment in case no. 20-1614 in a separate order.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge